# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 05-CV-1766 (JFB) (AKT)
_____

FRANK SLOUP,

Plaintiff,

VERSUS

ALAN LOEFFLER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A TOWN OF ISLIP EMPLOYEE, TOWN OF ISLIP, AND CRAIG POMROY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A TOWN OF ISLIP EMPLOYEE,

Defendants.

_____

MEMORANDUM AND ORDER
August 21, 2008
_____

JOSEPH F. BIANCO, District Judge:

On April 7, 2005, pursuant to 42 U.S.C. § 1983, plaintiff Frank Sloup ("plaintiff" or "Sloup") brought this action against defendants Alan Loeffler, individually and in his official capacity as a Town of Islip employee ("Loeffler") and Craig Pomroy, individually and in his official capacity as a Town of Islip employee ("Pomroy") (collectively, the "individual defendants"), as well as the Town of Islip ("Islip") (collectively, "defendants"), alleging that defendants violated plaintiff's rights under the First and Fourteenth Amendments of the United States Constitution.[1] Specifically, Sloup is a commercial fisherman, and the action arises out of a summons he received from Pomroy on June 9, 2004 regarding certain fishing equipment plaintiff had placed in the waters of Islip. The individual defendants and Islip now move, separately, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motions are granted in part and denied in part. In particular, defendants' motions are granted with respect to Sloup's First Amendment claims and denied on

---

[1] In addition, plaintiff originally brought a claim pursuant to the Fourth Amendment. However, he agreed to withdraw that claim at oral argument.

all other grounds.[2]

## I. FACTS

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 statements of facts.[3]

Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

### A. Introduction

#### (1) Sloup

Sloup has been a "bayman," or commercial fisherman, since 1953. (Sloup. Dep. at 17, 24.) In 1999, he incorporated a commercial fishing business called Crabs Unlimited, LLC ("Crabs Unlimited"). (Sloup Dep. at 17.)

---

[2] In addition, as a threshold matter, with regard to Sloup's claims against the individual defendants in their official capacities, the Court has determined that these claims are duplicative of the municipal liability claim lodged against Islip under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), discussed *infra*. *See, e.g., Tsotesi v. Bd. of Educ.*, 258 F. Supp. 2d 336, 338 n.10 (S.D.N.Y. 2003) (dismissing claims against officials sued in their official capacities where plaintiff also sued municipality) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Therefore, the Court dismisses all claims against the individual defendants sued in their official capacities. As also stated above, however, Sloup's Fourteenth Amendment claims against the individual defendants in their individual capacities survive summary judgment.

[3] In their reply brief, the individual defendants argue that Sloup has failed to comply with Local Civil Rule 56.1 in that he did not properly respond to Defendants' Joint 56.1 Statement ("Defs.' 56.1"). The Court agrees that Sloup failed to provide specific record citations for virtually all of the objections he lodged against Defs.' 56.1, as well as for the factual propositions set forth in his own 56.1 statement ("Pl.'s 56.1"). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Gilani v. GNOC Corp.*, No. 04-CV-2935 (ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Here, plaintiff's written submissions – including, *inter alia*, plaintiff's response to Defs.' 56.1 ("Pl.'s 56.1 Resp.") and Pl.'s 56.1 – cite generally to the portions of the record upon which plaintiff is relying. Thus, both the moving parties and the Court are aware of the portions of the record upon which plaintiff relies in opposition to the motion, and defendants have not identified any prejudice arising from plaintiff's failure to comply with Rule 56.1. Accordingly, in the exercise of its broad discretion, the Court will not reject plaintiff's opposition based upon his failure to comply with Rule 56.1, but rather has fully considered plaintiff's opposition to defendants' summary judgment motions on the merits. *See, e.g., Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 156 n. 2 (2d Cir. 2003) (excusing failure to comply with Local Civil Rule 56.1 where the relevant facts were apparent from the parties' submissions and there was no evidence of prejudice from the defect); *Williams v. R.H. Donnelley Inc.*, 199 F. Supp. 2d 172, 174 n.1 (S.D.N.Y. 2002) (excusing failure to submit statement pursuant to Local Civil Rule 56.1 where the facts were set forth in the party's memorandum of law).

a. Sloup's Fishing Procedures

Since 2002, Sloup has been "involved in catching eels, conch, fish, crabs, killies, which are minnows, clams, scallops, [and] different bait fish. . . ." (Sloup. Dep. at 24.)

In particular, plaintiff catches eels and crabs using traps or pots. (Sloup Dep. at 24.) For instance, an eel trap is three feet long and contains bait to "attract[]" the eels. (Sloup Dep. at 25.) Further, plaintiff has testified regarding the means by which he indicates whether a trap is in the water: "Depending on where I'm fishing and the time of year, sometimes there is a single buoy, float buoy, that marks where the pot is on the water, and sometimes I put them on the water without a buoy on them, with a weight on one end, and I drag it up." (Sloup Dep. at 25.) In addition, plaintiff personalizes the buoys in order to distinguish them from those of other fishermen. (Sloup Dep. at 26.)

Plaintiff testified that, in an average season, he uses "50 killi pots, 800 crab pots, 500 conch pots, 400 eel pots, and 120 blow fish pots." (Sloup Dep. at 240.) As of June 9, 2004, at least half of plaintiff's eel pots were in the waters of Islip. (Sloup Dep. at 243.) In particular, he had placed pots in the following portions of Islip: "Nichols creek . . . Champlin's creek, at the very mouth of Orowoc creek, Awixa creek, and . . . the Bay Shore cove. . . ." (Sloup Dep. at 244.)

During the relevant time period, Sloup held a Special Permit to fish for crabs from New York State. (Pl.'s 56.1 ¶ 54.) According to plaintiff, he also held a Commercial Fishing Permit from New York State. (Remmer Aff. ¶ 19.)

(2) Pomroy

As of 2004, Pomroy was an Islip Harbor Master. (Pomroy Dep. at 76.) As such, Pomroy explained, his duties were to "handle any paperwork that was outstanding, answer the phones, take any complaints, just you know, mostly clerical duties like that." (Pomroy Dep. at 78.) In addition, depending on the "manpower" available on a given day, Pomroy might also be responsible for leaving the office to "deal with [a] complaint." (Pomroy Dep. at 78.)

(3) Loeffler

Loeffler was Pomroy's supervisor, (Loeffler Dep. at 109), but Loeffler's precise professional position is a matter of dispute among the parties. According to Loeffler, he was an Islip "Harbor Master" between 1974 and 2005 and, sometime prior to 2004, was awarded the title "Chief Harbor Master." (Loeffler Dep. at 54.) However, in their response to Pl.'s 56.1, the individual defendants state that Loeffler "described his command as the 'Islip Town Harbor Police.'" (Indiv. Defs.' 56.1 Resp. ¶ 11.) According to Sloup, therefore, Loeffler's "true position" is uncertain. (Pl.'s 56.1 Resp. ¶ 82.) Plaintiff notes, for instance, that the title "Chief Harbor Master" does not appear in the Islip Town Code and states that defendants have, at times, referred to Loeffler as the "Chief of Harbor Police" or "Chief of Marine Law Enforcement Harbor Police." (Pl.'s 56.1 Resp. ¶ 25.)

In any event, Loeffler has testified that he was responsible for "[g]eneral supervision over the members of the division, administrative responsibilities, assuring that vendors were paid." (Loeffler Dep. at 103.) At his deposition, Loeffler agreed that he also "share[d] the knowledge of federal, state and

local laws governing fishing, clamming and boating in local waters" with his subordinates. (Loeffler Dep. at 103.) Specifically, Loeffler agreed that his job responsibilities included training his subordinates. (Loeffler Dep. at 92.)

(4) The Regulation of Fishing

Pursuant to *Sloup v. Islip* – and as counsel for defendants agreed at oral argument – Islip does not have the "legislative power to regulate fishing in public waters." 356 N.Y.S.2d 742, 745 (Suffolk Cty. 1974). Rather, such power rests in New York State. *Id.* at 745-46.

However, Islip is legally authorized to regulate "navigational hazards" within the waters of Islip. (Defs.' 56.1 ¶ 1.)[4] Specifically, pursuant to Islip Town Code 37-52 ("Section 37-52"),

> Any vessel or floating or submerged object which becomes a menace to navigation or unseaworthy or sinks, grounds or otherwise becomes incapable of navigation shall immediately be removed or restored to navigable condition by the owner or operator thereof at his own expense.

\***

In the event that a vessel or obstruction described in § 37-56A or B above is not immediately removed or restored to navigable condition, the Harbor Master shall notify the owner, either by certified mail or personally, of the condition of the vessel, floating object or obstruction. The owner shall have 72 hours after receipt of notification to remove or restore the vessel, floating object or obstruction unless the Harbor Master shall determine that the vessel, floating object or obstruction is an immediate hazard, in which case he may either immediately remove it or specify a lesser time for the owner to comply.

Islip Town Code §§ 37-52A, C. Further, the Islip Town Code defines "floating object" to include "fishing buoys." *See* Islip Town Code § 37-51.

B. Sloup's Contacts With Loeffler in the 1990s

According to Sloup, Loeffler approached him twice in the 1990s regarding certain of plaintiff's traps that Loeffler perceived as a threat to navigation. Plaintiff stated as follows regarding these two incidents:

> On both occasions, [Loeffler] alleged that he had gotten a call complaining about a trap. On both occasions, I moved the one trap. In one situation, in Bay Shore, I was setting an eel trap with no buoy in 14 feet of water. Alan Loeffler stated "I

---

[4] Although Sloup does not appear to dispute that Islip is authorized to regulate navigational hazards, *i.e.*, hazards to boating, counsel for plaintiff repeatedly emphasized at oral argument that this authority does not extend to the regulation of fishing.

4

want you to get that pot out of there, it's a hazard to navigation. I responded that it was 14 feet of water, that I never had a problem with a pot I placed there, it is a safe place to put the pot. The pot was weighted. Alan Loeffler said "Either you move it or we're going to move it" . . . . The discussion got heated, and Alan Loeffler pointed at me and said "If it's the last thing I do, I'm going to get you and your buoys out of this bay."

(Sloup Aff. ¶ 50.) As discussed in greater detail *infra*, defendants denied at oral argument that Loeffler ever made such a threat to plaintiff.

### C. The Events of June 9, 2004

As of June 9, 2004, Sloup had placed eight or nine crab pots marked with buoys on the East side of Champlin's Creek in Islip, and thirty to thirty-three crab pots marked with buoys on two double rows on the West side of Champlin's Creek. (Defs.' 56.1 ¶ 21.)

### (1) McCann's Alleged Complaint and Pomroy's Ensuing Investigation

According to Pomroy, on June 9, 2004, he had a telephone conversation with a boater named McCann, during which McCann lodged a complaint regarding the waters in Champlin's Creek. (Pomroy Dep. at 76.) In particular, a Complaint Report completed by Pomroy that day (the "Complaint Report") describes McCann's complaint as follows: "Above compl reported

crab traps & buoys creating a hazard at [Champlin's Creek]. States there are so many, it is difficult for two boats to pass one another." (*See* Complaint Report.)

According to Pomroy, he proceeded to Champlin's Creek and observed "there being a lot of hazards in the water that would make it difficult to operate a boat." (Pomroy Dep. at 85.) However, he also testified: "Whether or not I specifically tried to relate it for being difficult for two boats to pass, I don't think I saw it – looked at it in that capacity." (Pomroy Dep. at 85.) Pomroy testified that he understood a "hazard" to be "something in the way that would be – something that would prevent running a – a course – you know, running my course through the waterway to get from where I was to where I wanted to get without having some sort of problem with whatever it was that was in the waterway in front of me." (Pomroy Dep. at 86.) Pomroy also took photographs of these alleged hazards when he investigated the complaint. (*See* Defs.' Exh. U.)

The question of whether Sloup's fishing equipment actually posed a hazard to navigation on June 9, 2004, pursuant to the Islip Town Code, is a subject of complete dispute among the parties. (*Compare* Defs.' 56.1 ¶¶ 15 and 18 (stating that photographs Pomroy took, "taken in totality, showed the hazards he observed") *with* Pl.'s 56.1 Resp. ¶¶ 14-15, 17, and Sloup Aff. ¶ 14 ("All they can say as to Champlin Creek is that in an area the size of over 41 football fields with end zones and room on the sides for the teams, fields which can only be legally traveled by a motor boat at a walking pace (4 miles per hour), 41 brightly colored buoys the size of a very large human head present a menace to navigation. That is one football helmet per football field, supposedly creating a hazard to navigation for

people moving at the pace of a dog show best of breed walkabout.").

