UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| FRANK SLOUP and CRABS UNLIMITED, LLC, | ) ) ) | Docket No.: CV 05-1766 (JFB) (AKT) |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| ALAN LOEFFLER, TOWN OF ISLIP and CRAIG POMROY, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## INDIVIDUAL DEFENDANTS' MOTION TO SET ASIDE THE VERDICT

LEWIS JOHS AVALLONE AVILES, LLP

By:      Jessica Klotz, Esq.      (JK- 6521)
Attorneys for Defendants
LOEFFLER AND POMROY
425 Broad Hollow Road
Melville, New York 11747
631.755.0101
LJAA File No.:  132-1023

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT……………………………………………………… 1

LEGAL ARGUMENT…………………………………………………………… 2

POINT I:      STANDARD FOR JUDGMENT AS A MATTER OF LAW……………… 2

POINT II:     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A
              MATTER OF LAW……………………………………………… 4

POINT III:    STANDARD FOR A NEW TRIAL…………………………………….. 12

POINT IV:     DEFENDANTS ARE ENTITLED TO A NEW TRIAL………………… 12

POINT V:      THE EVIDENCE WAS INSUFFICIENT TO JUSTIFY
              PUNITIVE DAMAGES CHARGE…………………………………… 15

POINT VI:     STANDARD TO SET ASIDE THE VERDICT……………………… 16

POINT VII:    PUNITIVE DAMAGES AWARD SHOULD BE SET ASIDE AS
              EXCESSIVE AND AS AGAINST THE WEIGHT OF THE
              EVIDENCE……………………………………………………… 16

POINT VIII:   COMPENSATORY DAAMGES AWARD SHOULD BE SET
              ASIDE AS EXCESSIVE AND AS AGAINST THE WEIGHT OF
              THE EVIDENCE………………………………………………… 23

CONCLUSION……………………………………………………………............. 25

i

# TABLE OF AUTHORITIES

## CASES                                                                    PAGE

*Aldrich v. Thomson McKinnon Sec., Inc.,*
   756 F.2d 243 (2d Cir. 1985)……………………………………….. 20

*Alsaifullah v. Carter,*
   2009 WL 455442 (N.D.N.Y. 2009)…………………………………. 9

*Armstrong v. Commerce Tankers Corp.,*
   423 F.2d 957 (2d Cir. 1970)………………………………………. 3

*Beckford v. Irvin,*
   49 F.Supp.2d 170 (W.D.N.Y. 1999)……………………………….. 12

*BMW of North America, Inc. v. Gore,*
   517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)……………….17, 18, 19

*Carey v. Piphus,*
   435 U.S. 247,  98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)………………… 17

*Cine SK8 v. Town of Henrietta,*
   507 F.3d 778, 784 (2d Cir. 2007)…………………………………. 4

*Correa v. Hosp. San Francisco,*
   69 F.3d 1184 (1st Cir. 1995)……………………………………. 16, 23

*Cruz v. Local Union No. 3 of the Int'l Bd. of Elec. Workers,*
   34 F.3d 1148 (2d Cir. 1994)………………………………………. 2

*DiSorbo v. Hoy,*
   343 F.3d 172 (2d Cir. 2003)…………………………………..... 21, 22

*Douglas Asphalt Co. v. Moore, Inc.,*
   541 F.3d 1269 (11th Cir. 2008)…………………………………… 9

**CASES**                                                                    **PAGE**

*Engquist v. Oregon Department of Agriculture,*
  ---U.S. ----, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008).................…..... 7, 8, 9, 10

*Ferran v. Town of Nassau,*
  471 F.3d 363, (2d Cir. 2006)……………………………………………..   4

*Flowers v. City of Minneapolis,*
  558 F.3d 794 (8th Cir. 2009)……………………………………………..   9

*Garrity v. Lyle Stuart, Inc.,*
  40 N.Y.2d 354, 353 N.E.2d 793, 386 N.Y.S.2d 831 (1976)………………   17

*Harlan Associates v. Inc. Vill. of Mineola,*
  273 F.3d 494 (2d Cir. 2001)……………………………………………   4

*Ismail v. Cohen,*
  899 F.2d 183 (2d Cir. 1990)………………………………….............   16, 22

*Jund v. Town of Hempstead,*
  941 F.2d 1271 (2d Cir. 1991)…………………………………………...   3

*Katara v. D.E. Jones Commodities, Inc.,*
  835 F.2d 163 (2d Cir. 1988)…………………………………………...   3

*Kolstad v. American Dental Ass'n,*
  527 U.S. 523, 119 S.Ct. 2118 (1999)…………………………...............   17

*LeClair v. Saunders,*
  627 F.2d 606 (2d Cir. 1980)…………………………………………...   11

*Lee v. Edwards,*
  101 F.3d 805 (2d Cir. 1996)……………………………………………   21, 22

*Meriwether v. Coughlin,*
  879 F.2d 1037 (2d Cir. 1989)…………………………………………...   2

*Neilson v. D'Angelis,*
  409 F.3d 100 (2d Cir. 2005)…………………………………………...   7

iii

| CASES | PAGE |
|---|---|

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005)……………………………………….. 12

*O'Neill v. Krzeminski,*
   839 F.2d 9 (2d Cir. 1988)……………………………………… 16, 22

*Patterson v. Balsamico,*
   440 F.3d 104 (2d Cir. 2006)…………………………………… 20

*Reynolds v. Pegler,*
   123 F.Supp. 36 (S.D.N.Y. 1954)………………………………… 17

*Roginsky v. Richardson-Merrell, Inc.,*
   378 F.2d 832 (2d Cir. 1967)…………………………………… 19, 20

*Samuels v. Air Transport Local 504,*
   992 F.2d 12 (2d Cir. 1993)………………………………………. 2

*Smith v. Wade,*
   431 U.S. 30, 103 S.Ct. 1625 (1983)…………………………….. 17

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
   538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)……………… 17, 18, 19

*St. Louis, I.M. & S.R. Co. v. Williams,*
   251 U.S. 63, 40 S.Ct. 71, 64 L.Ed. 139 (1919)………………………….. 19