### (2) Pomroy's Conversations With Loeffler

#### a. Pomroy's Testimony

Pomroy testified that he had several conversations with Loeffler on June 9, 2004, (Pomroy Dep. at 142), including an initial conversation about McCann's complaint. (Pomroy Dep. at 143.) Pomroy did not specifically recall receiving direction from Loeffler regarding the complaint during that conversation, except "to look into the complaint." (Pomroy Dep. at 143.) Further, after Pomroy went to Champlin's Creek, he had another conversation with Loeffler, during which Pomroy informed Loeffler that "there were numerous buoys in the creek that were creating a hazard – and that . . . the complaint was, in [Pomroy's] opinion, substantiated." (Pomroy Dep. at 143.)

According to Pomroy, he was ultimately "instructed to issue [Sloup] a summons for the violation." (Pomroy Dep. at 62.) Pomroy, however, denied that he was "just following orders" when he issued the summons. (Pomroy Dep. at 67.) Specifically, Pomroy testified: "I was instructed to issue the summons, and I agreed that it was a just issuance of that summons." (Pomroy Dep. at 67.)

#### b. Loeffler's Testimony

Loeffler summarized his conversations with Pomroy as follows: "I was advised that there were crab pots in Champlin's Creek. I advised him to talk to Mr. Sloup and ask him to remove them because we had a complaint that there was – they were causing a hazard to navigation."[5] Loeffler also stated that he independently traveled by car to Champlin's Creek, and "concurred with [Pomroy's] judgment" on the basis of Loeffler's observations there. (Loeffler Dep. at 184.)

### (3) Pomroy Approaches Sloup About Alleged Hazard

According to plaintiff, on June 9, 2004, "two men" in a boat arrived at Sloup's business. (Sloup Dep. at 42.)[6] The boat bore an insignia stating "Islip Town Harbor Police." (Sloup Dep. at 42.) The men went into the building that housed plaintiff's business, and asked plaintiff whether "the pots in Champlin's creek" were Sloup's. (Sloup Dep. at 43.) Plaintiff responded in the affirmative. (Sloup Dep. at 43.) The men then stated: "'Well, we want you to remove the pots because there is a hazard to navigation.'" (Sloup Dep. at 43.) Sloup responded: "'The pots aren't a hazard to

---

[5] At Loeffler's deposition, Sloup's counsel asked him whether, "[a]s of June 9th 2004, . . . pots in general in Champlin's Creek [were] a navigation hazard." (Loeffler Dep. at 148.) Loeffler responded: "Depending on where the pots were set." (Loeffler Dep. at 148.) Later in the deposition, Loeffler stated that he was not personally aware of the position of any of Sloup's pots in Champlin's Creek on June 9, 2004 because "[t]hat wasn't my case. It was Officer Pomroy's case." (Loeffler Dep. at 150.) However, Loeffler testified that, in his twenty years of experience with Champlin's Creek prior to June 9, 2004, he had observed "pots, traps or buoys for pots or traps" in Champlin's Creek every time he was there. (Loeffler Dep. at 176.)

[6] Although Sloup did not identify the "two men" by name in describing the events of June 9, 2004 at his deposition, it is undisputed that Pomroy and a coworker – Officer Sgroi – were the two individuals in question. (Pomroy Dep. at 67-68.)

navigation, they're off against the shore. There's hundreds of feet for people to get by. They're marked with a buoy, and I'm legally allowed to be there by state law, and if I move those pots, I'm going to lose my business.'" (Sloup Dep. at 43.)[7]

Sloup further testified that, in response to his statement, the men stated: "'Let me call the office,'" and then proceeded back to their boat for a "short while." (Sloup Dep. at 44.) When the men returned, they informed plaintiff: "'If you don't remove the pots [from Champlin's Creek], we're going to impound them, we're going to write you a ticket and impound the pots.'" (Sloup Dep. at 45.) Sloup responded: "'Write me the ticket.'" (Sloup Dep. at 45.) The men then issued plaintiff a summons pursuant to Islip Town Code 37-56A, set forth *supra*, and a "time frame to remove the pots" of approximately 48 or 72 hours. (Sloup Dep. at 45; Defs.' Exh. R.)[8]

At his deposition, Pomroy stated that, in issuing other summonses pursuant to Islip Town Code 37-56A, he could not recall another occasion on which he ordered a fisherman to remove all of his traps and buoys from a particular body of water.

(Pomroy Dep. at 119-20.)

(4) Pomroy Completes Complaint Report

After issuing the summons, Pomroy proceeded back to the office and completed the Complaint Report. (Pomroy Dep. at 83.) Specifically, he completed the section entitled "Follow Up Action Taken," which states: "Issued Frank Sloup above summons for . . . 37.56A Hazard to Navigation. He stated traps would be removed by 1200 hrs. on 06/10/04." (*See* Complaint Report.)

(5) Sloup Discusses Alleged Hazard with Loeffler

According to Sloup, after receiving the summons, he proceeded immediately to Loeffler's office at the East Islip Marina – the "harbor police office." (Sloup Dep. at 48.) Loeffler informed Sloup that plaintiff had to remove all of his pots from "all harbor areas within the Town of Islip, the killi pots, eel pots, crab pots, all fishing gear." (Sloup Dep. at 47.) In particular, Sloup testified as follows regarding his conversation with Loeffler:

> We kind of had an – it was a slightly heated discussion, but I told him, I said, "Alan, I can't fish any other place at this time because of the slime in the bay. The only place that I can fish right now is in the creeks. I'm allowed to fish there. I've never had a problem with anyone," and he said, "All your pots are a hazard." I said, "How could they be a hazard in 18 inches of water against the shore?" I said, "I can't even get to those pots in my boat except on high tide." He says,

---

[7] At his deposition, Pomroy did not dispute that Sloup said that he would lose his business. (Pomroy Dep. at 62.) However, Pomroy also testified: "It didn't – it wasn't a consideration either way. It wasn't – I didn't really put any thought into it. Wasn't – wasn't my job to decide whether or not he was going to lose his business." (Pomroy Dep. at 62.) Loeffler denied knowing that Sloup would lose his business or that plaintiff had told Pomroy that plaintiff would lose his business. (Loeffler Dep. at 146.)

[8] This was the first summons Sloup ever received from Islip related to fishing. (Defs.' 56.1 ¶ 70.)

"Any water that a canoe can float in is considered navigable water in the State of New York, and a canoe could hit your killi pot in a mosquito ditch," and to get them out.

I said, "How am I going to get these pots out?" I said, "I don't have a boat that floats in that water where I have these pots." He said, "If we have to, we'll get a boat from the dock department," and I knew at that point that if anyone who didn't know how to handle this gear handled it in the wrong way, they would destroy it. So I made the decision immediately to pull the gear out, plus if it was impounded, I wouldn't have use of it for the rest of the season, so I pulled it all out so when the conditions changed, I would at least be able to make some kind of a living.

(Sloup Dep. at 49-50.)

At his deposition, Loeffler admitted that he informed Sloup that he could not fish in any of the harbor areas listed in the Islip Town Code. (Loeffler Dep. at 177.) The following colloquy then ensued:

Q: What did you indicate with regards to those harbor areas in the Town of Islip?
A: That they were prohibited from causing a navigation hazard.
Q: What did that mean to you?
A: That meant that if his fishing buoys caused a navigation hazard, they would be in violation of the town code, as per the town code.
Q: Had you ever used that interpretation of the town code prior to June 9th of 2004?
A: Yes, sir.

***

Q: It wasn't the town code that was making the statement to Mr. Sloup; it was you?
A: Yes.
Q: In making the statement, you were in your role as the harbor master?
A: Correct.

(Loeffler Dep. at 178, 180.) Loeffler denied that Sloup specifically told him that plaintiff's business would be destroyed if he removed all of his pots. (Loeffler Dep. at 192.)

### D. Loeffler's Subsequent Conversation with Richard Remmer

Attorney Richard Remmer ("Remmer") represented Sloup in 2004 in connection with his interaction with Islip, including with respect to the June 9, 2004 summons. According to Remmer, he spoke by telephone to Loeffler on June 14, 2004 regarding the summons, and Loeffler "indicated that he had determined that any fishing gear, including crab traps and eel pots, located in a Town Harbor Area would be considered a menace to navigation, regardless of the exact location of the gear or it proximity to channels, moorings

8

or docks." (Remmer Aff. ¶ 5.)[9]

Loeffler denies making this statement to Remmer. (Loeffler Dep. at 194.) Rather, Loeffler stated that he merely informed Remmer "of the definitions in the town code of the navigation law that prohibited any fishing buoy that became a hazard to navigation." (Loeffler Dep. at 141.)

### E. Removal of Pots

According to Sloup, he removed the crab pots from Champlin's Creek on June 9, 2004 and, in any event, removed all of his pots from all Islip waters within 48 hours. (Sloup Dep. at 46.)

### F. The Summons is Dismissed

On September 20, 2004, Sloup's summons was dismissed on the following grounds: "First, there is no factual allegation that the defendant committed the violation. Second, there is no factual allegation that the defendant failed to immediately remove the crab traps with attached floating buoys. Finally, there is no factual allegation that the defendant is the owner of the crab traps with attached floating buoys." (Order of the District Court of the County of Suffolk, Fifth District, dated September 20, 2004.) Islip appealed, and the Appellate Division dismissed the appeal in 2005. (Remmer Aff. ¶ 4.)

---

[9] Remmer also pointed out that he "has observed the tidal waters of the south shore of the Town of Islip over the last five decades" and, "[p]rior to June 9, 2004, there was never, in [his] experience, any attempt by the Town of Islip to impose the policy of blanket exclusion of fishing equipment in the creeks and rivers propounded to [Remmer]" by Loeffler. (Remmer Aff. ¶ 29.)

### G. The Events of October 6, 2004

By October 6, 2004, Sloup had put his eel pots back in the water. (Sloup Dep. at 52-53.) However, on October 6, 2004, Pomroy directed plaintiff to remove these pots. (Defs.' 56.1 ¶ 43.) Specifically, Sloup testified as follows regarding his conversation with Pomroy that day:

> I came in off the boat, I saw the harbor police vehicle there. . . . I went up to the vehicle. . . I says, "Is there some kind of a problem?" He says, "You have to move your pots out of Champlin's creek." I said, "You feel those pots are a hazard to navigation?" He said, "No, they're on town property."
>
> ***
>
> I said well, what – after he said they're on town property and I have to remove them, I said, "Well, what about the pots over by the marina?" He said, "They're not on town property, they're on state property."

(Sloup Dep. at 55, 56.) At oral argument, counsel for defendants denied that Pomroy stated that Sloup's eel traps were not a hazard to navigation.

In addition, Pomroy completed an Incident Report on October 6, 2004 that stated as follows: "Responded to above I/L and spoke with above subject [Sloup] in reference to 5 eel traps w/ attached markers placed in Champlin Creek. Above stated he owned and placed the traps there. Undersigned advised him to remove all traps within 24hrs and he stated he

would." (Defs.' Exh. W.)

Sloup subsequently removed all of his eel pots from the water, including those by the marina that Pomroy indicated plaintiff need not remove. (Sloup Dep. at 57.) He explained: "It's very hard to go out to fish with five or six eel pots to make a living. After I lost all my other earning opportunity, it didn't make sense, so I pulled them all out." (Sloup Dep. at 57.)

At his deposition, Pomroy testified that he had no independent recollection of any interaction with Sloup on October 6, 2004. (Pomroy Dep. at 114-15.)

H. October 20, 2004 Hearing

On October 20, 2004, Remmer represented Sloup at a hearing in Suffolk County Court regarding the restrictions Islip was imposing on plaintiff's fishing. At the hearing, Islip was represented by Richard Hoffman, the Deputy Town Attorney ("Hoffman"). At the hearing, Hoffman made the following statements in describing the restrictions on Sloup's fishing:

> Your Honor, if I might. The officer who issued the summons to Mr. Sloup prior had a conversation with me where he had a discussion with Mr. Sloup where he could and couldn't go. Again, informal discussions. They are in the bay saying, you got to go here, but you can't go there.
> The fact is, that I've been with the Town for 18 years, this is the first time I'm aware that anyone got a summons for it. It's not a question of we are going out there an handing everybody a summons. This person was in an area he shouldn't have been, he got a summons.