*Taylor v. National Railroad Passenger Corp.,*
   868 F.Supp. 479 (E.D.N.Y. 1994)…………………………….... 2, 3, 12, 16

*Unijax, Inc. v. Champion International, Inc.,*
   683 F.2d 678 (2d Cir. 1982)…………………………………………….. 3

*United States v. Moore,*
   543 F.3d 891 (7th Cir. 2008)……………………………………….. 9

*Vasbinder v. Scott,*
   976 F.2d 118 (2d Cir. 1992)…………………………………… 20, 21

iv

**CASES**                                                                         **PAGE**

*Vill. of Willowbrook v. Olech,*
   528 U.S. 562, 564 (2000)……………………………………………..    7

*Walz v. Town of Smithtown,*
46 F.3d 162 (2d Cir. 1995)…………………………………………….    21

*Zahra v. Town of Southold,*
   48 F.3d at 674 (2d Cir. 1995)……………………………………… 10, 11

**RULES**

Rule 50(a) of the Federal Rules of Civil Procedure………………… 1, 2, 3, 14

Rule 50(b) of the Federal Rules of Civil Procedure…………………  1, 2, 14

Rule 59 of the Federal Rules of Civil Procedure ……………………  1, 7, 14

**STATUTES**

Islip Town Code § 37-51………………………………………………..    5

Islip Town Code § 37-52……………………………………………….    5

Islip Town Code § 37-56………………………………………………    8, 11

## PRELIMINARY STATEMENT

At the close of plaintiff's case, defendants ALAN LOEFFLER ("LOEFFLER") and CRAIG POMROY ("POMROY") moved pursuant to Rule 50(a) of the Federal Rules of Civil Procedure for judgment as a matter of law. Exhibit A, TT,[1] p.1067, l.1 - p.1071, l.2. The Court reserved decision and allowed the matter be submitted to the jury, with leave to renew the motion following a verdict. Exhibit A, TT p.1079, l.4 - p.1081, l.2. During the charge conference, defendants ALAN LOEFFLER and CRAIG POMROY objected to the jury being charged on punitive damages. Exhibit A, TT p. 1319, l.9-16. This Court reserved decision on the issue of punitive damages, with leave to renew the motion following a verdict. Exhibit A, TT p.1319, l.17-21. At the close of all the evidence, defendants ALAN LOEFFLER and CRAIG POMROY again moved pursuant to Rule 50(a) of the Federal Rules of Civil Procedure for judgment as a matter of law. Exhibit A, TT p.1379, l. 24 - p.1380, l.6. This Court again reserved decision, with leave to renew the motion following a verdict. Exhibit A, TT p.1380, l.9-11.

On November 2, 2009, the jury returned a verdict, answering in the affirmative on every liability question, awarding compensatory damages of 1.8 million dollars and awarding punitive damages of $150,000 each against defendant ALAN LOEFFLER and CRAIG POMROY. Exhibit A, TT, p.1565, l.5 - p.1568, l.19. Defendants ALAN LOEFFLER and CRAIG POMROY now move pursuant to: (1) Rule 50(b) for judgment as a matter of law; (2) Rule 59 to set aside the verdict on the grounds that the verdict and both damage awards are grossly excessive and against the weight of the evidence; and alternatively, (3) Rule 59 for a new trial on the grounds that the verdict and both damage awards are grossly excessive and against the weight of the evidence.

---

[1] "TT" is a reference to Trial Transcript.

**LEGAL ARGUMENT**

**POINT I**

**STANDARD FOR JUDGMENT AS A MATTER OF LAW**

Defendants ALAN LOEFFLER and CRAIG POMROY move for judgment as a matter of law pursuant to Rule 50(b). According to Rule 50:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). A motion for judgment as a matter of law may be renewed within ten days after an entry of judgment. Fed.R.Civ.P. 50(b). Where, as here, a party moves jointly under Federal Rules of Civil Procedure 50(b) and 59(a), the court must rule separately on each motion. *Taylor v. National Railroad Passenger Corp.*, 868 F.Supp. 479, 483 (E.D.N.Y. 1994)(citing 5A *Moore's Federal Practice*, ¶ 50.13[1], p.50-112 (2d ed.)).

Rule 50(b) permits a party to renew post-verdict a motion for judgment as a matter of law made and denied at the close of all the evidence. *Cruz v. Local Union No. 3 of the Int'l Bd. of Elec. Workers,* 34 F.3d 1148 (2d Cir. 1994); *Meriwether v. Coughlin,* 879 F.2d 1037 (2d Cir. 1989); *Taylor,* 868 F.Supp. at 483. A district court may grant the motion only upon a showing that "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir. 1993); *Taylor,* 868 F.Supp. at 483 (citing *Mattivi v. South African Marine Corp.,* 618 F.2d 163, 168 (2d Cir. 1980). In other words, a trial court may correct a jury's decision only

2

if after so viewing the evidence it is convinced that (1) there is a complete absence of probative evidence to support the verdict in favor of the prevailing party, or (2) that the evidence is so strong and overwhelmingly in favor of the nonprevailing party that reasonable and fair-minded persons in the exercise of impartial judgment could not render a verdict against it. *Unijax, Inc. v. Champion International, Inc.*, 683 F.2d 678 at 680 n.6 (2d Cir. 1982); *Armstrong v. Commerce Tankers Corp.*, 423 F.2d 957, 959 (2d Cir. 1970), *cert. denied*, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970).

In deciding a Rule 50 motion, the Court is constrained to view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in its favor. *Taylor,* 868 F.Supp. at 483 (citing *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 60 (2d Cir. 1993)). The Court cannot "assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Id.* (citation omitted). However, where the evidence reasonably permits only a conclusion in the movant's favor judgment as a matter of law should be granted. *Jund v. Town of Hempstead*, 941 F.2d 1271, 1290 (2d Cir. 1991); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 163, 167-8 (2d Cir. 1988).