\*\*\*

> The Court: Mr. Hoffman, you would have 30 seconds to tell me why I should not do what Mr. Remmer wants me to do.
> Mr. Hoffman: Well, because number one, the harbor area is defined. If you say the Connetquot River, the whole Connetquot River is not a harbor area. There are certain areas on the shore that are harbor areas. That's defined by the law, state law and town laws, what a harbor is.
> Now, there are proportions of every waterway within the Town of Islip that are not harbor areas, and he's free to fish, do whatever it is he's doing. I'm not sure what it is he's doing in those non-harbor areas.
> Again, when he was out there – after this action was posted, he did go out again. And, again, he was told, don't do it here, do it here. Again, no summons was issued. Please move your pots. They showed him where he can go. It's not a question of the Town saying, no, we are issuing summonses for violations of law. There are definitions. Harbor area is defined. It's not as if it's a

moving target, it is a definition. There are maps which show where harbor areas are.

(*See* Transcript of Hearing ("Tr.") at 19-20, 25-26.)

### I. Other Fishermen

As set forth below, the parties dispute whether other commercial fishermen were active in the waters of Islip during the relevant time period – as well as the extent to which Section 37-56 was enforced against any such fishermen.

For instance, defendants assert that there "were no other commercial fishermen who fished the waters in the harbor areas of the Town of Islip in 2004. (Defs.' 56.1 ¶ 55.)

Plaintiff agrees that he was "unaware of others using crab pots in Champlin's Creek in June 2004, other than homeowners using pots off their docks." (Defs.' 56.1 ¶ 56.) However, Sloup also testified that commercial fishermen were generally fishing the creeks of Islip at that time. (Sloup Dep. at 261-62.) Plaintiff, in particular, noted that a commercial fisherman named John Buczek fished in the creeks of Islip during 2004. (Sloup Dep. at 262.) Indeed, Remmer stated as follows regarding an experience he had with Buczek in the fall of 2004:

> I observed Town of Islip Harbor Unit members in Harbor Unit boats . . . observing John Boucek fishing (trapping) in the Connetquot River in areas Alan Loeffler had indicated were areas in which fishing

> equipment would be seized and summonses issued if fishing occurred. They took no action against John Boucek during the ten minutes I observed Boucek's fishing activities and the Harbor Unit watching these activities.

(Remmer Aff. ¶ 6.) According to Sloup, Buczek continues to fish in the waters of Islip. (Sloup Dep. at 250.)

Further, with respect to the time period between the summons and the summons' dismissal (June 2004-September 2004), plaintiff asserts:

> There were other individuals using pots and traps in the harbor areas, including homeowners and other individuals who would not be considered commercially licensed. Boucek began working in the harbor areas vacated by Sloup sometime in the fall of 2004, Jackie Verity, Tommy Quinon, John Walters fished either Babylon and Islip or areas of Islip Town harbor areas including West Islip. There were many other people, part time baymen, homeowners and single shot individuals working in the harbor areas.

(Pl.'s 56.1 Resp. ¶ 39.)[10]

---

[10] The Court, however, has reviewed the record citations plaintiff provides in support of this assertion and finds that they fail to support plaintiff's broad claim. For instance, plaintiff cites the Remmer Affidavit, but that document refers

## II. Procedural History

Sloup filed the complaint in this action on April 7, 2005. On September 26, 2005, Islip and the individual defendants separately moved to dismiss the complaint pursuant to Rules 8 and 12(f) of the Federal Rules of Civil Procedure. By Memorandum and Order dated March 13, 2006, the Court denied defendants' motions in their entirety. On May 3, 2006, Islip and the individual defendants submitted their answers to the complaint and, on May 19, 2008, Islip and the individual defendants submitted their motions for summary judgment. Plaintiff submitted his opposition on June 16, 2008. Defendants submitted their replies on June 30, 2008. The Court held oral argument on July 11, 2008.

### A. The Remmer Affidavit and the Hearing Transcript

At oral argument, defendants objected on procedural grounds to the Court's considering two pieces of evidence proffered by plaintiff: the Remmer Affidavit and the transcript of the October 20, 2004 hearing in Suffolk County Court, described *supra*. In particular, defendants objected to the Remmer Affidavit on the grounds that it contains hearsay evidence, and to the transcript on the grounds that Sloup had not

only to Buzcek. Further, plaintiff cites to Sloup's deposition, but plaintiff testified that Quinon, Walters, and Verity were fishing in Babylon, not Islip. (Sloup Dep. at 345.) In other words, plaintiff has failed to cite to any evidence in the record – including his own deposition and affidavit – suggesting that any commercial fishermen were fishing the waters of Islip during 2004 other than Buzcek and Sloup.

produced it to defendants until oral argument. Although the Court rejected defendants' objections on the record during oral argument – stating that the Court would fully consider all of the evidence submitted by the parties, including the Remmer Affidavit (to the extent it contained certain portions that were based on personal knowledge) and the transcript – the Court also afforded defendants the opportunity to make additional written submissions regarding these two documents. Defendants made such submissions on August 8, 2008. Plaintiff responded to these submissions on August 14, 2008.[11] The Court has carefully reviewed the parties' additional submissions and, as set forth below, continues to conclude

[11] Counsel for defendants also filed letters seeking to have the Court disregard and/or strike the letter dated August 14, 2008 from plaintiff's counsel because it contained "defamatory comments and disparaging statements against the attorneys who are/were employed by the Town of Islip and outside counsel attorneys." (Letter from Office of the Town Attorney, dated August 15, 2008, at 1.) Although the Court is denying the motion because such relief is unwarranted under these circumstances and has fully considered the legal and factual arguments contained in the letter of plaintiff's counsel, the Court cautions plaintiff's counsel that his submissions and statements to the Court should be focused on the legal and factual arguments relating to the relevant issues, rather than engaging in personal attacks on opposing counsel in making those arguments. Moreover, the Court notes that, based upon its review of the motions papers, the court docket, and its interaction with counsel for defendants at court proceedings, the Court sees absolutely no evidence of any misconduct or unprofessional behavior of any kind. In fact, in connection with these court proceedings, defense counsel have conducted themselves at all times in a professional and ethical manner in representing their respective clients and the Court finds no basis for any personal attacks directed towards their conduct.

that the Court may properly consider both the portions of the Remmer Affidavit based on personal knowledge and the transcript for purposes of deciding the instant motion.

As stated *supra*, defendants object to the Remmer Affidavit on hearsay grounds. However, for purposes of the summary judgment motions, the Court has relied solely on those portions of the Remmer Affidavit that relay Remmer's personal observations and direct conversations. Thus, defendants' hearsay objection is moot. With respect to the transcript, defendants argue that the statements of the Deputy Town Attorney are inadmissible hearsay. However, these statements, at a minimum, are admissible against Islip pursuant to Rule 801(d)(2) of the Federal Rules of Civil Procedure as admissions by an Islip employee. Further, although Islip argues that the statements in the transcript are unsworn, there is no requirement under this Rule that an admission be a sworn statement and the issues regarding the facts and circumstances of the statements go to their weight, not their admissibility.[12] Moreover, the Court has not considered this statement in isolation against Islip, but rather has simply considered the transcript in the context of the overall factual record in this case.[13]

III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson,* 477 U.S. at 248 (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."); *Rivkin v. Century 21 Teran Realty LLC,* 494 F.3d 99, 103 (2d Cir. 2007). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

IV. DISCUSSION

As stated *supra*, Sloup brought his claims pursuant to Section 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States

---

[12] Defendants also provide factual background for the hearing in order to place it into a legal context.

[13] In any event, neither the Remmer Affidavit nor the transcript has played a dispositive role in the Court's analysis herein.

Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n. 3 (1979).[14]  For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).  Here, the parties do not dispute that defendants were acting under color of state law.  The question presented, therefore, is whether defendants' conduct deprived Sloup of the rights he asserts under the First and Fourteenth Amendments.  As set forth below the Court denies defendants summary judgment with respect to the Fourteenth Amendment claims, but grants summary judgment with respect to the First Amendment claims.

A. Fourteenth Amendment Claims

Plaintiff claims that defendants violated his substantive due process and equal

protection rights pursuant to the Fourteenth Amendment.[15]  For the reasons set forth below, defendants' motions for summary judgment are denied with respect to both claims.

(1) Substantive Due Process

As the Second Circuit has explained, "[t]he touchstone of due process is protection of the individual against arbitrary action of government."  In particular, the Fourteenth Amendment affords "[s]ubstantive due-process rights . . . against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999), *cert. denied*, 2000 U.S. LEXIS 3033 (May 1, 2000).  According to Sloup, his substantive due process rights were violated when defendants allegedly caused plaintiff – without legal authority and on the sole basis of personal animosity – to remove all of his fishing equipment from the waters of Islip and, thereby, destroyed plaintiff's commercial fishing business.  As set forth below, the Court has determined that, if plaintiff's version of events is credited, a rational jury could find that Sloup's right to substantive due process was thus violated.  The Court, therefore, denies defendants summary

[14] Specifically, Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ...

42 U.S.C. § 1983.

[15] The Court notes that, although defendants move for summary judgment on a procedural due process claim, plaintiff raised no such claim.  Instead, his complaint and opposition papers clearly reflect that he brings a claim related to substantive due process.  Indeed, even after Sloup clearly described his substantive due process claim in his opposition papers – without mentioning procedural due process – defendants failed to discuss the question of substantive due process in their reply papers.  In any event, the Court has analyzed plaintiff's substantive due process claim and, as set forth below, finds that it survives summary judgment.

14

judgment with respect to Sloup's substantive due process claim.

### a. Legal Standard

In order to demonstrate a violation of substantive due process rights under the Fourteenth Amendment, a plaintiff must demonstrate that (1) he had a "valid property interest"; and (2) "defendants infringed on that property right in an arbitrary or irrational manner." *Cine SK8 v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007) (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001)). The Court describes each of these elements below.

### 1. Property Interest

To meet the first prong of the test for substantive due process violations, a plaintiff must show that he has a "valid property interest." *Cine SK8 v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007) (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001)). In particular,

> [t]he Second Circuit uses a strict entitlement test to determine whether a party's interest in land-use regulation is protectible under the Fourteenth Amendment. . . . Because the U.S. Constitution generally does not create property interests, this court, in applying the entitlement test, looks to existing rules or understandings that stem from an independent source such as state law to determine whether a claimed property right rises to the level of a right entitled to protection

under the substantive due process doctrine. . . .

507 F.3d at 784-85 (citations and quotation marks omitted); *see also Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006) ("This Circuit applies a 'clear entitlement' analysis to determine whether a landowner has a constitutionally cognizable property interest in the benefit sought. This approach derives from the analysis set forth in [*Board of Regents v. Roth*, 408 U.S. 564 (1972)]. In *Roth*, the Supreme Court held that, [t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.") (citation and quotation marks omitted).

Further, the Second Circuit has specifically set forth the standard for determining whether a plaintiff possesses such a valid property interest under New York State law:

> Under New York law, a property owner has no right to an existing land-use benefit unless that right has vested. In New York, a vested right can be acquired when, pursuant to a legally-issued permit, the landowner demonstrates a commitment to the purpose for which the permit was granted by effecting substantial changes and incurring substantial expenses to further the development. In order to gain the vested right, [t]he landowner's actions relying on a valid permit must be so substantial that the municipal

action results in serious loss rendering the improvements essentially valueless.

507 F.3d at 784-85 (citations and quotation marks omitted); *see also Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 450-51 (S.D.N.Y. 1998) (explaining in context of substantive due process analysis that, "[u]nder New York law, a vested right . . . may arise where a landowner demonstrates a commitment to the purpose for which the [certificate] was granted by effecting substantial changes and incurring substantial expense to further the development. However, neither the issuance of the certificate, nor the landowner's substantial changes and expenditures, standing alone, will establish a vested right. The landowner's reliance on the certificate must have been so substantial that the municipal action results in serious loss rendering the improvements essentially valueless.") (citations and quotation marks omitted).