LOEFFLER and POMROY previously moved pursuant to Rule 50 for judgment as a matter of law on the grounds that plaintiff failed to establish the elements of his claims of substantive due process, class of one and selective enforcement. Exhibit A, TT p.1067, l. 1 - p.1071, l.2; p.1379, l.24 - p.1380, l.6. Additionally, the individual defendants previously moved to dismiss the claim for punitive damages. Exhibit A, TT p.1319, l.9-16. Thus, LOEFFLER and POMROY have preserved their right to renew their motion for a judgment as a matter of law.

3

## POINT II

## DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW

### Plaintiff's Substantive Due Process Claims

Plaintiff failed to present evidence to the jury that was legally sufficient to support his substantive due process claim. In order to demonstrate a violation of substantive due process rights under the Fourteenth Amendment, a plaintiff must demonstrate that he had a "valid property interest"; and (2) "defendants infringed on that property right in an arbitrary or irrational manner." *Cine SK8 v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007)(citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001)). Here, there was no evidence before the jury that defendants ALAN LOEFFLER and CRAIG POMROY acted in the requisite arbitrary or irrational manner.

It is not enough that the infringement of the property interest be infringed on in an arbitrary manner; a plaintiff must show a conscious shocking or oppression in the constitutional sense. *Harlen Associates,* 273 F.3d at 505. The reason is because if the action is merely arbitrary and capricious, it can be corrected in a state lawsuit and it is not an issue with respect to a violation of constitutional rights. *Id.* at 505 (citation omitted). In particular, plaintiffs must show that the government's infringement was " 'arbitrary,' 'conscience shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.' " *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006).

Here, defendants did not violate plaintiff's substantive due process rights. Plaintiff did not have an unfettered right to fish the waters of the Town of Islip. Rather those fishing rights must safely co-exist with the rights of the Town of Islip constituents using the waters of the Town of Islip for enjoyment and recreation, including but not limited to boating. The Town of

Islip, and their employees LOEFFLER and POMROY, had the duty to enforce the Islip Town

Code, as well of the laws of the State of New York, regarding hazards to navigation.  Indeed,

Islip Town Code § 37-52 specifically mandates that the Harbor Master "shall enforce" the

provisions of Article III, entitled "Navigation Regulations."  See, Exhibit D, Islip Town Code.

Section 37-51 states that use of the word "shall" means "mandatory. *Id.*

Plaintiff did not present evidence that established that the Harbor Masters acted in an

irrational manner.  With respect to the claimed actions of defendants ALAN LOEFFLER and

CRAIG POMROY in June and October, 2004, those actions were rational and reasonable.  As to

June 2004, all of plaintiff's witnesses, including plaintiff's former attorney, plaintiff's expert and

Captain Huss conceded that the Harbor Masters had the authority to do what they did.  When

asked by plaintiff's counsel what a DEC officer would do if he saw a navigational hazard,

Captain Huss stated that he "could report it to someone like Islip organization."  Exhibit A, TT,

p.214, l.3-12.  Captain Huss acknowledged that a fishing buoy attached to a fishing trap could be

a hazard to navigation.  Exhibit A, TT, p.182, l.14-18.  Captain Huss conceded that in a busy

area for boats, such as Champlins Creek, it would be especially dangerous to have a number of

crab pots in the channel.  Exhibit A, TT, p.192, l.17 - p.193, l.3.  He testified as follows:

> Q.    Can we agree that if a harbormaster sees buoys in the water that are in the
> channel, that it's well within the harbormaster's authority to ask the fisherman or
> the owner of the trap and buoys, to move it?
> A.    I would say yes.
> Q.    Okay.  And the reason that the harbormaster would be allowed to ask the
> fisherman or whoever had this crab trap in the middle of the channel, to move it
> would be just for what were talking about before.  It's a hazard to navigation, fair
> enough?
> A.    Yes.
> Q.    And the more fish traps or crab pots that are in a channel, the greater the
> hazard becomes.  Right?
> A.    Yes.

Exhibit A, TT, p.186, l.1-15.  Similarly, plaintiff's expert, Jack Fensterer testified that buoys in or

near the channel could be a potential hazard to a recreational boater traveling at night.  Exhibit A, TT, p.453, 19-23.  Richard Remmer also acknowledged that crab pots could be hazardous to a boater.  Exhibit A, TT, p.348, l.5-11; p. 357, l.6-9.

Richard Remmer testified that he understood that the Town of Islip's position was that they did not want plaintiff to fish in areas that the Town thought was hazardous and that the Town's position was rational:

> Q.      Did you understand that at least the Town, through its employees, was relaying to you that they didn't want your client to fish in areas that they, the Town, thought was hazardous?  Whether you agree with whether it was hazardous is a different story, but at least that was their side of the position?
> A.      Yes.
> Q.      Okay.  So that was their logic.  Don't fish where it's hazardous to other boats to do so, right?
> A.      Correct.
> Q.      **As a general proposition that's a rational thought for somebody, right?**
> A.      **Certainly.  Absolutely.**

Exhibit A, TT, p.374, l.22 - p.375, l.9 (emphasis added).

Defendants presented independent witnesses at trial.  Dennis McCann, the original complainant, testified that crab pots were placed all over the channel and creek, making it dangerous for a boater to navigate.  Exhibit A, TT, p.1185, l.2-23.  Tom Kuhner, a lifelong fisherman well acquainted with not only the waters of Islip, but also with plaintiff's fishing habits, testified before the Court.  Mr. Kuhner testified that the plaintiff was fishing in the Great South Bay and the harbors areas of the Town of Islip all through the year 2004, including spring, summer and fall.  Exhibit A, TT, p.1215, l.19 - p. 1216, l. 2.  His testimony clearly establishes that plaintiff was not banned from fishing.  Mr. Kuhner further testified that he had been asked to move his pots by Town of Islip harbor masters as well.  Exhibit A, TT, p.1213, l.2 - p.1215, l.17.  Mr. Kuhner's testimony clearly establishes that the law was applied equally to all fishermen.