## 2. Arbitrary or Irrational Infringement on Property Interest

In order to meet the second prong of a substantive due process claim, plaintiffs must show "that defendants infringed their property right in an arbitrary or irrational manner." *Cine SK8*, 507 F.3d at 785. In particular, plaintiffs must show that the government's infringement was "'arbitrary,' 'conscience shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'" *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 505 (2d Cir. 2001) ("As we have held numerous times, substantive due process 'does not forbid governmental actions that might fairly be deemed arbitrary or

capricious and for that reason correctable in a state court lawsuit. . . . [Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.'") (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)); *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996) (explaining that plaintiff meets second prong of substantive due process test "only when government acts with no legitimate reason for its decision") (citation and quotation marks omitted); *Pina v. Lantz*, 495 F. Supp. 2d 290, 297 (D. Conn. 2007) ("'Mere irrationality is not enough: only the most egregious official conduct, conduct that shocks the conscience, will subject the government to liability for a substantive due process violation based on executive action.'") (quoting *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005)) (internal quotation marks omitted).

For example, "[i]n the zoning context, a government decision regulating a landowner's use of his property offends substantive due process if the government action is arbitrary or irrational. Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with no legitimate reason for its decision." *Southview Assoc., Ltd. v. Bongartz*, 980 F.2d 84, 102 (2d Cir. 1992) (citations and quotation marks omitted); *see also Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69, 78 (D. Conn. 2004) (explaining that "denial by a local zoning authority violates substantive due process standards only if the denial is so outrageously arbitrary as to constitute a gross abuse of governmental authority") (citation and quotation marks omitted). For instance, in the context of a substantive due process claim against the Town of Colchester where zoning

rights were at issue, the Second Circuit reversed a grant of summary judgment to the Town where, *inter alia*, it "had no authority under state law" to take certain actions with respect to plaintiffs' "protected property interest in the use of their property." *Brady v. Town of Colchester*, 863 F.2d 205, 215-16 (2d Cir. 1988). The Second Circuit explained that under these circumstances, a "trier of fact could conclude that there was no rational basis for the [Town's zoning board's] actions, and that, as a result, the [zoning board] violated appellants' rights to substantive due process." *Id.* at 216 (citation and quotation marks omitted).

b. Application

Here, with respect to the first prong of the substantive due process test – namely, whether Sloup possessed a constitutionally-cognizable property interest – the Court has carefully reviewed the record and concludes that genuine issues of material fact exist as to whether Sloup possessed such an interest in his fishing permits and commercial fishing business. As a threshold matter, it is undisputed that: (1) Sloup incorporated Crabs Unlimited, a commercial fishing business, in 1999; (2) Sloup possesses a special license for crabbing; and (3) as of June 9, 2004, Sloup had placed eight or nine crab pots marked with buoys on the East side of Champlin's Creek in Islip, and thirty to thirty-three crab pots marked with buoys on two double rows on the West side of Champlin's Creek, as well as other fishing equipment throughout the harbors of Islip. In addition to these undisputed facts, and as described *supra*, Sloup has either testified or provided other evidence that (1) he has been a commercial fisherman since 1953; (2) he has been fishing commercially for a variety of fish since 2002; (3) he possesses a general

commercial fishing permit from New York State; (4) in an average season, he uses 50 killi pots, 800 crab pots, 500 conch pots, 400 eel pots, and 120 blow fish pots; (5) as of June 9, 2004, at least half of plaintiff's eel pots were in the waters of Islip; (6) Sloup had placed pots in several portions of Islip, including Nichols creek, Champlin's creek, at the very mouth of Orowoc creek, Awixa creek, and the Bay Shore cove; and (7) defendants' actions caused him to remove all of his fishing equipment from Islip and, thus, vitiated his ability to "make a living." Under these circumstances, if plaintiff's version of events is credited, a rational jury could conclude that Sloup expended substantial effort and expense in reliance on his fishing permits – and, therefore, on his ability to maintain a commercial fishing business in Islip – and that defendants' actions caused such substantial loss to Sloup that his efforts became valueless. Thus, the Court declines to conclude as a matter of law that plaintiff cannot meet the first prong of the test for substantive due process violations.

The Court has also determined, as set forth below, that material issues of fact preclude the Court from determining as a matter of law that defendants did not infringe on Sloup's property right in an arbitrary or irrational, conscience-shocking manner.

As a threshold matter, it is undisputed that defendants lack the legal authority to regulate fishing in the waters of Islip and are authorized only to regulate "hazards to navigation" – defined specifically in the Town Code as a "vessel or floating or submerged object which becomes a menace to navigation." Nevertheless, in support of his substantive due process claim, and as described *supra*, Sloup has proffered the following evidence: (1) Loeffler's alleged statement in the 1990s that "If it's the last thing I do, I'm going to get you

and your buoys out of this bay"; (2) the testimony of Pomroy – who personally identified Sloup's eel pots as a "menace to navigation" under the Town Code, and signed the summons – that he understood a "hazard to navigation" to be "something in the way that would be – something that would prevent running a – a course – you know, running my course through the waterway to get from where I was to where I wanted to get without having some sort of problem with whatever it was that was in the waterway in front of me"; (2) Pomroy's testimony that, in issuing other summonses pursuant to Islip Town Code 37-56A, he could not recall another occasion – other than June 9, 2004 – on which he ordered a fisherman to remove all of his traps and buoys from a particular body of water; (3) Sloup's testimony that Loeffler informed Sloup that plaintiff had to remove all of his pots from "all harbor areas within the Town of Islip, the killi pots, eel pots, crab pots, all fishing gear" and that "[a]ll" of plaintiff's pots posed a hazard because "[a]ny water that a canoe can float in is considered navigable water in the State of New York, and a canoe could hit [Sloup's] killi pot in a mosquito ditch"; (4) Remmer's sworn statement that Loeffler "indicated [to Remmer] that he had determined that any fishing gear, including crab traps and eel pots, located in a Town Harbor Area would be considered a menace to navigation, regardless of the exact location of the gear or it proximity to channels, moorings or docks"; (5) Remmer's sworn statement that he "has observed the tidal waters of the south shore of the Town of Islip over the last five decades" and, "[p]rior to June 9, 2004, there was never, in [his] experience, any attempt by the Town of Islip" to impose a "blanket exclusion" such as the exclusion imposed on Sloup; (6) the dismissal of the June 9, 2004

summons on the grounds, in part, that "there is no factual allegation that the defendant committed the violation"; (7) Sloup's testimony that Pomroy informed him in October 2004 that plaintiff had to remove all of his pots from Champlin's creek even though the pots did not pose a hazard to navigation, on the grounds that the pots were on Islip property; (8) Loeffler's testimony that he informed Sloup that he could not fish in any of the harbor areas listed in the Islip Town Code; (9) Hoffman's statement at the hearing in October that Sloup was issued a summons because he was fishing in "harbor areas"; (10) Hoffman's statement at the hearing in October that Sloup was the only fisherman to receive a similar summons; (11) Sloup's testimony that commercial fishermen were generally fishing the creeks of Islip during the relevant time period, and Remmer's sworn statement that he observed such a fisherman, *i.e.,* Buscek, "fishing (trapping) in the Connetquot River in areas Alan Loeffler had indicated were areas in which fishing equipment would be seized and summonses issued if fishing occurred" and that the Harbor Unit saw Buscek and "took no action against John Boucek during the ten minutes [Remmer] observed Boucek's fishing activities"; and (12) Remmer's and Sloup's testimony that Buscek continues to fish in the waters of Islip. In addition, as stated *supra*, the parties completely dispute whether Sloup's pots actually posed a "menace to navigation" under the Town Code on June 9, 2004. Indeed, as the parties made evident at oral argument, this crucial factual dispute is reflected not only in the parties' testimony regarding their vastly differing observations on June 9, 2004, described above, but also in the parties' differing interpretations of historical and photographic evidence.

Under these circumstances, the Court has determined that genuine issues of material fact

– including key questions revolving around photographic and historical evidence – preclude the Court from determining that Sloup's substantive due process claim fails as a matter of law. Specifically, if Sloup's version of events is credited, a rational jury could find that – on the basis of personal animosity toward Sloup – defendants knowingly and intentionally subjected plaintiff (and only plaintiff) to a legally unfounded, blanket geographical prohibition from fishing in all of the harbor areas of Islip, despite defendants' knowledge that defendants were not legally authorized to regulate fishing and that plaintiff's pots did not pose a hazard to navigation under the Town Code.[16] The Court, therefore, denies defendants summary judgment on plaintiff's substantive due process claim. *See Cine SK8*, 507 F.3d at 789 ("In its resolution amending plaintiff's special use permit, the reasons the Town Board offered for its actions included (a) that Fun Quest had failed to fulfill the written and verbal commitments it had made to the Town Board with respect to security arrangements and with respect to admissions policies for teen dances and (b) that Fun Quest did not cooperate with the Town Board's request that it suspend teen dances pending the hearing on the special use permit. Under the Code, these rationales might have justified the Board's revocation or suspension of Fun Quest's special use permit. They do not, however, justify the actions that the Town Board took; specifically, the Code does not permit the Town Board to amend a special use permit for these reasons or for any other. And, as defendants' counsel conceded at oral argument, if the Town Board did not have authority for the actions it took regarding Fun Quest's permit – as it appears it did not – the Board's actions were ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation.").[17]

### (2) Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Here, Sloup brings claims pursuant to the Equal Protection Clause under two different theories: "selective enforcement" and "class of one." As the Court sets forth below, because a rational jury could find in favor of plaintiff under both theories, the Court denies defendants summary judgment on plaintiff's equal protection claims.[18]

---

[16] In fact, at oral argument, counsel for the individual defendants conceded that a substantive due process violation would lie against defendants if they knew plaintiff's pots did not pose a hazard to navigation, but took unauthorized action against him based on personal animosity.

[17] The Court is aware that defendants dispute Sloup's version of events – with respect to all of plaintiff's claims – on the grounds that plaintiff's testimony lacks credibility. At oral argument, for instance, defendants urged the Court to discredit plaintiff's allegations on the basis of alleged factual inconsistencies within and between his testimony and affidavit. However, as the Court stated *supra* and at oral argument, the Court must eschew credibility assessments at the summary judgment stage, review the record in the light most favorable to plaintiff, and draw all reasonable inferences in his favor. A jury, not the Court, must resolve any such credibility issues.

[18] "While the Second Circuit has not resolved the question of whether there truly is a distinction between selective enforcement and class of one equal protection theories, courts in this circuit have

### a. "Class of One"[19]

### 1. Legal Standard

In *Prestopnik v. Whelan*, the Second Circuit explained the difference between "class of one" equal protection claims and more traditional equal protection claims:

> "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). While this clause "is most commonly used to bring claims alleging discrimination based on membership in a protected class," it may also be used to bring a "class of one" equal protection claim. *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In a "class of one" case, the plaintiff uses "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff . . . to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Neilson*, 409 F.3d at 105.

No. 06-3186-cv, 2007 U.S. App. LEXIS 19612, at *3-*4 (2d Cir. Aug. 16, 2007); *see also King v. N.Y. State Division of Parole*, No. 05-1860-pr, 2008 U.S. App. LEXIS 875, at *11 (2d Cir. Jan. 16, 2008) ("In [*Olech*], the Supreme Court recognized the viability of an Equal Protection claim 'where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.") (quoting *Olech*, 528 U.S. at 564). In particular, as the Court sets forth below, in order to prevail on a class of one claim, a plaintiff must demonstrate that (1) he was treated differently from a similarly situated individual; (2) the differential treatment was arbitrary and irrational; and (3) the treatment was not based on a discretionary or subjective decision.

### (A) Similarly Situated

First, in order to prevail on a class of one claim,

> the plaintiff "must demonstrate that [[h]e was] treated differently than someone who is prima facie identical in all relevant respects." *Neilson*, 409 F.3d at 104 (quoting *Purze*

---

repeatedly treated them as distinct theories with distinct elements of proof and have accordingly evaluated them as separate claims." *Bonenfant v. Kewer*, No. 3:05cv01508, 2007 U.S. Dist. LEXIS 64104, at *24 (D. Conn. Aug. 30, 2007) (collecting cases). The Court, therefore, has evaluated Sloup's class of one and selective enforcement claims separately.

[19] The Court notes that, as with Sloup's substantive due process claim, defendants failed to address plaintiff's class of one claim, despite plaintiff's discussion of this claim in the complaint and in his opposition brief.

*v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). This requires a showing that the level of similarity between the plaintiff and the person(s) with whom she compares herself is "extremely high" – so high (1) that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy," and (2) that "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson*, 409 F.3d at 104-05.