6

Even taking the facts in the light that are most beneficial to the plaintiff for the purpose of this Rule 50 motion and assuming *arguendo* there was a blanket prohibition on commercial fishing in the harbor areas of the Town of Islip, there is no evidence that the Town Harbor Unit did not enforce the ban against others. Mr. Remmer's testimony that his brother George and John Boucek were fishing in October or November 2004 in the Connequot River (Exhibit A, TT, p.401, 1.13-22; p.401, 1.6 - p.402, 1.16) and the photograph taken by Mrs. Sloup in October 2004 but not produced until the first day of trial which shows a fishing buoy in the distance that purportedly belonged to Mr. Boucek, is not sufficient evidence for the jury to find that plaintiff was treated differently than other fisherman. No evidence was presented to establish that the Town Harbor Unit saw either George Remmer or John Boucek during this time. Moreover, Tracey Sloup testified that the buoy was not in the channel. Exhibit A, TT, p.1029, 1.18-22.

Here, plaintiff did not set forth any evidence to the jury to establish that the conduct of ALAN LOEFFLER and CRAIG POMROY was conscious shocking or oppressive in the constitutional sense, as required to establish his claim. Therefore, defendants are entitled to judgment as a matter of law dismissing plaintiff's substantive due process claim.

**Plaintiff's Class of One Claim**

Plaintiff failed to present evidence to the jury that was legally sufficient to support his class of one claim. A plaintiff asserting class of one equal protection claim must show: (1) he was intentionally treated differently than others similarly situated; and (2) there was no rational basis for such different treatment. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005). In *Engquist v. Oregon Department of Agriculture,* ---U.S. ----, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008), the Supreme Court added the requirement that a class of one plaintiff must show that the differential treatment received

resulted from non-discretionary state action. *Engquist,* 128 S.Ct. at 2154. Here, the actions of defendants ALAN LOEFFLER and CRAIG POMROY were rational and reasonable under the circumstances. Here, there were no others "similarly situated" to Frank Sloup, as required in a class-of-one equal protection claim. Nor can plaintiff establish that the alleged differential treatment resulted from a non-discretionary state action.

It is uncontroverted that the June 9, 2004 summons issued to FRANK SLOUP for his fishing equipment creating a hazard to navigation under Islip Town Code § 37-56 was the first and only time a summons was ever written under that section. However, the evidence clearly establishes that no one, including plaintiff, ever refused to move fishing equipment when asked by a Harbor Master. As stated *supra,* the Harbor Masters not only had the right to enforce Islip Town Code § 37-56, they were mandated to do so if there was a violation of the Town Code. Whether something constituted a hazard and how it was addressed was discretionary. As to the ban, the evidence put before the jury was that the only times the purported ban was enforced against plaintiff was when plaintiff was fishing in Champlins Creek - once on June 9, 2004 and once on October 6, 2004. By plaintiff's own admission at trial, there were no other commercial fishermen utilizing Champlins Creek in 2004 and therefore plaintiff cannot establish that he and his comparators were prima facie identical in all relevant respects or directly comparable in all material respects.

In *Engquist v. Oregon Department of Agriculture,* ---U.S. ----, 128 S.Ct. 2146, 2154, 170 L.Ed.2d 975 (2008), the Supreme Court stated:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be treated alike, under like circumstances and conditions is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge

8

based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*        *        *

Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. **But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.**

128 S.Ct. at 2154 (emphasis added).   Various courts have gone on to state the principals discussed by the Supreme Court in *Engquist,* should be extended to all "class of one" cases.

In *Alsaifullah v. Carter*, 2009 WL 455442 (N.D.N.Y. 2009), the Northern District of New York held that *Engquist* added an additional prong to state such a class-of-one claim, that plaintiff must prove that the difference in treatment resulted from a non-discretionary state action.  2009 WL 455442 at 3 (citing *Engquist,* 128 S.Ct. at 2154).   In *Flowers v. City of Minneapolis,* 558 F.3d 794 (8th Cir. 2009), the Eighth Circuit stated that "while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim." *Id.* at 799-800.   In *United States v. Moore,* 543 F.3d 891 (7th Cir. 2008), the Seventh Circuit held that "a class-of-one equal protection challenge, at least where premised solely on arbitrariness/irrationality, is just as much a 'poor fit' in the prosecutorial discretion context as in the public employment context." *Id.* at 901. *See also, Douglas Asphalt Co. v. Moore, Inc.,* 541 F.3d 1269, 1274 (11th Cir. 2008).

Here, the decision that FRANK SLOUP's fishing equipment in Champlins Creek in June and October 2004 was a hazard to navigation and issuance and prosecution of the June 9, 2004 summons were clearly discretionary acts which require dismissal of plaintiff's "class of one"

9

claim. Indeed, the issuance of the ticket is the very situation that the Supreme Court in *Engquist* stated was a discretionary act for which "class of one" liability would not lie. Therefore, defendants are entitled to judgment as a matter of law dismissing plaintiff's "class of one" claim.

**Plaintiff's Selective Enforcement Claims**

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "is essentially a direction that all persons similarly situated should be treated alike." *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)(citation omitted). As the Second Circuit has recognized, selective enforcement is a "murky corner of equal protection law in which there are surprisingly few cases." *Id.* (citation omitted). A selective enforcement claim is proper where it is established that: (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. *Zahra,* 48 F.3d at 683 (citations omitted).

A plaintiff claiming selective enforcement needs to prove more than that he was treated differently from others. *Id.* The Second Circuit's precedents have "firmly established that 'equal protection does not require that all evils of the same genus be eradicated or none at all.' " *Id.* (citation omitted). Rather, to sustain an equal protection claim based on the alleged selective enforcement of a Town Code, plaintiff must satisfy both prongs of the test stated above. Evidence suggesting that plaintiff was "treated differently"" from others does not, in itself, show malice. *Id.* (citing *LeClair*, 627 F.2d at 610-11 (allegation of different treatment did not alone demonstrate malice)). Even evidence suggesting that others acting in the same manner as plaintiff were not issued violations, while plaintiff was, does not, standing alone, establish a

10

malicious or bad faith intent to injure. *Zahra*, 48 F.3d at 683 (citing *LeClair*, 627 F.2d at 608 ("Mere failure to prosecute other offenders is not a basis for a finding of denial of equal protection.")).