*Prestopnik*, 2007 U.S. App. LEXIS 19612, at *4-*5; *see also Doninger v. Niehoff*, 527 F.3d 41, 53 (2d Cir. 2008) ("[A] class-of-one plaintiff must show . . . an 'extremely high degree of similarity between [himself] and the persons to whom [he] compare[s] [himself]' in order to succeed on an equal protection claim.") (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006); *King*, 2008 U.S. App. LEXIS 875 at *11 (explaining that, subsequent to *Olech*, the Second Circuit has "held that 'the level of similarity between [class of one] plaintiffs and the persons with whom they compare themselves must be extremely high'") (quoting *Nelson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)); *Clubside, Inc.*, 468 F.3d at 159 ("We have held that class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. This showing is more stringent than that used at the summary judgment stage in the employment discrimination context.") (citation omitted); *Pina v. Lantz*, 495 F. Supp. 2d 290, 304 (D. Conn. 2007) ("[T]he Second Circuit has left no doubt that a [class of one] plaintiff must meet a high threshold to move beyond summary judgment. Specifically, for a plaintiff to demonstrate that he or she was treated differently from similarly situated individuals in an irrational manner, in violation of the Fourteenth Amendment, the plaintiff must demonstrate that he or she is prima facie identical to the comparators.") (citation and quotation marks omitted). Further, "[g]enerally, whether two [individuals] are similarly situated is a factual issue that should be submitted to the jury." *Cine SK8*, 507 F.3d at 790-91 (noting that "rule is not absolute and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met") (citations and quotation marks omitted); *Clubside, Inc.*, 468 F.3d at 159 (explaining that, "[g]enerally, whether parties are similarly situated is a fact-intensive inquiry," although "a court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, however, where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated").

### (B) Irrational and Arbitrary Basis

In addition, the plaintiff must demonstrate "that the defendant intentionally treated [him] differently, with no rational basis." *Prestopnik*, 2007 U.S. App. LEXIS 19612, at *5; *see also Price v. City of New York*, No. 06-3481-cv, 2008 U.S. App. LEXIS 3133, at *2 (2d Cir. Feb. 13, 2008) ("To prevail on a 'class

of one' selective treatment claim without asserting membership in a protected class, Price must demonstrate, *inter alia*, that the defendants *intentionally* treated him differently from others similarly situated without any rational basis.") (emphasis in original); *Siao-Pao v. Connolly*, No. 06 Civ. 10172, 2008 U.S. Dist. LEXIS 48697, at *27 (S.D.N.Y. June 25, 2008) ("This Court has interpreted the Olech standard to require that differential treatment be both intentional and irrational to satisfy the class of one standard."); *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 n.7 (S.D.N.Y. 2008) (explaining that, in contrast with selective enforcement claims, which require "showing of animus or 'malicious or bad faith intent,'" class of one claims are based on "'irrational and wholly arbitrary' governmental conduct").[20]

### (C) Lack of Discretion or Subjectivity

In addition to the two elements set forth above, the Supreme Court recently set forth another requirement for plaintiffs bringing class of one claims. Specifically, in *Engquist v. Oregon Department of Agriculture*, the Supreme Court held that such plaintiffs must show that the differential treatment received resulted from non-discretionary state action:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

128 S. Ct. 2146, 2154 (June 9, 2008); *see also Siao-Pao*, 2008 U.S. Dist. LEXIS at *27 ("Additionally, the Supreme Court recently clarified the Olech holding by limiting class of one claims in contexts characterized by individualized and subjective determinations . . . .").

### 2. Application

Here, with respect to the similarly situated element of a class of one claim, after carefully reviewing the record in the light most favorable to Sloup, and drawing all reasonable inferences in his favor, the Court finds that genuine issues of material fact preclude the Court from determining as a matter of law that Sloup's comparator fishermen were not

---

[20] The Court is aware that the Second Circuit has not resolved the issue of whether plaintiffs bringing class of one claims must also demonstrate the "malice or bad faith" required in a selective enforcement claim, described *infra*. *See Prestopnik*, 2008 U.S. App. LEXIS 19612, at *5 n.1; *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 n.7 (S.D.N.Y. 2008) ("[T]he Second Circuit has repeatedly deferred the question of whether *Olech* eliminated the inquiry into defendant's bad faith intent. . . ."). However, because the Court has found – as stated *infra* – that a rational jury could find that defendants acted with malice or bad faith, this unresolved legal question does not materially impact the Court's analysis of Sloup's class of one claim.

similarly situated to plaintiff. Specifically, if Sloup's evidence is credited that (1) a commercial fisherman named John Buczek fished in the creeks of Islip during 2004; and (2) according to Remmer, he observed Buczek "fishing (trapping) in the Connetquot River in areas Alan Loeffler had indicated were areas in which fishing equipment would be seized and summonses issued if fishing occurred," a rational jury could find that Buczek was "someone who is prima facie identical in all relevant respects" to Sloup. *See, e.g., Viruet v. Connecticut*, No. 3:03CV1345, 2006 U.S. Dist. LEXIS 17536, at *12 (D. Conn. Mar. 29, 2006) (denying summary judgment on class of one claim in part because plaintiff presented evidence that a single other individual was similarly situated to – and treated differently from – plaintiff).

Similarly, there are disputed issues of material fact that preclude summary judgment on whether defendants knowingly and intentionally treated Sloup differently from Buczek without a rational basis. In particular, if the evidence described *supra* with respect to plaintiff's substantive due process claim is credited – including, *inter alia*, (1) Loeffler's alleged statement in the 1990s that "If it's the last thing I do, I'm going to get you and your buoys out of this bay"; (2) Pomroy's testimony that, in issuing other summonses pursuant to Islip Town Code 37-56A, he could not recall another occasion – other than June 9, 2004 – on which he ordered a fisherman to remove all of his traps and buoys from a particular body of water; (3) Sloup's testimony that Loeffler informed Sloup that plaintiff had to remove all of his pots from "all harbor areas within the Town of Islip, the killi pots, eel pots, crab pots, all fishing gear" and that "[a]ll" of plaintiff's pots posed a hazard because "[a]ny

water that a canoe can float in is considered navigable water in the State of New York, and a canoe could hit [Sloup's] killi pot in a mosquito ditch"; (4) Remmer's sworn statement that Loeffler "indicated [to Remmer] that he had determined that any fishing gear, including crab traps and eel pots, located in a Town Harbor Area would be considered a menace to navigation, regardless of the exact location of the gear or it proximity to channels, moorings or docks"; (5) Remmer's sworn statement that he "has observed the tidal waters of the south shore of the Town of Islip over the last five decades" and, "[p]rior to June 9, 2004, there was never, in [his] experience, any attempt by the Town of Islip" to impose a "blanket exclusion" such as the exclusion imposed on Sloup; (6) the dismissal of the June 9, 2004 summons on the grounds, in part, that "there is no factual allegation that the defendant committed the violation"; (7) Sloup's testimony that Pomroy informed him in October 2004 that plaintiff had to remove all of his pots from Champlin's creek even though the pots did not pose a hazard to navigation, on the grounds that the pots were on Islip property; (8) Loeffler's testimony that he informed Sloup that he could not fish in any of the harbor areas listed in the Islip Town Code; (9) Hoffman's statement at the hearing in October that Sloup was issued a summons because he was fishing in "harbor areas"; (10) Hoffman's statement at the hearing in October that Sloup was the only fisherman to receive a similar summons; (11) Remmer's statement that he observed Buscek fishing in the areas prohibited to Sloup; and (12) Sloup' statement that Buscek continues to fish the waters of Islip – a rational jury could conclude that plaintiff was intentionally and irrationally treated in a different manner from an individual, *i.e.,* Buscek, in a *prima facie* identical position.

Finally, the Court has determined that

genuine issues of material fact preclude the Court from determining as a matter of law that defendants' actions resulted from discretionary or subjective decision-making under the rule in *Endquist*. As a threshold matter, the Court notes that Sloup's claims relate, in part, to the question of whether his fishing equipment posed a "menace to navigation" under the Town Code. If this were the only factual or legal issue in the case, the Court recognizes that the *Endquist* rule would preclude a class of one claim because such a determination is clearly discretionary. However, despite the fact that certain of defendants' decisions may have had such a discretionary component, fundamental to Sloup's case is the premise that defendants lacked any authority whatsoever to regulate fishing and that defendants, nevertheless, maliciously imposed a blanket restriction on all of plaintiff's fishing activities in Islip. Because it is beyond cavil that such actions, taken in the absence of any legal authority, are not "discretionary," the Court declines to conclude as a matter of law that the *Endquist* rule bars a class of one claim under the circumstances of this case.

In sum, after carefully reviewing the record in the light most favorable to Sloup, and drawing all reasonable inferences in his favor, the Court has determined that the record contains genuine issues of material fact regarding each of the components of a class of one claim and, therefore, the Court denies defendants summary judgment as to this claim. *See Nat'l Council of Arab Americans v. City of New York*, 478 F. Supp. 2d 480, 496 (S.D.N.Y. 2007) (denying summary judgment on class of one claim, despite defendants' argument that plaintiffs failed "to establish differential treatment," on the grounds that "a trial is necessary to determine, *inter alia*, whether Plaintiffs were similarly situated to other permit applicants and whether those applicants were treated differently than Plaintiffs"); *Viruet v. Connecticut*, No. 3:03CV1345, 2006 U.S. Dist. LEXIS 17536, at *12 (D. Conn. Mar. 29, 2006) ("Viruet has presented sufficient evidence to bring his [class of one] claim before a jury. . . . With no rational basis for the disparate treatment of two virtually identical individuals, Viruet could prove to a jury that there was no rational basis for Armstrong's decision."); *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 205 (D. Conn. 2005) ("Because Piscottano has created a genuine issue of material fact as to whether she has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment, summary judgment is . . . denied on [her class of one] claim.") (citation and quotation marks omitted).

b. Selective Enforcement

1. Legal Standard

The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)). As set forth below, however, and as the Second Circuit held in *Cine SK8*, it is well settled that plaintiffs must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment. *Cine SK8*, 507 F.3d at 790.

(A) Similarly Situated[21]

First, plaintiff must demonstrate that he "was treated differently from other similarly situated [individuals]." *Id.* (citations and quotation marks omitted); *see also Church of the American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) ("A selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated."). In particular, at the summary judgment stage, a "plaintiff must present evidence comparing [himself] to individuals that are 'similarly situated in all material respects.'" *Sebold v. City of Middletown*, No. 3:05-CV-1205, 2007 U.S. Dist. LEXIS 70081, at *81 (D. Conn. Sept. 21, 2007) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Further, the Second Circuit has held that, to the extent a municipality is selectively enforcing land use restrictions, a plaintiff would be "hard pressed" to demonstrate selective treatment without also demonstrating the municipality's knowledge of the other, unenforced violations. *See LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999), *cert. denied* 2000 U.S. LEXIS 1580 (Feb. 28, 2000); *see, e.g., Zavatsky v. Anderson*, No. 3:00cv844, 2004 U.S. Dist. LEXIS 7440, at *23 (D. Conn. Mar. 8, 2004) (denying summary judgment where material issues of fact remained as to defendant's knowledge of similarly situated individuals treated differently from plaintiff). However, the Second Circuit also stated:

> We do not hold that knowledge will be required in every case. It is conceivable that selective treatment could be shown where, for example, proof was offered that a municipality did not know of prior violations because it adhered to a see-no-evil policy of not enforcing an ordinance, and then abandoned that policy with respect to a violator engaged in protected activity.

*LaTrieste*, 188 F.3d at 70 n.1.

Further, as with class of one claims, and "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (explaining that "rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met"); *see, e.g., Kirschner v. Zoning Bd. of Appeals*, 924 F. Supp. 385, 394 (E.D.N.Y. 1996) ("The issues presented . . . regarding whether the two auto body shops are similarly situated present classic issues of fact.

---

[21] Although one district court in the Second Circuit has stated that "the standard for 'similarly situated' when bringing a selective enforcement claim is the same as in a 'class of one' claim," *Dones v. City of New York*, No. 07 Civ. 3085, 2008 U.S. Dist. LEXIS 53681, at *28 (S.D.N.Y. July 9, 2008), the Court employs the slightly different formulations set forth by the Second Circuit for each claim. If anything – as the Court's analysis reflects in this Memorandum and Order – the two standards differ only in that the similarly situated standard for class of one claims is more stringent. Thus, because the Court found that summary judgment is precluded on that prong for the class of one claim, it follows that summary judgment is precluded on that prong for the selective enforcement claim. In any event, the Court has undertaken separate analysis for each claim.