As set forth above, there was no evidence presented to the jury establishing other fisherman in Champlins Creek in 2004 when plaintiff was told to move his equipment, There was no evidence presented to the jury that on the two occasions plaintiff and his former attorney Richard Remmer claim that George Remmer and John Boucek was fishing, those individuals were observed by members of the Harbor Unit.  There was no evidence that plaintiff's treatment was based on impermissible considerations, maliciousness or bad faith.

Even assuming *arguendo* there was selective enforcement of Islip Town Code §37-56 against plaintiff, selective enforcement of a facially constitutional law or regulation does not, by itself, violate the Equal Protection Clause. Nor does demonstration of different treatment to persons similarly situated, without more, establish malice or bad faith. Even failure to prosecute all known lawbreakers resulting in people who are equally guilty of violations receiving unequal treatment, is not a violation of equal protection.  Rather, there must be a showing of clear and intentional discrimination.

In *Zahra, supra,* the Second Circuit stated that a plaintiff claiming selective enforcement needs to prove more than that he was treated differently than others. 48 F.3d at 684.  The Court further stated that even evidence suggesting others acting in the manner the as plaintiff were not in violation while the plaintiff was, is not enough to establish malicious or bad faith intent to injure the plaintiff.  The Second Circuit in *LeClair v. Saunders,* 627 F.2d 606 (2d Cir. 1980) found that "[m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection." *Id.* at 608.  Based on these cases, there is no basis for a finding that the

11

defendants selectively enforced the Town Code against plaintiff.   Therefore, defendants are entitled to judgment as a matter of law dismissing plaintiff's selective enforcement claim.

## POINT III

### STANDARD FOR A NEW TRIAL

The Court should grant a motion for a new trial if the Court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005)(citation omitted); *Beckford v. Irvin*, 49 F.Supp.2d 170, 183 (W.D.N.Y. 1999)(citation omitted).   When proceeding under Rule 59(a), the Court may order a new trial even where substantial evidence supports the jury's verdict.  *Nimely,* 414 F.3d at 392 (citation omitted); *Beckford*, 49 F.Supp.2d at 183 (citation omitted); *Taylor,* 868 F.Supp. at 484 (citation omitted).   Unlike judgment as a matter of law, the Court is not constrained to view the evidence in the light most favorable to the non-movant.  *Beckford,* 49 F.Supp.2d at 183; *Taylor,* 868 F.Supp. at 484 (citation omitted).   In a Rule 59 motion, the Court conducts its own "detailed appraisal of the evidence." *Beckford,* 49 F.Supp.2d at 183; *Taylor,* 868 F.Supp. at 484 (citation omitted).   A new trial is proper where "the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." *Id.* (citation omitted).

## POINT IV

### DEFENDANTS ARE ENTITLED TO A NEW TRIAL

The verdict finding that plaintiff's constitutional rights were violated by defendants is against the weight of the evidence entitling defendants to a new trial.   As set forth in Point II *infra*, and below, even plaintiff's witnesses testified that the harbor master defendants had the right to do what they did, and that they acted reasonably and rationally.   Richard Remmer

testified that "the harbormaster has a duty to enforce the Town Code" and that he wants all sections of the Town Code enforced.  Exhibit A, TT, p.368, l.9-22.

Significantly, Captain Huss testified that the DEC does **not** regulate the placement of eel pots and crab traps:

> Q.    Now, fishing traps, eel pots and the like are legal in New York State; is that correct?
> A.    Yes.
> Q.    Placing of this equipment is legal?
> A.    Yes.
> Q.    What makes it legal?
> A.    Well, by virtue of a license and the regulation allows it.
> Q.    And the only thing that would be illegal if you placed it in the wrong place; is that correct?
> A.    **We don't really regulate where they place them, as far as eel pots and crab traps, no.**
> Q.    Yes.
> A.    **There's nothing illegal in our law about where they go. There's nothing illegal in our law about where they go.**

Exhibit A, TT, p.216, l.20 - p.217, l.7 (emphasis added).  Captain Huss testified that a DEC officer who saw a navigational hazard would "report it to someone like Islip organization." Exhibit A, TT, p.214, l.3-12.  According to Captain Huss, the DEC does not get involved in regulating navigational hazards.  Exhibit A, TT, p.179, l.15-22.  Captain Huss did not even believe that the DEC had the power to regulate navigational hazards in the waters of the Town of Islip.  Exhibit A, TT, p.181, l.7 - p.182, l.3.

Captain Huss acknowledged that a fishing buoy attached to a fishing trap could be a hazard to navigation.  Exhibit A, TT, p.182, l.14-18.  Captain Huss conceded that in a busy area for boats, such as Champlins Creek, it would be especially dangerous to have a number of crab pots in the channel.  Exhibit A, TT, p.192, l.17 - p.193, l.3.  Richard Remmer also acknowledged that crab pots could be hazardous to a boater.  Exhibit A, TT, p.348, l.5 - 11; p. 357, l.6-9.

Captain Huss testified as follows:

13

> Q.      Can we agree that if a harbormaster sees buoys in the water that are in the channel, that it's well within the harbormaster's authority to ask the fisherman or the owner of the trap and buoys, to move it?
> A.      I would say yes.
> Q.      Okay.  And the reason that the harbormaster would be allowed  to  ask  the fisherman or whoever had this crab trap in the middle of the channel, to move it would be just for what were talking about before.  It's a hazard to navigation, fair enough?
> A.      Yes.
> Q.      And the more fish traps or crab pots that are in a channel, the greater the hazard becomes.  Right?
> A.      Yes.

Exhibit A, TT, p.186, l.1-15.  Similarly, plaintiff's expert. Jack Fensterer testified that buoys in or

near the channel could be a potential hazard to a recreational boater traveling at night.  Exhibit

A, TT, p. 453, 19 - 23.

Here, defendants presented Dennis McCann, the complaining witness on June 9, 2004,

who testified as follows:

> Q.      On your wife's birthday, what did you do? Keep it short relative to  boating and what not?
> A.      We went out boating for the day with the family.
> Q.      That was on June 8th
> A.      Yes.
> Q.      And did you make any observations while you were boating relevant to Champlin's Creek?
> A.      Upon return, it was almost dark out, I remember, and when we returned there was what I refer to as a ton of buoys what seem to be marking traps which I normally see traps underneath.
> Q.      Where were the buoys that were trap marks, as you said?
> A.      Just scattered all over the canal, all over the creek.
> Q.      Were they in the portion of the channel, the navigable portion of Champlin's Creek?
> A.      Yes.
> Q.      Can you tell the members of the jury how many buoys at that time you saw?
> A.      I don't recall counting them. I would estimate between 30 and 40.