Under these facts and circumstances, whether the locations of different entities are sufficiently analogous when making an equal protection claim is not the sort of decision this Court should make as a matter of law. The two auto body operations were both located in the village of Valley Stream. According to the plaintiffs, they sought similar permits during a similar period. The Court believes that whether, based on these allegations, the two shops can be considered similarly situated is a question best left to the trier of fact.").

(B) Impermissible Considerations

With respect to the second prong, the Second Circuit has held that a plaintiff must demonstrate that the "differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8*, 507 F.3d at 790 (citations and quotation marks omitted); *see also Freedom Holdings Inc. v. Int'l Tobacco Partners, Ltd.*, 357 F.3d 205, 234 (2d Cir. 2004) ("To establish a violation of the Equal Protection Clause based on selective enforcement, a plaintiff must ordinarily show the following: '(1) [that] the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'") (quoting *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999)). In particular, the Second Circuit has explained that, in analyzing the second prong of selective enforcement claims, courts must distinguish between a "motivation to punish

[in order] to secure compliance with agency objectives," and "spite, or malice, or a desire to '"get' [someone] for reasons wholly unrelated to any legitimate state objective." *Bizzarro v. Miranda*, 394 F.3d 82, 82 (2d Cir. 2005) (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995)).

Moreover, as with the similarly situated prong, the Second Circuit has emphasized that "the issue of whether an action was motivated by malice generally is a question of fact properly left to the jury. . . ." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 502 (2d Cir. 2001) (explaining that courts may, however, grant summary judgment based on issue of malice where nonmoving party "adduces nothing more than speculation to support its claims"); *see also Fair Haven Development Corp. v. DeStefano*, 528 F. Supp. 2d 25, 32 (D. Conn. 2007) ("Although [second prong of selective enforcement claim] generally present[s] a question of fact properly left to the jury, it is appropriate to grant summary judgment where the non-moving party adduces nothing more than speculation to support its claims.") (citations and quotation marks omitted).

2. Application

Here, Sloup's selective enforcement claim survives summary judgment for substantially the same reasons that plaintiff's class of one claim survives, as described *supra*. Namely, with respect to the similarly situated element of the selective enforcement claim, after carefully reviewing the record in the light most favorable to Sloup, and drawing all reasonable inferences in his favor, the Court finds that genuine issues of material fact preclude the Court from determining as a matter of law that Sloup's comparator fisherman was not similarly situated to plaintiff. Specifically, if

Sloup's evidence is credited that (1) a commercial fisherman named John Buczek fished in the creeks of Islip during 2004; and (2) according to Remmer, he observed Buczek "fishing (trapping) in the Connetquot River in areas Alan Loeffler had indicated were areas in which fishing equipment would be seized and summonses issued if fishing occurred," a rational jury could find that Buczek was similarly situated to Sloup in all material respects.

Similarly, the Court declines to conclude as a matter of law that defendants did not knowingly and intentionally treat Sloup differently from Buczek in a malicious manner, for the purpose of causing plaintiff injury. In particular, if the evidence described *supra* with respect to plaintiff's substantive due process claim is credited – including, *inter alia*, (1) Loeffler's alleged statement in the 1990s that "If it's the last thing I do, I'm going to get you and your buoys out of this bay"; (2) Pomroy's testimony that, in issuing other summonses pursuant to Islip Town Code 37-56A, he could not recall another occasion – other than June 9, 2004 – on which he ordered a fisherman to remove all of his traps and buoys from a particular body of water; (3) Sloup's testimony that Loeffler informed Sloup that plaintiff had to remove all of his pots from "all harbor areas within the Town of Islip, the killi pots, eel pots, crab pots, all fishing gear" and that "[a]ll" of plaintiff's pots posed a hazard because "[a]ny water that a canoe can float in is considered navigable water in the State of New York, and a canoe could hit [Sloup's] killi pot in a mosquito ditch"; (4) Remmer's sworn statement that Loeffler "indicated [to Remmer] that he had determined that any fishing gear, including crab traps and eel pots, located in a Town Harbor Area would

be considered a menace to navigation, regardless of the exact location of the gear or it proximity to channels, moorings or docks"; (5) Remmer's sworn statement that he "has observed the tidal waters of the south shore of the Town of Islip over the last five decades" and, "[p]rior to June 9, 2004, there was never, in [his] experience, any attempt by the Town of Islip" to impose a "blanket exclusion" such as the exclusion imposed on Sloup; (6) the dismissal of the June 9, 2004 summons on the grounds, in part, that "there is no factual allegation that the defendant committed the violation"; (7) Sloup's testimony that Pomroy informed him in October 2004 that plaintiff had to remove all of his pots from Champlin's creek even though the pots did not pose a hazard to navigation, on the grounds that the pots were on Islip property; (8) Loeffler's testimony that he informed Sloup that he could not fish in any of the harbor areas listed in the Islip Town Code; (9) Hoffman's statement at the hearing in October that Sloup was issued a summons because he was fishing in "harbor areas"; (10) Hoffman's statement at the hearing in October that Sloup was the only fisherman to receive a similar summons; (11) Remmer's statement that he observed Buscek fishing in the areas prohibited to Sloup; and (12) Sloup' statement that Buscek continues to fish the waters of Islip – a rational jury could conclude that plaintiff was intentionally and maliciously treated in a different manner from an individual, *i.e.,* Buscek, that was similarly situated to plaintiff in all material respects.

Under these circumstances, the Court denies defendants motions for summary judgment on plaintiff's selective enforcement claim. *See Brady*, 863 F.2d at 261-17 (acknowledging that, in response to appellants' selective enforcement claim, appellees "insist that all of these statements and events are susceptible of different interpretations, and that

together they do not constitute sufficient evidence to prove appellants' claims," but holding that "[n]evertheless, on a summary judgment motion all ambiguities and inferences to be drawn from the underlying facts should be resolved in the light most favorable to the nonmoving party. Applying this standard to the facts presented, we believe that the evidence adduced by appellants of discriminatory intent and selective and improper enforcement is sufficient to withstand a motion for summary judgment. We find this to be particularly so in light of the record evidence which suggests that appellants' property might have been zoned for commercial use all along, in which case appellees' actions may have been wholly unwarranted under the law. Thus, appellees have failed to meet their burden of establishing that there is no genuine issue of material fact to be submitted to the trier of fact with respect to appellants' equal protection claim"); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1353 (2d Cir. 1994) ("The record in this case amply establishes genuine issues of material fact as to whether the individual defendants named in Nu-Life's fourth amended complaint singled out Nu-Life for selective, injurious treatment (1) in retaliation for its exercise of First Amendment rights, or (2) with a malicious or bad faith intent to injure Nu-Life. . . .We are aware, of course, that the individual defendants contend that Nu-Life's problems resulted from poor performance of its contractual obligations, rather than invidiously selective action by those defendants. This factual controversy should be resolved by the trier of fact, not on a motion for summary judgment.").

## B. First Amendment Claim

Sloup alleges that defendants violated his First Amendment rights in three different ways: (1) by issuing him the June 9, 2004 summons in retaliation for litigating *Sloup v. Islip* in 1974, as discussed *supra*; (2) by issuing him the June 9, 2004 summons in retaliation for refusing to voluntarily remove his crab pots from the water, as Pomroy had suggested that day; and (3) by ordering him to remove all of his pots from the water on October 6, 2004 in retaliation for litigating the June 9, 2004 summons.[22] However, as set forth below, after carefully reviewing the record in the light most favorable to Sloup and drawing all reasonable inferences in his favor, the Court has determined that no genuine issues of material fact warrant a trial on plaintiff's First Amendment claims – on any of the three factual grounds he has proffered – because the record contains absolutely no evidence that defendants actually chilled the exercise of plaintiff's First Amendment rights. Thus, the Court grants summary judgment to defendants on plaintiff's First Amendment claim.

### (1) Legal Standard

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the

---

[22] As defendants pointed out at oral argument, Sloup raised the third ground for his First Amendment claim for the very first time at oral argument. The Court is aware that Federal Rule of Civil Procedure 15(a) allows a party to amend its pleadings by leave of the court, and further directs that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, because the Court has analyzed this new allegation and, as set forth below, has determined that it does not survive summary judgment, permitting Sloup to amend his complaint to add this allegation would be futile.

First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 126 S. Ct. 1695, 1701 (2006) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)) (additional citation omitted). In particular, the Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Williams v. Town of Greenburgh*, No. 06-4897-cv, 2008 U.S. App. LEXIS 15403, at *10 (2d Cir. July 22, 2008). Where, as in the instant case, a "private citizen . . . sue[s] a public official," *id.* at 11, such plaintiff must demonstrate that "'(1) [he] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.'" *Id.* (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *see also Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (explaining that, in contrast to public employee asserting First Amendment retaliation claim against employer, private citizens suing public officials must demonstrate chilling).

Specifically, in order to meet the chilling requirement, a plaintiff must "come forward with evidence showing either that (1) defendants silenced him or (2) "defendant[s'] actions had some actual, non-speculative chilling effect' on his speech." *Williams*, 2008 U.S. App. LEXIS 15403, at *16 (quoting *Columbo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002)). Thus, "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley*, 268 F.3d at 73. In particular, "[t]he

Supreme Court has held that 'allegations of a subjective "chill"' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).

(2) Application

Here, in opposing defendants' motions to dismiss his First Amendment claim, Sloup simply asserts, in a wholly conclusory fashion, that defendants intended to chill plaintiff's speech. (Pl.'s Opp. at 13.) However, even assuming *arguendo* that defendants actually had this intention – an assumption for which the Court has found no basis in the record[23] – Sloup does not refer to any evidence that his speech was actually chilled. Indeed, the Court has carefully reviewed the record in the light most favorable to Sloup and, even drawing all inferences in his favor, has found absolutely no evidence that plaintiff was silenced or that his First Amendment rights were chilled whatsoever by defendants' alleged conduct. On the contrary, the record reflects – as described above – that Sloup successfully fought the June 9, 2004 summons, and that Sloup's attorney represented plaintiff during a court hearing regarding his fishing rights after

---

[23] Indeed, the Court notes that Sloup's primary factual allegation in support of his First Amendment claim relates to a litigation that took place over thirty years ago – an event that, given the lack of any direct or indirect evidence of retaliation, is clearly too attenuated in time from the retaliatory acts alleged to give rise to an inference of causation. *See, e.g., Ifill v. UPS*, No. 04 Civ. 5963, 2008 U.S. Dist. LEXIS 54792, at *36-*37 (S.D.N.Y. July 17, 2008) (granting summary judgment to defendants on First Amendment retaliation claim because alleged retaliatory act took place fourteen months after protected activity).

the incident in October 2004. Thus, the record demonstrates that plaintiff vigorously exercised his First Amendment rights subsequent to all of the allegedly retaliatory conduct plaintiff has alleged. Under these circumstances, the Court has determined that Sloup's First Amendment claim fails as a matter of law and, therefore, summary judgment for defendants on this claim is warranted. *See Williams*, 2008 U.S. App. LEXIS 15403, at *16-*17 ("It is abundantly clear from the record that Williams's readiness to hold forth on his perceived mistreatment at the hands of Bland and White was unimpaired by their allegedly punitive conduct. Because Williams cannot show that his speech was either silenced or chilled – *i.e.,* that his right to free speech was actually violated – Williams's claim fails as a matter of law."); *Smolicz v. Borough/Town of Naugatuck*, No. 06-6539-cv, 2008 U.S. App. LEXIS 12503, at *6-*7 (2d Cir. June 12, 2008) ("Even if the search was motivated by Defendants'/Appellees' desire to 'deter or silence' Smolicz's criticism of the police department and its leadership in his newsletters, Smolicz has not shown that their attempt to do so was successful. The district court determined that Smolicz had not shown a chilling of his rights because he continued to publish his newsletter and attend union meetings after the search was executed. On this appeal, Smolicz does not challenge that determination in any meaningful way, other than to state conclusorily that his First Amendment right to free speech was violated further by the chilling effect the defendants' actions had on his ability to publish his union newsletter, Police Biz. Such a conclusory statement[] . . . is not sufficient to defeat a summary judgment motion."(citation and quotation marks omitted); *Curley*, 268 F.3d at 73 (affirming district court's grant of summary judgment to defendants on First Amendment retaliation claim where plaintiff could not demonstrate chilling).