Exhibit A, TT, p.1185, l.2-23.

The harbor masters who testified, LOEFFLER, POMROY and Robert Sgroi, all testified there was no ban against plaintiff fishing in the harbor areas. Exhibit A, TT, p.545, l.1-21; p.1085,l.3-7; p.1245, l. 4-7. Assistant Town Attorney Robert Cicale testified was no ban against plaintiff fishing in the harbor areas. Exhibit A, TT, p.1326, l.19-24; p.1328, l.14-24. Commercial fisherman Tom Kuhner testified there was no ban against plaintiff fishing in the harbor areas. Exhibit A, TT, p.1218, l.4-7. Tom Kuhner also testified plaintiff was fishing in the Bay and the harbor areas in 2004 and that he also received warnings from the harbormasters regarding fishing gear in the channel. Exhibit A, TT, p.1213, l.2 - p. 1215, l.17. The jury clearly ignored this relevant and substantial evidence.

Accordingly, the jury's finding that the defendants violated plaintiff's Constitutional right is seriously erroneous and a miscarriage of justice, requiring correction by this Court. Allowing this verdict to stand would have a chilling effect on marine law enforcement in the Town of Islip. Accordingly, a new trial is warranted.

**POINT V**

**THE EVIDENCE WAS INSUFFICIENT TO JUSTIFY PUNITIVE DAMAGES CHARGE**

Over defendants' objection (Exhibit A, TT p.1319, l.9-16), the Court charged the jury on punitive damages. Exhibit F, Jury Charge. The evidence in this case did not establish that LOEFFLERR or POMROY exhibited extreme or outrageous conduct or that their actions were done maliciously or wantonly. There was no evidence of ill will or spite towards plaintiff. There was no demonstration that the defendants acted in reckless or callous indifference to plaintiff's rights. As the charge states, plaintiff must show that defendants had a conscious desire to violate federal rights of which he is aware, or a conscious desire to injure plaintiff in a manner he knows to be unlawful. Exhibit F. Here, there is no such showing with respect to the acts of

15

LOEFFLER or POMROY in 2004.  Thus, the jury should not have been charged as to punitive damages.

### POINT VI

### STANDARD TO SET ASIDE THE VERDICT

Damage awards should be set aside if the award is "so high as to shock the judicial conscience and [the award] constitute[s] a denial of justice." *Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir. 1990); *O'Neill v. Krzeminski,* 839 F.2d 9, 13 (2d Cir. 1988).  The Courts of the Second Circuit consider a jury verdict excessive "if it is so high as to 'shock the judicial conscience.' " *Taylor,* 868 F.Supp. at 484 (citing *Schneider v. National R.R. Passenger Corp.,* 987 F.2d 132, 137 (2d Cir. 1993)).  The law does not permit a jury to "abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." *Taylor,* 868 F.Supp. at 484 (citing *Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768, 773 (3d Cir. 1987).  Rather, the award must be fair and reasonable, and the injury sustained and the amount awarded rationally related.  *Taylor,* 868 F.Supp. at 484. In weighing the propriety of the 1.8 million dollar compensatory damages verdict and the $150,000 punitive damages verdict against both LOEFFLER and POMROY involved here, this Court may look to the amount of damages awarded to other plaintiffs in cases involving comparable claims.  *Taylor,* 868 F.Supp. at 485 (citation omitted).  When a party challenges the sufficiency of the evidence, the Court "must take both the facts and the reasonable inferences therefrom in the light most hospitable to the jury's verdict." *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1188 (1st Cir. 1995).

### POINT VII

### PUNITIVE DAMAGES AWARD SHOULD BE SET ASIDE AS EXCESSIVE AND AS AGAINST THE WEIGHT OF THE EVIDENCE

Punitive damages may be awarded in a limited number of instances "where the wrong

complained of is morally culpable, or is actuated by evil and reprehensible motives.... It is a social exemplary 'remedy', not a private compensatory remedy." *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 353 N.E.2d 793, 795, 386 N.Y.S.2d 831, 833 (1976). *See also, Carey v. Piphus,* 435 U.S. 247, 257 n.11, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The imposition of punitive damages is not for the benefit of the successful private litigant, but for the good of the public, principally for its deterrence against a repetition by the same offender or by others who may be bent upon the same offensive conduct. *Reynolds v. Pegler*, 123 F.Supp. 36, 39 (S.D.N.Y. 1954), *aff'd*, 223 F.2d 429 (2d Cir. 1955).

The elements of proof for punitive damages in § 1983 actions was identified by the Supreme Court in *Smith v. Wade*, 431 U.S. 30, 103 S.Ct. 1625 (1983). Specifically the Court held "that a jury may be permitted to assess punitive damages when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith,* 103 S.Ct. at 1625. First, as a threshold matter, the plaintiff must prove that the defendant intentionally violated his federally protected rights, or acted with reckless indifference toward those rights. *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Second, even if this threshold is met, the Due Process Clause of the Fourteenth Amendment limits the amount of punitive damages available, prohibiting "grossly excessive" awards. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416-17, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 1594, 134 L.Ed.2d 809 (1996)(citing *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 454, 113 S.Ct. 2711, 2718, 125 L.Ed.2d 366 (1993)). To be entitled to an award of punitive damages, a claimant must show "a positive element of conscious wrongdoing." *Kolstad v. American Dental Ass'n*, 527 U.S. 523, 538, 119 S.Ct. 2118

17

(1999). Here, there was no evidence of conscious wrongdoing by either LOEFFLER or POMROY. Both LOEFFLER and POMROY believed that their actions were justified and legal. Therefore, punitive damages are not warranted.