## C. Municipal Liability

In addition, Islip argues that it is entitled to summary judgment on the grounds that Sloup has failed to demonstrate municipal liability as a matter of law. However, as set forth below, because the Court finds that genuine issues of material fact exist as to Islip's municipal liability, the Court rejects Islip's argument and denies Islip's motion for summary judgment on this ground without prejudice to Islip's renewing it prior to the jury's receipt of the case.

### (1) Legal Standard

#### a. Evidence of Municipal Custom or Policy

The Supreme Court expressly rejected liability pursuant to a theory of *respondeat superior* for purposes of Section 1983 in *Monell*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[a] municipality will not be held liable under § 1983 unless plaintiffs can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of New York*, No. 04-CV-1721, 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quotation marks omitted) (citing *Monell*, 436 U.S. at 690). However, "'the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least

circumstantially, such an inference.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)). The plaintiff in a Section 1983 action bears the burden of establishing municipal liability. *See Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985), *cert. denied*, 480 U.S. 916, 107 S. Ct. 1369, 94 L. Ed. 2d 685 (1987).

### b. Policymakers

In addition to demonstrating directly that a municipality has a custom or policy that led to a constitutional violation, the Second Circuit has held that a plaintiff may demonstrate municipal liability by showing that a municipal "policymaker" violated plaintiff's constitutional rights:

> Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, or by a [municipal] employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the [municipality's]

authorized policymakers.

*Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see also Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) ( "Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights."); *Davis v. Lynbrook Police Dept.*, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002) ("A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation. . . ."). Indeed, "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy." *Gronowski*, 424 F.3d at 296; *see also Amnesty Am.*, 361 F.3d at 126 ("Thus, even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983.")(citation omitted) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986)). "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. . . . The relevant legal materials[] include state and local positive law, as well as custom or usage having the force of law." *Jeffes v. Keenan*, 208 F.3d 49, 57 (2d Cir. 2000), *cert. denied*, 2000 U.S. LEXIS 4908 (Oct. 2, 2000). Specifically, "'[t]he matter of whether the official is a final policymaker under state law is to be resolved by the trial judge *before* the case is submitted to the jury.'" *Richardson v. Metropolitan Dist. Commission*, No. 3-00-CV-1062, 2003 U.S. Dist. LEXIS 12757, at *20 (D. Conn. July 23, 2003) (quoting *Jeffes*, 208 F.3d at 57).

31

In particular, where a municipal official "'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Gronowski*, 424 F.3d at 297 (quoting *Rookard v. Health and Hosps. Corp*, 710 F.2d 41, 45 (2d Cir. 1983)); *see also Diodati v. City of Little Falls*, No. 6:04-CV-446, 2007 U.S. Dist. LEXIS 4322, at *6 (N.D.N.Y. Jan. 18, 2007) ("A policymaker is an individual whose 'decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions.'") (quoting *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003) (internal citation and quotation marks omitted). Moreover, "the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the [municipality's] business." *Jeffes*, 208 F.3d at 57 (citation and quotation marks omitted) (emphasis in original). "Thus, the court must ask whether [the] governmental official [is a] final policymaker[] for the local government in a particular area, or on [the] particular issue involved in the action." *Jeffes*, 208 F.3d at 57 (citations and quotation marks omitted); *see also Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 543 (D. Conn. 2006) ("The critical inquiry is not whether an official *generally* has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit.") (emphasis in original). However, "[a]lthough the official in question does not have to be a final policymaker for all purposes, but only with respect to the conduct challenged, simply exercising discretion in an area where that official is not the final policymaker under state law cannot, by itself, establish municipal liability." *Barry v. N.Y. City Police Dept.*, No. 01 Civ. 10627, 2004 U.S. Dist. LEXIS 5951, at *43 (S.D.N.Y. Apr. 7, 2004; *see also Diodati*, 2007 U.S. Dist. LEXIS 4322, at *6 ("An individual who merely has discretion to handle a particular situation is not a policymaker."); *Richardson*, 2003 U.S. Dist. LEXIS 12757, at *20 ("Mere discretion in the performance of his duties is not sufficient. However, the official need only have the power to make official policy on a particular issue."). On the other hand, where a policymaker "exceeded the bounds of the authority granted to him," his actions "cannot be fairly said to represent official policy." *Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 544 (D. Conn. 2006) ("[A]lthough Giordano is generally a final policymaker for Waterbury, Giordano's specific actions in this case cannot be fairly said to represent official policy, because under state law, he exceeded the bounds of the authority granted to him.")

c. The Actions of Subordinates

Further, the Second Circuit has also recognized that,

> More often than not . . . plaintiffs allege constitutional deprivations at the hands of the lower-level municipal employees to whom some authority has been delegated, rather than at the hands of those officials with final policymaking authority. While allowing the municipality to be held liable on the basis of the mere delegation of authority by a policymaking official would result in *respondeat superior* liability, allowing delegation,

without more, to defeat municipal liability would contravene the remedial purposes of § 1983. Therefore, § 1983 plaintiffs may establish that the city is liable for their injuries by proving that the authorized policymakers approve[d] a subordinate's decision and the basis for it.

Thus, when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiff's ability to attribute the subordinate's conduct to the action or omissions of higher ranking officials with policymaking authority. One means of doing so, of course, is to establish that a policymaker ordered or ratified the subordinates' actions.

*Amnesty Am.*, 361 F.3d at 126; *see also Bruker v. City of New York*, 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) ("In addition to establishing that a policymaker ordered a subordinate's decision, a plaintiff can show municipal liability by demonstrating that 'the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'") (quoting *Amnesty Am.*, 361 F.3d at 126); *Barry*, 2004 U.S. Dist. LEXIS 5951, at *43-*44 ("Moreover, if policymaker liability is premised on the fact that the official knew of and approved of the act in question (as opposed to ordering the act or executing it herself), the plaintiff must also prove that the official knew that the subordinate employees took that action for unconstitutional reasons."); *Houghton v. Cardone*, 295 F. Supp. 2d 268, 277 (W.D.N.Y. 2003) ("Even in the absence of an explicitly adopted rule or regulation, a plaintiff may prove the existence of municipal policy if he can show that the unlawful act was done or approved by the person with final policymaking authority in the area in which the action was taken. Where, however, liability is premised on the policymaker's approval of a subordinate's unlawful act, it must be shown that the policymaker ratified both the subordinate's decision and the basis for it. . . . ") (citations and quotation marks omitted).

(2) Application

Here, as set forth below, the Court has determined that genuine issues of material fact preclude the Court from determining as a matter of law at this juncture that Islip is not municipally liable under the circumstances of this case and, therefore, the Court denies Islip's motion without prejudice to its renewal at the close of evidence in this case.

As a threshold matter, the Court has determined – after carefully reviewing the record in the light most favorable to Sloup, and drawing all reasonable inferences in his favor – that the record contains genuine issues of material fact as to whether Islip had a custom or policy of imposing a blanket geographic prohibition on commercial fishing in the waters of Islip, or as-applied to Sloup. Specifically, in light of Hoffman's role as Islip's attorney – and in the overall factual context of this case – a rational jury could find that Hoffman's statement at the hearing in October that Sloup was issued a summons because he was fishing in "harbor areas" directly demonstrates that Islip had a policy to issues summonses under such legally unauthorized circumstances.

Moreover – as an independent basis for denying summary judgment to Islip on municipal liability grounds – the Court has determined that the record contains insufficient evidence for the Court to determine as a matter of law – at this juncture – whether Loeffler was a municipal "policymaker" in the area of navigational hazards vis a vis commercial fishermen. In particular, as stated *supra*, the parties dispute the most basic and critical issue regarding Loeffler, *i.e.,* his actual professional title and responsibilities, including whether he is the "Harbor Master" described in the Town Code, or whether he holds what is presumably an even higher position, *i.e.,* "Chief Harbor Master," or whether he is the "Chief of Harbor Police" or "Chief of Marine Law Enforcement Harbor Police."[24] Although the individual defendants contend in a conclusory manner that Loeffler was not a policymaker, they fail to point to any evidence demonstrating that any official other than Loeffler was empowered to determine the standard by which Islip determined whether commercial fishing equipment posed a hazard to navigation under the Town Code. On the contrary, the record contains evidence tending to suggest that Loeffler was, indeed, such a policymaker – namely (1) Sloup's testimony that Loeffler informed Sloup that plaintiff had to remove all of his pots from "all harbor areas within the Town of Islip, the killi pots, eel pots, crab pots, all fishing gear" and that "[a]ll" of plaintiff's pots posed a hazard because "[a]ny water that a canoe can float in is considered navigable water in the State of New York, and a canoe could hit [Sloup's] killi pot in a mosquito ditch"; (2) Remmer's sworn statement that Loeffler "indicated [to Remmer] that he had determined that any fishing gear, including crab traps and eel pots, located in a Town Harbor Area would be considered a menace to navigation, regardless of the exact location of the gear or it proximity to channels, moorings or docks"; (3) Remmer's sworn statement that he "has observed the tidal waters of the south shore of the Town of Islip over the last five decades" and, "[p]rior to June 9, 2004, there was never, in [his] experience, any attempt by the Town of Islip" to impose a "blanket exclusion" such as the exclusion imposed on Sloup; (4) Loeffler's testimony that he informed Sloup that he could not fish in any of the harbor areas listed in the Islip Town Code; and (5) the colloquy during Loeffler's deposition where he agreed that it was he, and not the Town Code, that made such statements to Sloup. Nevertheless, because neither party has provided sufficient information regarding Loeffler's precise responsibilities, both generally and with respect to the specific conduct at issue in this case, it would be inappropriate for the Court to determine as a matter of law that Loeffler did not – at the very least, on the day Sloup received his summons – possess complete policymaking authority over such issues.[25]

[24] The Court notes that, even if Loeffler was merely the "Harbor Master" described in the Town Code, the relevant legislation (set forth *supra*) appears to afford Loeffler with complete authority to determine whether an object poses a hazard to navigation and, therefore, may invest Loeffler with sufficient policymaking power to give rise to municipal liability. As set forth below, the Court simply does not have sufficient information to determine as a matter of law the precise role Loeffler played.

[25] The Court is aware that, to the extent that the jury wholly credits Sloup's version of events, described *supra* – namely, that Loeffler imposed a legally unauthorized, blanket geographic prohibition over all of Sloup's commercial fishing activities in the waters of Islip – a jury could determine that

With respect to Pomroy, the individual defendants simply argue that Pomroy was merely following Loeffler's orders and, therefore, that Pomroy's actions cannot give rise to municipal liability.[26]  However, as described above, even assuming *arguendo* that Pomroy was just following orders – or that his conduct was ratified by Loeffler – Pomroy's actions may give rise to municipal liability to the extent that Loeffler was a policymaker.  Indeed, after carefully reviewing the record in the light most favorable to Sloup, and drawing all reasonable inferences in his favor, the Court has determined that – as a third, independent ground for municipal liability in this case – genuine issues of material fact exist as to whether Pomroy was following Loeffler's orders and/or whether Pomroy's actions were ratified by Loeffler – namely, (1) Pomroy testimony that "I was instructed to issue the summons, and I agreed that it was a just issuance of that summons"; (2) Loeffler's testimony that "I was advised that there were crab pots in Champlin's Creek.  I advised [Pomroy] to talk to Mr. Sloup and ask him to remove them because we had a complaint that there was – they were causing a hazard to navigation" and that Loeffler independently traveled by car to Champlin's Creek, and "concurred with [Pomroy's] judgment" on the basis of Loeffler's observations there; and (3) Sloup's testimony

that, on the day he received the summons, Pomroy called his office prior to issuing the summons.   Under these circumstances, a rational jury could find that Loeffler either ordered or ratified Pomroy's actions and, in light of the Court's inability to determine at this juncture whether Loeffler was a policymaker, the Court declines to conclude as a matter of law that Pomroy's conduct cannot give rise to municipal liability.