In *BMW,* the Supreme Court provided three guideposts for determining whether a punitive damages award was "grossly excessive" in this sense: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 517 U.S. at 575. The Supreme Court has stated that the degree of reprehensibility is the most important guidepost in the *BMW* test. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In measuring the reprehensibility of a defendant's conduct, the Supreme Court has instructed Courts to consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm,* 538 U.S. at 419 (citing *BMW,* 517 U.S. at 576-77, 116 S.Ct. 1589). Here, there was no physical harm to plaintiff, nor the threat of physical harm. Here, the actions of LOEFFLER and POMROY were based on their consideration of the safety of others, not evidence of an indifference to or reckless disregard of the welfare and safety of others. Here, there is no evidence of intentional malice, and there is no claim of trickery or deceit.

Under the second *BMW* guidepost, this Court must consider whether punitive damages bear a reasonable relationship to the harm that the defendant's conduct caused or is likely to have caused. *BMW,* 517 U.S. at 581. Here, there is no plausible relationship between the $150,000

and the alleged harm.  Indeed, the jury imposed the identical sanction on LOEFFLER and POMROY despite the facts that each defendant is alleged to have committed different acts.  The fact that the jury treated LOEFFLER and POMROY exactly the same in imposing punitive damages demonstrates that the jury's verdict was not based on the evidence and was clearly based on the jury's sympathy for the plaintiff.  Under the final *BMW* guidepost, the Court must consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm,* 538 U.S. at 428, 123 S.Ct. 1513.

Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. *BMW,* 116 S.Ct. at 1599.  A punitive award may not be "wholly disproportioned to the offense." *St. Louis, I.M. & S.R. Co. v. Williams,* 251 U.S. 63, 66-67, 40 S.Ct. 71, 73, 64 L.Ed. 139 (1919).  This principle reflects the accepted view that some wrongs are more blameworthy than others:  nonviolent crimes are less serious than crimes marked by violence or the threat of violence; trickery and deceit are more reprehensible than negligence. *BMW,* 116 S.Ct. at 1599 (citations omitted).  That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages does not establish the high degree of culpability that warrants a substantial punitive damages award. *BMW,* 116 S.Ct. at 1602.  Here, the punitive damages award of $150,000 each against LOEFFLER and POMROY cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal. *BMW,* 116 S.Ct. at 1603.

In considering this motion, this Court must consider the nature and purpose underlying the concept of punitive damages. As Judge Friendly concluded in *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 843 (2d Cir. 1967)(Friendly, J.), the conduct that will give rise to

19

punitive damages under New York law must be "close to criminality."

> The purpose of punitive damages [is] to punish the defendant and to deter him and others from similar conduct in the future...[The Court's] task is to make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.

*Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006) (citation omitted). *See, Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir. 1992)(citation omitted). Additionally, the court should not "affirm punitive damages that result in the financial ruin of the defendant or constitute a disproportionately large percentage of the defendant's net worth." *Patterson,* 440 F.3d at 121. Punitive damages should not be awarded beyond an amount reasonably necessary to secure the purpose of punishment and deterrence. *Aldrich v. Thomson McKinnon Sec., Inc.,* 756 F.2d 243, 249 (2d Cir. 1985)

An award should not be so high as to result in the financial ruin of the defendant. *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir. 1992) (citing *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 373 (2d Cir. 1988)). Nor should it constitute a disproportionately large percentage of a defendant's net worth[2]. *Id.* Indeed, " 'even outrageous conduct will not support an oppressive or patently excessive award of damages.' " *Vasbinder,* 976 F.2d at 121 (citation omitted). Significantly, because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute "a windfall to the individual litigant." *Vasbinder,* 976 F.2d at 121 (citation omitted).

In *Vasbinder, supra,* the Second Circuit found the punitive damages awarded by the jury, $150,000 against each defendant, to be excessive as a matter of law. The evidence revealed that the punitive damages award was in excess of fifty percent of one defendant's net worth. The

---

[2] Here, the only discussion of ALAN LOEFFLER's finances was that his current salary with the New York State Naval Militia was $74,000 a year. Exhibit A, TT, p. 615, l. 5 - 17. Plaintiff's counsel did ask LOEFFLER whether his New York State pension which began in 2005 was $99,000, to which LOEFFLER responded "No Sir" and "I wish it was." Exhibit A, TT, p. 615, l. 5 - 17. There was no discussion of CRAIG POMROY's finances whatsoever.

Second Circuit stated that the "dramatic reduction in [defendant] Switzers' wealth and retirement expectations 'shocks the judicial conscience' because it far exceeds what is needed to deter the defendants or similarly situated individuals from engaging in the wrongful conduct addressed in this action." 976 F.2d at 121. The evidence also revealed that the punitive damages award against the other defendant would consume approximately thirty percent of his net worth, and over forty percent of his liquid assets at a time where the defendant was contemplating retirement. The Second Circuit stated that "[i]f the jury's award were upheld, he would suffer a massive loss of retirement income." *Id.* Thus, notwithstanding the jury's finding that the defendants had violated plaintiff's First Amendment rights, "the jury's award of punitive damages substantially exceeds that necessary to punish the defendants and deter similar conduct in the future, and therefore represents an unjustifiable windfall to [plaintiff]." 976 F.2d at 121.

With regards to punitive damages, "a district court may refuse to uphold a punitive damage award when the amount is so high as to shock the judicial conscience and constitute a denial of justice." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996)(citation omitted). "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Id.* (citation omitted).

To determine the appropriate level of punitive damages and determine whether the award is excessive the Court should be review awards in other section 1983 cases. *DiSorbo v. Hoy*, 343 F.3d 172, 188 (2d Cir. 2003). Cases involving discretionary acts of government officials are almost non-existent. However, in *Walz v. Town of Smithtown*, 46 F.3d 162 (2d Cir. 1995), the Town Highway Commissioner was found to have used his position and authority in an attempt to extort plaintiffs out of a piece of their property. There, the Second Circuit affirmed a punitive

21

damages verdict against the Commissioner in the amount of $9,500. That is a far cry from the $150,000 punitive damages award issued to each of the individual defendants here.