In sum, the Court denies Islip's motion for summary judgment on municipal liability grounds without prejudice to Islip's renewing it at the close of the evidence at trial.  *See Barry*, 2004 U.S. Dist. LEXIS 5951, at *46-*48 ("Thus, the parties ask the court to decide the question of the individual defendants' policymaking authority in a vacuum. . . . While it seems likely . . . that the Police Commissioner bore final policymaking authority in the areas implicated by the adverse acts taken against plaintiff, and that he would have to have ordered or ratified the adverse acts in question, or at least known that Mullane, Reiss, and Fox had a retaliatory motive for carrying them out, the court needs more information about the power and authority of the police officers in question beyond the information provided by the parties before it can make a final determination as a matter of law.  The Court is mindful, however, that plaintiff Barry bears the ultimate burden of establishing New York City's liability based on the acts of its policymakers.") (citations omitted); *Iannillo v. County of Orange*, 187 F. Supp. 2d 170, 187 (S.D.N.Y. 2002) ("Although we find it likely that, at minimum, Kirchner had final policymaking authority, this Court does not have sufficient evidence to make such a determination as a matter of law.  Neither party has submitted any evidence illuminating the extent to which the County delegated to defendants authority to make personnel

---

Loeffler completely exceeded the bounds of the authority provided to him and, therefore, that Loeffler's actions did not reflect the policies of Islip.  Under those circumstances, Islip might not be municipally liable for Loeffler's actions in this case.

[26] As a threshold matter, as described *supra*, Pomroy denied that he was "just following orders" when he issued the summons.

decisions for the Department. More information is needed before a final determination can be made on this issue. Accordingly, defendants' motion for summary judgment on plaintiff's municipal liability claim must be denied without prejudice. We note, however, that the burden of demonstrating that defendants were the final municipal policymakers will ultimately rest with plaintiff.") (citations omitted).

## D. Qualified Immunity

The individual defendants also contend that they are entitled to summary judgment on qualified immunity grounds for all of the constitutional violations Sloup claims.[27] For the reasons set forth below, however, the Court denies summary judgment to the individual defendants on this ground.

### (1) Legal Standard

According to the Second Circuit, government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding*, 2007 U.S. App. LEXIS 28939, at *4 (explaining

---

[27] The issue of qualified immunity does not affect Islip because "[m]unicipalities do not enjoy either absolute or qualified immunity from suit under Section 1983." *White River Amusement Pub, Inc. v. Town of Hartford*, 412 F. Supp. 2d 416, 429 n.6 (D. Vt. 2005), *aff'd*, 2007 U.S. App. LEXIS 7150 (2d Cir. Mar. 28, 2007) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993)).

that government officers "are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law"). "A right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . The unlawfulness must be apparent." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) (citations and quotation marks omitted). In addition, the Second Circuit has repeatedly stated that qualified immunity only protects officials performing "discretionary functions." *See Simons v. Fitzgerald*, No. 07-0773-cv, 2008 U.S. App. LEXIS 15782, at *2 (2d Cir. July 25, 2008) ("'Qualified immunity shields government officials performing discretionary functions from liability for civil damages. . . .'") (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007)); *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 208 (D. Conn. 2005) ("'The qualified immunity doctrine protects government officials from civil liability in the performance of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'") (quoting *Lee v. Sandberg*, 136 F.3d 94, 100 (2d Cir. 1997)).

As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (quotation marks omitted)). Thus, qualified immunity is not merely a defense, but is "an entitlement not to stand trial or face the other burdens of litigation." *Forsyth*, 472 U.S. at 526. Accordingly, courts should determine the

availability of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

With respect to the summary judgment stage in particular, the Second Circuit has held that courts should cloak defendants with qualified immunity at this juncture "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required.") (citations and quotation marks omitted); *Stancuna v. Sherman*, No. 3:07CV00491, 2008 U.S. Dist. LEXIS 49059, at *18 (D. Conn. June 27, 2008) ("Here, the court finds that summary judgment on qualified immunity grounds is inappropriate. As the Second Circuit has held, [w]hen a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical. As noted above, there are issues of material fact in this case that this court may not decide. These issues of fact are critical to determining whether Sherman was operating under a reasonable belief as to what kind of search he was permitted to conduct.") (citation and quotation marks omitted).

## (2) Application

Here, it is not in dispute that the rights Sloup asserts – namely, his right to conduct his commercial fishing business, using legal permits, without arbitrary and wholly unauthorized state action depriving him of the use of his fishing equipment and livelihood – are clearly established. *See, e.g., Cobb v. Pozzi*, 363 F.3d 89, 111 (2d Cir. 2003) (explaining that "law pertaining to 'class of one' equal protection claims was clearly established in 1999" and, indeed, may date back generally to 1923); *Brady*, 863 F.2d at 217 ("It is well settled that enforcement of an otherwise valid zoning ordinance violates the Constitution . . . if . . . the decision of the particular zoning body is arbitrary, . . . or if the ordinance is applied or enforced with a discriminatory intent or purpose. We conclude that the appellees are not entitled to claim the defense of qualified immunity in the event that they are found to have violated the appellants' fourteenth amendment rights.") (citations and quotation marks omitted). Moreover, as described above, the Court has found that genuine issues of material fact preclude the Court from determining as a matter of law that these clearly established rights were not violated. Thus, the critical question is whether it was objectively reasonable for the individual defendants to believe that they were not committing such violations and, as the Court sets forth below, the Court declines to so conclude as a matter of law that it was objectively reasonable for defendants to believe that they were not violating plaintiff's rights.

Specifically, according to the Second Circuit, the very fact that the Court has determined – as described *supra* with respect

to Sloup's substantive due process and class of one claims – that a rational jury could find that the individual defendants singled Sloup out in an irrational and arbitrary manner is independently sufficient to preclude the Court from determining as matter of law that the individual defendants' actions were objectively reasonable. As the Second Circuit observed in *Cobb v. Pozzi*,

> The defendants also argue that they are entitled to qualified immunity as a matter of law because they treated the plaintiffs in an "objectively reasonable" manner. Under the circumstances, however, this is a question for the jury. We have already determined that there was enough evidence for the jury, rather than the district court, to decide whether the defendants treated the plaintiffs differently from similarly situated officers and had a rational basis for doing so. The issue of rational treatment is not sufficiently different from the issue of whether the defendants acted in an "objectively reasonable" manner so as to lead us to resolve the latter issue as a matter of law where we have concluded in the face of disputed issues of fact that the jury must resolve the former issue. *See Pathways Psychosocial v. Town of Leonardtown*, 133 F. Supp. 2d 772, 793 (D. Md. 2001) (concluding that the

defendants were not entitled to qualified immunity on the grounds that they acted in an objectively reasonable manner where a jury could find that their actions were irrational). *Cf. Stefanoff v. Hays County, Texas*, 154 F.3d 523, 526 (5th Cir. 1998) (finding that a policy was not objectively reasonable after determining that the policy was not rational for equal protection purposes); *cf. also Tesfu v. Ashcroft*, 322 F.3d 477, 481 (7th Cir. 2003) (noting that, in the context of asylum determinations, a fear of persecution must be "objectively reasonable" and therefore may not be "irrational"); *Perinpanathan v. I.N.S.*, 310 F.3d 594, 597-98 (8th Cir. 2002) (same). Indeed, it is difficult for us to see how conduct that is irrational (if so found by a jury) could nevertheless be objectively reasonable. Given these circumstances, the facts pertaining to whether the defendants acted in an objectively reasonable fashion, like those pertaining to the issue of whether they treated the plaintiffs differently from similarly situated officers for rational reasons, must be evaluated by a jury rather than by a court as a matter of law.

363 F.3d at 111-12.[28] Here, for the reasons stated *supra*, the Court has determined that – if Sloup's version of events is credited – a rational jury could find that defendants intentionally, irrationally, and arbitrarily subjected plaintiff (and only plaintiff) to a legally unfounded, blanket geographical prohibition from fishing in all of the harbor areas of Islip, despite defendants' conceded knowledge that they were not legally authorized to regulate fishing and that plaintiff's pots did not pose a hazard to navigation under the Town Code. Under these circumstances, the Court declines to conclude as a matter of law that the individual defendants' conduct was objectively reasonable. *See Walz v. Town of Smithtown*, 46 F.3d 162, 169 (2d Cir. 1995) ("Regardless of any doubts as to whether his conduct violated due process, Dowling could not have believed, as a matter of equal protection or simply of the laws of the town, that he had discretion to deny an excavation permit to the Walzes as a means of extorting land from them. Indeed, appellants offer no authority whatsoever that might have led Dowling to believe otherwise."); *Viruet*, 2006 U.S. Dist. LEXIS 17536, at *12-13 ("Further, Armstrong is not entitled to qualified immunity at this juncture because "the issue of rational treatment is not sufficiently different from the issue of whether [Armstrong] acted in an objectively reasonable manner so as to lead [the court] to resolve the latter issue as a matter of law where [the court] has concluded in the face of disputed issues of fact that the jury must resolve the former issue.") (quoting *Cobb*, 363 F.3d at 112) (internal quotation marks omitted); *see generally TLC Development, Inc. v. Town of Branford*, 855 F. Supp. 555, 558-59 (D. Conn. 1994) ("A finding of arbitrariness not only establishes a due process violation but precludes a defense of qualified immunity. . . . Further [the zoning commission defendant's] regulations specifically limited consideration of the sections on which it relied for the purpose of ordering modifications, not outright denials of site plan applications. It follows that there was no discernible, lawful authority for denial of plaintiff's site plan application. In doing so, it violated plaintiff's substantive due process rights. Accordingly the Town and the members of the commission are not entitled to summary judgment as a matter of law and their motion is denied.") (citations and quotation marks omitted). Accordingly, the Court denies the individual defendants' summary judgment motion on qualified immunity grounds.[29]

---

[28] The Court is aware that, "[b]ecause the focus of the qualified immunity inquiry is on the objective reasonableness of the defendant's actions, motivation does not come into play." *Sound Aircraft Servs., Inc. v. Town of East Hampton*, 192 F.3d 329, 334 (2d Cir. 1999) (reversing district court's rejection of qualified immunity defense because district court took defendants' hostility toward plaintiff into account). Thus, the Court has not taken the individual defendants' alleged malicious motivations into account in determining whether the individual defendants are entitled to qualified immunity, but merely the individual defendants' allegedly arbitrary, irrational, and unauthorized conduct.

[29] The Court notes that, in order to determine the availability of the qualified immunity defense in this case at trial, the Court is prepared to follow the procedures set forth by the Second Circuit in *Zellner v. Summerlin*, 494 F.3d 344, 367-68 (2d Cir. 2007). Specifically, although "the ultimate question of whether it was objectively reasonable for [defendants] to believe that [their] conduct did not violate a clearly established right, i.e., whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court," *id.* at 368, the jury must first "resolve[] any disputed facts that are material to the qualified immunity issue." *Id.* Further, "[t]o the

## V. Conclusion

For the foregoing reasons, the Court denies defendants' motions for summary judgment with respect to Sloup's Fourteenth Amendment claims, and grants their motions with respect to plaintiff's First Amendment claims. With respect to plaintiff's municipal liability claim, Islip's motion for summary judgment is denied without prejudice to Islip's renewing it at the close of evidence at trial.[30]

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: August 21, 2008
Central Islip, New York

* * *

Plaintiff is represented by Lawrence E. Kelly, Esq. of Glynn Mercep and Purcell, LLP, North Country Road, P.O. Box 712, Stony Brook, NY, 11790-0712. The individual defendants are represented by Jessica D. Klotz, Esq. of Lewis, Johs, Avallone, Aviles & Kaufman, LLP, 425 Broadhollow Road, Melville, NY, 11747. Islip is represented by Erin A. Sidaras, Esq., of the Town Attorney's Office, 655 Main Street, Islip, NY, 11751.

---

extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. *Id.* (citations omitted) (noting that "if the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding"). In particular, "'the jury should decide these issues on special interrogatories.'" *Id.* (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990). Once the jury has determined these factual issues, the Court will – if necessary – afford defendants an additional opportunity to renew their motion with respect to qualified immunity. *See, e.g., Zellner*, 494 F.3d at 364.

[30] In addition, the Court is aware that defendants moved for summary judgment on the grounds that, although Crabs Unlimited suffered most of the alleged damages in this action, the business was not named as a plaintiff. As the Court stated at argument, because plaintiff may be entitled to nominal damages if the jury finds that Sloup's constitutional rights were violated, his failure to bring suit on behalf of his business merely goes to the issue of the level of damages to which plaintiff is entitled, but is not grounds for summary judgment. In any event, if Sloup wishes Crabs Unlimited to be a plaintiff in this action, he must amend the complaint to that end

---

within sixty days of this Memorandum and Order.