The most common civil rights cases that result in punitive damages awards are police brutality cases. In *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003), plaintiff was beaten in her cell resulting in two hematomas on her head, bruises throughout her upper body, and injuries consistent with being choked. Remittitur was ordered unless plaintiff agreed to reduce punitive damages from $1.275 million to $75,000. In *Ismail v. Cohen*, 899 F.2d 183 (2d Cir. 1990), the plaintiff was struck by a police officer in the back of the head causing plaintiff to lose consciousness. When plaintiff regained consciousness he was handcuffed with a gun pressed behind his head. As a result of the incident plaintiff suffered two displaced vertebra, a cracked rib and serious head trauma. The Second Circuit affirmed the jury's verdict of $150,000. In *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996), plaintiff was knocked unconscious by a police officer. The Second Circuit ordered remittur unless plaintiff consented to reduce punitive damages from $125,000 to $75,000. In *O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988), plaintiff was beaten in his cell resulting in a fractured nose and lacerations to his forehead and eyebrow. The Second Circuit ordered remittitur unless plaintiff agreed to reduce punitives from $185,000 (combined against both officers) to $80,000 (combined against both officers).

These cases demonstrate that even in cases involving severe beatings by law enforcement personnel in the last ten years, the Second Circuit has reduced most punitive damages awards to between $40,000 and $75,000. The differences in the conduct against the law enforcement personnel in those case and the conduct by LOEFFLER and POMROY here is staggering. Here, there was no physical violence against the plaintiff.

A review of all the evidence at trial does not support the punitive damages award of $150,000 each against ALAN LOEFFLER and CRAIG POMROY.  This award is so "grossly excessive" that the only conclusion is that it was a product of sympathy, passion and prejudice.  Indeed, a $150,000 punitive damages award has only been sustained in a § 1983 case when the law enforcement personnel severely beat a handcuffed individual.  It would clearly be a denial of justice to permit the punitive damages award to stand here.  Thus, as a matter of law, the punitive damages award of $150,000 against each individual defendant cannot be warranted and must be set aside.

## POINT VIII

### COMPENSATORY DAMAGES AWARD SHOULD BE SETASIDE AS EXCESSIVE AND AS AGAINST THE WEIGHT OF THE EVIDENCE

A jury's award of compensatory damages will be overturned only if it is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.  *Correa,* 69 F.3d at 1197 (citation omitted).  Here, the $1.8 million compensatory damages award should be set aside because it is so grossly shocking it must compel the conclusion that it was a product of passion and prejudice.

Indeed, there is no evidence to substantiate the compensatory damages award.  As plaintiff admitted during his direct testimony: "I'm self-employed.  I have no guaranteed income. I know, you can have a bad season and not have income."  Exhibit A, TT, p.740, l. 2-3.  When asked by his attorney what his losses were, plaintiff responded:  "About $115,000."  Exhibit A, TT, p.729, l.15-19.  Plaintiff testified that he arrived at that figure " figuring how many days [he] lost production of gear in the harbor areas" and that he "based those losses on historic averages." Exhibit A, TT, p.729, l.19-23.  This figure is not an accurate representation of losses, as it fails to incorporate plaintiff's expenses.

A more accurate reflection of plaintiff's out-of pocket losses is his ordinary or business income. The tax summary chart that plaintiff admitted into evidence and which the jury reviewed prior to reaching their verdict shows that plaintiff's ordinary/business income was as follows:

| | |
|---|---|
| 2002 | $ 96,781 |
| 2003 | $ 64,572 |
| 2004 | $ 33,406 |
| 2005 | $ 30,786 |
| 2006 | $118,462 |

Exhibit C, tax summary chart. Even the use of the net income figures is inaccurate because of the way plaintiff's tax preparer arrived at the figures on plaintiff's 2003 tax returns. It is uncontroverted that the bank records do not demonstrate deposits for January, February or March, 2003. Therefore, the tax preparer took an average of the bank deposits for April through December 2003, and then used that figure as the sales for the missing months of January, February and March 2003. Exhibit A, TT, p.1283, l.23 - p.1284, l.7.

To the extent that the compensatory damages award was based on plaintiff's testimony that he had offers to purchase the property for $1.2 million and $1.4 million, these offers do not accurately reflect the value of the property. First, those offers did not come to fruition, as no one purchased the property prior to the foreclosure. Second, even if plaintiff had received either amount for the property, plaintiff did not own the property free and clear, and would have had to pay off his existing mortgage. At the time of plaintiff's bankruptcy filing in October 2005, the amount of the mortgage was $631,803.20. See, Exhibit D, 2005 bankruptcy petition. Moreover, when the property was sold at auction, the bank purchased it back for the price of the mortgage. Thus, even if the jury believed that plaintiff lost his property due to the actions of the defendants, the value of the property was the value of the mortgage.

24

The jury's award indicated that the jury clearly failed to consider plaintiff's pre-existing debts and financial situation.  The evidence presented at trial clearly established that plaintiff was in dire financial straits prior to the alleged unconstitutional actions of the defendants.  After refinancing in 2002, plaintiff fell behind in his mortgage in 2003.  Exhibit A, TT, p.745, l.15-18.  Plaintiff fell behind in his mortgage payments and as of June 9, 2004, was behind.  Exhibit A, TT, p.747, l.6-10.  In 2004, the bank threatened to foreclose on the property.  Exhibit A, TT, p.747, l.25 - p.748, l.3.  In the beginning of 2005, Maspeth started foreclosure proceedings against plaintiff's property.  Exhibit A, TT, p.748, l.17-20.

A review of all the evidence at trial does not support a 1.8 million dollar compensatory damages award.  This award ignores the evidence presented at trial.  Moreover, the award is so "grossly excessive" that the only conclusion is that it was a product of passion and prejudice.  It would clearly be a denial of justice to permit this verdict to stand.  Thus, the compensatory damages award should be set aside.

## CONCLUSION

For the reasons set forth above, it is respectfully requested that this Court issue an Order pursuant to: (1) Rule 50(b) for judgment as a matter of law; (2) Rule 59 to set aside the verdict on the grounds that the verdict and both damage awards are grossly excessive and against the weight of the evidence; and alternatively, (3) Rule 59 for a new trial on the grounds that the verdict and both damage awards are grossly excessive and against the weight of the evidence.