# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 05-CV-1766 (JFB) (AKT)

———————————

## FRANK SLOUP AND CRABS UNLIMITED, LLC,

Plaintiffs,

VERSUS

## ALAN LOEFFLER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A TOWN OF ISLIP EMPLOYEE, TOWN OF ISLIP, AND CRAIG POMROY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A TOWN OF ISLIP EMPLOYEE,

Defendants.

———————————

## MEMORANDUM AND ORDER
September 30, 2010

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Frank Sloup ("Sloup") and his business, Crabs Unlimited, LLC ("Crabs Unlimited") brought this action against defendants Alan Loeffler, individually and in his official capacity as a Town of Islip employee ("Loeffler") and Craig Pomroy, individually and in his official capacity as a Town of Islip employee ("Pomroy") (together the "individual defendants"), as well as the Town of Islip (the "Town" or "Islip") (collectively "defendants"), alleging that defendants violated plaintiffs' constitutional rights when they were banned from fishing and crabbing in certain waters of the Town of Islip.

A jury trial took place from October 19, 2009 through November 3, 2009, and the jury (1) found that a ban was imposed on plaintiff

Frank Sloup, prohibiting him from fishing in the harbor areas of the Town of Islip in 2004 by both Alan Loeffler and Craig Pomroy; (2) found defendants Alan Loeffler and Craig Pomroy liable under an equal protection "class of one" claim; (3) found defendants Alan Loeffler and Craig Pomroy liable under an equal protection "selective enforcement" claim; (4) found defendants Alan Loeffler and Craig Pomroy liable for violating plaintiffs' substantive due process rights; and (5) found the Town of Islip liable for violations of plaintiffs' constitutional rights.

With respect to damages, the jury awarded $1.8 million in compensatory damages and $150,000 in punitive damages against defendant Alan Loeffler and $150,000 in punitive damages against defendant Craig Pomroy in connection with the imposition of the ban on Sloup's fishing.

Presently before the Court are post-trial motions brought by the Town and the individual defendants. Defendant Town of Islip now moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) on the basis that there was an absence of proof that defendant Loeffler was a policymaker or that a long-standing custom or policy existed in the Town that led to the alleged constitutional violation. The Town also moves for a new trial under Federal Rule of Civil Procedure 59 based on the grounds that (a) defendant Loeffler was erroneously found to be a policymaker and it was error to find that the Town had a long-standing custom or policy that led to the constitutional violation; (b) excessive compensatory and punitive damages were awarded; and (c) the verdict was against the weight of the evidence.

The individual defendants also move for judgment as a matter of law under Rule 50(b). Specifically, they argue that plaintiffs failed to present legally sufficient evidence to support their (a) substantive due process; (b) equal protection class of one; and (c) equal protection selective enforcement claims. The individual defendants also move to set aside the verdict and for a new trial under Rule 59 on the grounds that (a) the verdict was against the weight of the evidence; and (b) the damages were grossly excessive. The individual defendants further move to set aside the verdict on the grounds that the compensatory and punitive damages awarded were excessive and against the weight of the evidence.

For the reasons that follow, defendants' Rule 59 motions for a new trial on the issue of damages is granted, but the remainder of defendants' claims are denied.

I. BACKGROUND

Sloup filed the complaint in this action on April 7, 2005. On September 26, 2005, Islip and the individual defendants separately moved to dismiss the complaint pursuant to Rules 8 and 12(f) of the Federal Rules of Civil Procedure. By Memorandum and Order dated March 13, 2006, the Court denied defendants' motions in their entirety. On May 3, 2006, Islip and the individual defendants submitted their answers to the complaint, and, after discovery, on May 19, 2008, Islip and the individual defendants submitted their motions for summary judgment. On August 21, 2008, the Court denied defendants' motions for summary judgment with respect to plaintiff Frank Sloup's Fourteenth Amendment claims and granted their motions with respect to plaintiff's First Amendment claims. With respect to plaintiff's municipal liability claim, the Town's motion for summary judgment was denied without prejudice to Islip renewing it at the close of evidence at trial. Familiarity with the decisions, the facts and the legal analysis contained in the Court's March 13, 2006 Memorandum and Opinion and August 21, 2008 Memorandum and Opinion is presumed. On October 20, 2008, plaintiff amended the complaint to add Crabs Unlimited, LLC, as a plaintiff to the action.

From October 19, 2009 through November 3, 2009, a jury trial was held before this Court on plaintiffs' remaining claims. On November 3, 2009, the jury found in favor of the plaintiffs as to their claims for violation of their equal protection and substantive due process rights and awarded $1.8 million in compensatory damages against all defendants. The jury also determined that punitive damages were warranted against the individual defendants. After deliberation, the jury awarded $150,000 in punitive damages

against defendant Alan Loeffler and $150,000 in punitive damages against defendant Craig Pomroy.

On November 18, 2009, the Town and the individual defendants filed post-trial motions. Defendants moved for judgment as a matter of law notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b) and for *remittitur* or a new trial pursuant to Federal Rule of Civil Procedure 59 as to the compensatory and punitive damages against the defendants. Plaintiffs' opposition papers were filed on December 17, 2009. Defendants filed their reply papers on January 29, 2010. Oral argument was held on February 11, 2010. The Court has fully considered all submissions of the parties.

## II. Discussion

### A. Rule 50(b) Motions for Judgment as a Matter of Law

#### 1. Standard of Review

The standard governing motions for judgment as a matter of law (formerly described as motions for directed verdict) pursuant to Rule 50 is well-settled. Judgment as a matter of law may not properly be granted under Rule 50 against a party "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)). In deciding such a motion, the Court must give deference to all credibility determinations and reasonable inferences of the jury, and it "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. N.Y. Life Ins. Co.*,

240 F.3d 138, 145 (2d Cir. 2001) (quoting *Galdieri-Abrosini*, 136 F.3d at 289). Thus, judgment as a matter of law should not be granted unless:

(1) [T]here is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

(2) [T]here is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289) (internal citations omitted).

#### 2. The Town's Rule 50(b) Motions

##### a. Absence of Evidence of Town Policy

First, the Town moves for judgment as a matter of law on the issue of municipal liability. In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a "policy" or "custom." The Supreme Court has identified at least two situations that constitute a municipal policy: "(1) where there is an officially promulgated policy as that term is generally understood (*i.e.*, a formal act by the municipality's governing body), and (2) where a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken." *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 336-37 (S.D.N.Y. 2002). The Town of Islip contends in its motion for judgment as a matter of law that, in the instant case, liability

cannot be predicated upon either theory because plaintiffs presented no evidence at trial of a longstanding policy, practice, or custom of the Town of Islip. The Town also contends that the individual defendants were not policymakers whose allegedly unconstitutional actions would result in the imposition of liability on the municipality. The Court addresses each of these arguments in turn and upholds the jury's finding of liability for the Town on each ground.

### (1) Practice or Custom

"A municipality will not be held liable under § 1983 unless plaintiffs can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of N.Y.*, No. 04-CV-1721, 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quotation marks omitted) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Here, it is not disputed that defendants Loeffler and Pomroy were acting under color of law when they approached Sloup regarding his traps being hazards to navigation.

The Court concludes that plaintiffs presented sufficient evidence from which the jury could conclude that the Town of Islip had a practice or custom of banning plaintiffs from fishing in the harbor areas. Plaintiffs presented several pieces of evidence tending to suggest that such a ban existed. Specifically, plaintiffs presented testimony by plaintiff Sloup that on at least four different occasions, a ban was enforced by employees of the Town of Islip against him and his fishing company: (1) in June 2004, Officer Pomroy told plaintiff Sloup to move his pots

that were located in Champlain's Creek because they were a "hazard to navigation" (Tr. 707:21-22); (2) on the same date in June 2004, Officer Sgroi also told Sloup that "Chief Loeffler says you have to put [your fishing pots] in the fish trap areas. They have to get out of Champlain's Creek" (Tr. 708:17-19); (3) plaintiff Sloup also testified that he was told by Chief Harbor Master Loeffler "to move every single piece of equipment from the harbor areas, and the killie pot" (Tr. 712:11-12); and (4) when Sloup replaced his pots into the harbor waters in early October, he was again told to remove them by defendant Pomroy (Tr. 721:7-14).

There was also testimony by Sloup's attorney from the Article 78 proceeding, Richard Remmer, that defendant Loeffler explicitly stated that Sloup was banned from the harbor areas. Remmer testified that he discussed with Loeffler that Sloup had informed him that "[Loeffler's] office [was] telling [Sloup he could fish] nowhere in the Town of Islip other than a designated fish trap area, all of which are in the Great South Bay, are not in the harbor areas." (Tr. 353:1-4.) Remmer asked Loeffler "Is that really what the Town of Islip is intending to do?" to which Loeffler replied "yes, it is." (Tr. 353:4-6.)

Moreover, plaintiffs presented testimony by the Deputy Islip Town Attorney, Richard Hoffman, from the oral argument during Sloup's Article 78 proceeding in state court. Specifically, Hoffman made the following statements during that court proceeding:

> [T]he harbor area is defined. . . . Now there are proportions of every waterway within the Town of Islip that are not harbor areas, and he's free to fish, do whatever he is doing. I'm

not sure what it is he's doing in those nonharbor areas. Again, when he is out there after this action was posted, he did go out again, and again he was told, don't do it here. Do it here.

Again, no summons was issued. Please move your pots. They showed him where he can go. It's not a question of the town saying, no. We are issuing summons for violation of law.

There are definitions. Harbor areas defined. It's not as if it's a moving target. It's a definition. There are maps which show where harbor areas are.

(Tr. 327:24-25, 328:5-18.) This statement, made by the Town's attorney during oral argument, could be interpreted as stating that Sloup was entirely banned from fishing in the harbor areas. During the same hearing, there was testimony by Richard Remmer, the attorney representing Sloup in that proceeding, that "from what [Sloup] has been told, the only place he can set his gear outside of the – he can't set it in Oralock Creek, Champlin's Creek, Brown's River, or any of those areas listed in the town code as a harbor area." (Tr. 327:9-12.)

Thus, viewed in a light most favorable to plaintiffs, the non-moving party, the various evidence presented at trial, in the form of testimony by plaintiff Sloup and his former attorney Richard Remmer, as well as Hoffman's statements from the Article 78 proceeding that Sloup brought against the Town in 2004, provided sufficient evidence from which a reasonable jury could conclude that there was a practice or custom within the Town of Islip of banning plaintiffs from fishing in the Town's harbor areas. Accordingly, the Town's motion for judgment as a matter of law on the grounds that plaintiffs have failed to demonstrate the existence of an unconstitutional policy or custom is denied.

(2) Policymaker Liability

The Town also argues that there was insufficient evidence to support a finding of policymaker liability. Specifically, the Town argues both that there was no basis for the Court to rule that defendant Loeffler was a policymaker as a matter of law, and there was insufficient evidence upon which to predicate municipal liability based on Loeffler's actions. As set forth below, the Court disagrees.

"[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). "When a plaintiff's theory of municipal liability is based on showing that a single action by a municipal employee caused the constitutional injury, rather than showing that a formally adopted or ratified municipal policy caused the injury, a plaintiff must demonstrate that the official had final policymaking authority for the particular subject matter involved." *Brocuglio v. Proulx*, 478 F. Supp. 2d 309, 323-24 (D. Conn. 2007) (collecting cases). As discussed in this Court's Memorandum & Order dated August 21, 2008, "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy." *Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("Thus, even a single action by a

decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." (quoting *Pembaur*, 475 U.S. at 481-82).

In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988), a plurality of the Supreme Court made it clear that to hold a municipality liable for the acts of its employees, a plaintiff cannot just prove that the final policymaking authority knew of the adverse action. The plaintiff must also prove that the final policymaking authority knew that the subordinates took that action for unconstitutional reasons. *Id.* "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* (emphasis added).

"Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. . . . The relevant legal materials[] include state and local positive law, as well as custom or usage having the force of law." *Jeffes v. Keenan*, 208 F.3d 49, 57 (2d Cir. 2000). "As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). The Second Circuit has cautioned that:

> [i]t is well established in this Circuit that when examining an individual's status as a policymaker under *Monell*,

the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the [municipality's] business, or must have the power to make official policy on a particular issue, or must "possess[ ] final authority to establish municipal policy with respect to the action ordered. Thus, the court must ask whether [the] governmental official [is a] final policymaker[ ] for the local government in a particular area, or on [the] particular issue' involved in the action.

*Hurdle v. Bd. of Educ. of City of N.Y.*, 113 F. App'x 423, 425 (2d Cir. 2004) (internal citations omitted).

The Town argues that defendant Loeffler was not in a position of policymaking authority in the Town of Islip. According to the Town, Eric Hofmeister, the head of the New York State Department of Environmental Conservation ("DEC"), was senior to Chief Harbor Master Loeffler, and therefore was the only policymaker in the department. The Town also argues that the regulation of fishing activities, including placing a ban on the actions constituting fishing activities, is reserved exclusively to New York State under the New York State Environmental Conservation Law. The Court disagrees and concludes that it correctly determined that defendant Loeffler was a policymaker under New York State law.

Defendant Loeffler was the "Chief Harbor Master" in the Town of Islip. The evidence during trial suggested that this title afforded Loeffler with complete authority to determine

whether an object poses a hazard to navigation in the Town waters. During the trial, Richard Remmer testified that "[n]ormally, as an attorney, I would speak to the attorney for the Town of Islip or the senior person who was handling the matter, which I understood to be Chief Loeffler." (Tr. 362:11-14.)

Furthermore, Officer Pomroy testified that he investigated the location of Sloup's pots at the instruction of Chief Loeffler: "Q. You speak to the chief and you report this complaint; is that correct? A. Yes. Q. The chief says go check it out, right? A. Something to that effect." (Tr. 1147:1-5; *see also* Tr. 1147:17-19 ("Q. In any event, Chief Loeffler ordered you to go out and check it out, correct? A. In some form, yes, he told me to go check it out.").) There was no indication or testimony suggesting that Loeffler was acting at the direction of another.[1]

Chief Harbor Master Loeffler was also in a position of authority sufficient to attempt to negotiate a compromise with Sloup's attorney regarding the location of Sloup's crab and fishing pots. (*See* Tr. 373:9-74:25.) This further suggests that Loeffler certainly had authority with respect to the challenged conduct—that is, regulating the placement of Sloup's fishing pots and/or imposing a ban on their placement in the harbor areas of the Town of Islip.

In fact, during cross-examination of Remmer by the individual defendants' counsel, it was established that the Chief Harbor Master wields significant control over regulation of the waterways of the Town of Islip:

> Q: One of the permits that you were looking to have approved was that you wanted to add some dock space, right?
>
> A: That's correct.
>
> Q: Has that permit been approved?
>
> A: No.
>
> *    *    *

---

[1] Moreover, the Court notes that, to the extent that the Town argues that the policymaker with respect to navigational hazards on the water was the head of the Department of Environmental Conservation, that argument is contrary to one theory set forth by the individual defendants' counsel at trial. Specifically, in an attempt to minimize the weight of the testimony offered by Captain Timothy Huss, an officer with the DEC, counsel queried Captain Huss, "You don't believe that the DEC has even the authority to regulate navigational hazards. Can we agree on that?" (Tr. 179:23-25.) The individual defendants also offered testimony from Captain Huss's deposition as follows: "Question: Does your department have the authority to regulate navigational hazards within the Town of Islip? Answer: I don't believe we have the authority. But it's not something we do." (Tr. 181:15-19; *see also* Tr. 202:20-203:6 ("Q. A harbormaster like Chief Loeffler, it would be well within his rights to approach a boat on the bay and take a look at a commercial fisherman's catch. A. Yes. Q. He could write him a ticket or enforce the environmental conservation law. Right? A. Yes. Q. Now, while you guys have your separate areas, you do environment, he sticks to navigation. He has that right, if he wanted to enforce, right? Right?"); Tr. 214:13-17 ("Q. Have you ever learned in your years with the DEC, the department of law enforcement, of one of your officers noticing a hazard to navigation and reporting it to you or to the Islip harbor police? A. Not off the top of my head, no.").)

Q: And you're aware that that permit application at some point *was put before the harbormaster because it involved the waterways*?

A: Yes.

(Tr. 380:16-381:4 (emphasis added).) Indeed, unlike Officers Pomroy and Sgroi, who appeared to act under the direction or authority of Chief Harbor Master Loeffler, there was no suggestion at trial that the decisions of Loeffler were reviewed for "substantive propriety" by higher supervisory officials. *See Praprotnik*, 485 U.S. at 129. Loeffler's actions exhibited more than a mere exercise of discretion, *see, e.g.*, *Verri v. Nanna*, 972 F. Supp. 773, 794 (S.D.N.Y. 1997), and indicated the exercise of policymaking authority over regulation of the waters in the Town of Islip. Thus, there was sufficient evidence for this Court to conclude that defendant Loeffler was a policymaker in the Town of Islip with respect to the use and management of the navigable waters within the Town.[2]

---

[2] An alternative theory upon which liability could be predicated is that Deputy Town Attorney Richard Hoffmann, Esq. was a policymaker in the Town of Islip, and that his statements during the hearing in the Article 78 proceeding before Honorable Michael Mullen, Supreme Court Justice, Suffolk County, on October 20, 2004, were sufficient to create liability for the Town based upon the imposition of a policy banning Frank Sloup from fishing in the harbor areas.

In an unrelated argument during this discussion, the Town argues that it was error for the Court to admit the transcript from these proceedings into evidence. Specifically, the Town argues that "[a]dmission of the transcript unduly prejudiced the defendants because the jury was directed to only certain portions of the transcript,

Finally, there was evidence from which the jury could conclude that Loeffler, as a policymaker, violated plaintiffs' constitutional rights by enforcing the above-discussed ban on plaintiffs' fishing in the Town harbor areas and that defendant Loeffler took action for unconstitutional reasons. *See Praprotnik*, 485 U.S. at 127. As discussed *supra*, there was evidence indicating that Loeffler directed

---

which in and of themselves, were hearsay testimony." (Town's Mot. at 12.) As a threshold matter, Deputy Town Attorney Hoffman's statements during the Article 78 proceeding were clearly admissible as against the Town because they were statements made by a person authorized by the Town to make statements concerning the subject and also were statements by an agent within and during the scope of employment. *See* Fed. R. Evid. 801(d)(2). The Court was prepared to admit only those statements into evidence to avoid any potential prejudice from the other portions of the proceeding. However, in accordance with *defendants'* request (including the Town), the Court admitted the entire transcript into evidence for context. *Cf. Tomaino v. O'Brien*, 315 F. App'x 359 (2d Cir. 2009) ("Neither did the court err in not permitting the entire trial transcript of Tomaino's criminal trial upon which this civil litigation was based to be admitted in evidence. Tomaino's attorney had an opportunity to, and did, select relevant portions that were admitted through testimony during the trial.").

The Town also argues that it was unduly prejudicial that, during his closing argument, plaintiff's counsel stated to the jury that if the Town had nothing to hide, it would have called Mr. Hoffman as a witness. The Town points out that Mr. Hoffman was equally available to both parties. However, the Court instructed the jury that these were "just the arguments of counsel," and that it was for the jury to "decide whether to accept or reject the arguments and whether it is based on the evidence or not based on the evidence." (Tr. 1484:7-8, 1484:10-12.)

Officers Pomroy and Sgroy to impose the ban on plaintiffs. In addition, Sloup testified regarding at least one heated exchange between himself and defendant Loeffler in which Loeffler told him: "If it's the last thing I do, I'm going to get your buoys out of this bay." (Tr. 700:6-7.) Plaintiff also testified that when he challenged the ticket he was issued for refusing to move his crab pots, Loeffler stated, "that's it. Now, get everything out. You're done in the Town of Islip. Everything out." (Tr. 712:1-2.) Sloup's testimony suggested that Loeffler imposed the ban on Sloup as a result of Sloup challenging the ticket. Thus, the Court concludes that there was sufficient evidence from which to conclude that Alan Loeffler was a policymaker in the Town of Islip regarding the use and regulation of the Town's navigable waters. Furthermore, there was ample evidence upon which the jury could predicate municipal liability based upon the actions of Chief Harbor Master Alan Loeffler. Accordingly, the Court correctly determined that Chief Harbor Master Loeffler was a policymaker as a matter of law, and the Town's motion for judgment as a law on the issue of policymaker liability is denied.

### 3. Individual Defendants' Rule 50(b) Motions

The individual defendants move for judgment as a matter of law on each of plaintiffs' claims. They contend that the evidence was insufficient to find that plaintiffs' constitutional rights were violated. In evaluating defendants' motion, the Court is mindful that in considering a motion for judgment as a matter of law, the Court:

> must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence . . . . "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (quoting *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000)). The Court addresses defendants' arguments regarding each of plaintiffs' theories of liability in turn, and ultimately concludes that there was sufficient evidence upon which the jury could find defendants liable for violating plaintiffs' constitutional rights under each theory.

### a. Substantive Due Process Claim

In order to demonstrate a violation of substantive due process rights under the Fourteenth Amendment, a plaintiff must demonstrate that (1) he had a "valid property interest;" and (2) "defendants infringed on that property right in an arbitrary or irrational manner." *Cine SK8 v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007) (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001)). Defendants do not take issue with the first prong—*i.e.*, whether Sloup had a valid property interest. However, defendants argue that they did not infringe on Sloup's property right in an arbitrary or irrational manner. The jury found that they did, and the Court concludes that there is sufficient evidence from which the jury could have reached that conclusion. Accordingly, defendants' motion for judgment as a matter of law regarding plaintiffs' substantive due process claim is denied.

In order to meet the second prong of a substantive due process claim, plaintiffs must show "that defendants infringed their property right in an arbitrary or irrational manner." *Cine SK8*, 507 F.3d at 785. In particular, plaintiffs must show that the government's infringement was "'arbitrary,' 'conscience shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'" *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 505 (2d Cir. 2001) ("As we have held numerous times, substantive due process 'does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit. . . . [Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.'" (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999))); *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996) (explaining that plaintiff meets second prong of substantive due process test "only when government acts with no legitimate reason for its decision" (citation and quotation marks omitted)); *Pina v. Lantz*, 495 F. Supp. 2d 290, 297 (D. Conn. 2007) ("'Mere irrationality is not enough: only the most egregious official conduct, conduct that shocks the conscience, will subject the government to liability for a substantive due process violation based on executive action.'" (quoting *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (internal quotation marks omitted))).

Defendants argue that plaintiffs' substantive due process claim must fail because any actions by the defendants were not arbitrary, capricious, or conscience shocking. Instead, defendants contend that Sloup did not have an unfettered right to fish in the waters of Islip; they insist that Sloup's fishing rights had to safely co-exist with the rights of others who used the waters in the Town of Islip. (*See* Individual Defs.' Mot. at 4.) According to defendants, the Harbor Masters "had the authority to do what they did." (*Id.* at 5.) Specifically, they argue that there was testimony that buoys, fishing traps, and crab pots near the channel could be a hazard to navigation. (*See, e.g.*, Tr. 182:14-18, 186:3-15, 192:17-193:3.)

However, there was sufficient evidence from which the jury could have concluded that defendants denied plaintiffs their property rights in an irrational, arbitrary, or conscience-shocking manner. Sloup testified that he was told to remove *all* of his pots from the water—not just those that specifically posed navigational hazards. In June 2004, defendant Pomroy approached Sloup regarding the location of his pots in Champlin's Creek; plaintiff testified: "He asked me if the crab pots in Champlin's Creek were mine, and I said yes. He says: 'You have to move them. They're a hazard to navigation.' . . . I said they're not a hazard to navigation. They're off to the side. They're not in anyone's way." (Tr. 707:21-25.)

There was further testimony that plaintiff was told by Officer Sgroi that defendant Loeffler had stated that plaintiff could not place his traps in Champlin's Creek at all. Plaintiff stated: "[a]t that point Mr. Sgroi was there also and he said, you have to move your pots. And Chief Loeffler says you have to put them in the fish trap areas. They have to get out of Champlin's Creek. They have to go in the fish trap areas out in the bay." (Tr. 708:16-20; *see also* Tr. 709:9-10 ("[Officer Pomroy] said either you remove the pots or we're going to impound them or write you a ticket.").) Sloup also testified that, during an

altercation he had with defendant Loeffler, in response to plaintiff challenging the ticket he received, Loeffler stated, "that's it. Now, get everything out. You're done in the Town of Islip. Everything out." (Tr. 712:1-2; *see also* Tr. 712:11-17 ("I was directly told to move every single piece of equipment from the harbor areas, and the killie pot. I said: Alan, my killie pots, they're in a mosquito ditch. He says, I don't care. Any water in New York State that is navigable water, that a canoe can float in is navigable water and your pots are a hazard to canoes.").) Indeed, Sloup testified that on multiple occasions, Chief Loeffler reiterated the nature of the ban on plaintiff fishing in the harbor areas of the Town of Islip:

> Chief Loeffler had drew a line from there's a side canal by the Qunituck Country Club that goes back from that canal across to what would be the River View Restaurant in Oakdale, and there's a four mile an hour speed limit that starts basically at that point. To the south is unrestricted speed, to the north would be restricted speed. And I was not allowed to put my gear north of that line which would be the restricted speed.

(Tr. 725:13-18.)

Moreover, there was evidence from which the jury could have concluded that the defendants acted with malice or bad faith when they issued the ban on plaintiffs. *See DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 485-86 (E.D.N.Y. 2009). For example, in addition to the fact that defendants imposed such a ban on plaintiffs, Sloup testified that defendant Loeffler told him: "If it's the last thing I do, I'm going to get your buoys out of this bay."

(Tr. 700:6-7.) There was further testimony that Officer Pomroy approached plaintiff on at least two separate occasions regarding removing his pots from the harbor areas. Sloup placed his pots back in the waters in early October, but shortly after he did so, he was told to remove them. Sloup testified that he was told by defendant Pomroy: "You have to take the pots out of Champlin's Creek. I said: Why? Do you feel there's a hazard to navigation? He goes: No. Messina says just because you won in court doesn't mean you can fish in the Town of Islip. Your pots are on Town property." (Tr. 721:10-14.)

Finally, defendants further argue that there is no evidence that the Town Harbor Unit did not enforce this ban against others. However, there was sufficient evidence from which the jury could conclude that the enforcement of this ban against plaintiffs was arbitrary. Mr. Remmer testified that his brother George and John Boucek were fishing in October or November 2004 in Connequot River (Tr. 330:5-22, 401:6, 401:13-22, 402:16.) Also, plaintiffs presented into evidence a picture that Mrs. Sloup took in October 2004 that shows one of John Boucek's buoys in the distance. (*See, e.g.*, Tr. 803:15-805:6.) Thus, there was evidence from which the jury could have concluded that defendants enforced a ban on fishing and crabbing in certain waters in the Town of Islip only against plaintiffs.

Thus, the Court concludes that there was sufficient evidence to support the jury's finding that plaintiffs proved, by a preponderance of the evidence, that the defendant imposed a ban on the plaintiff Frank Sloup prohibiting him from fishing in the harbor areas of the Town of Islip in 2004 and that defendants intentionally infringed upon plaintiffs' property interest in an arbitrary or irrational manner or in a manner

that is shocking to the conscience. Thus, the Court denies defendants' motion for judgment as a matter of law on the substantive due process claim.

### b. Class of One Claim

Defendants contend that they are entitled to judgment as a matter of law on plaintiffs' class of one claim. The Court disagrees.

In a "class of one" case, the plaintiff uses "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff . . . to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Prestopnik v. Whelan*, 249 F. App'x 210, 212-13 (2d Cir. 2007).

First, defendants argue that plaintiff was not similarly situated to any other fishermen in a manner that would support a class of one claim. Defendants contend that the summons issued to Sloup under Islip Town Code § 37-56 was the only summons ever issued under that section because no one had ever refused to move fishing equipment when asked by a Harbor Master. According to defendants, the Harbor Masters "not only had the right to enforce Islip Town Code § 37-56, they were mandated to do so if there was a violation of the Town Code." (Individual Defs.' Opp. at 8.)

"A class-of-one plaintiff must show, among other things, 'an extremely high degree of similarity' between herself and alleged comparators in order to succeed on an equal protection claim." *Mattison v. Black Point Beach Club Assoc.*, No. 09-4174-cv,

2010 WL 1838705, at *1 (2d Cir. May 10, 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). "To succeed on such a claim, the plaintiff must demonstrate that (1) 'no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy,' and (2) 'the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.' *Id.* (citing *Clubside, Inc.*, 468 F.3d at 159 (internal quotation marks omitted)).

At trial, plaintiffs presented evidence that similarly situated fishermen were not subject to the blanket ban (or any ban) that was imposed on plaintiffs. For example, Sloup testified that in October of 2004, John Boucek had a fishing buoy located at the entrance of Qunituck Creek by the harbormaster's office. Plaintiffs introduced a picture of the buoy, depicting its location. (Tr. 803:15-805:6; *see also* Tr. 822:9-10 ("I took [this picture] for the purposes of showing that someone else was fishing where I was not allowed to fish.").) Evidence of even one similarly situated individual is adequate to support a class of one claim. *See Viruet v. Connecticut*, No. 3:03-CV-1345, 2006 U.S. Dist. LEXIS 17536, at *12 (D. Conn. Mar. 29, 2006). Captain Timothy Huss, a captain with the New York State Department of Environmental Conservation, also testified that in 2004 and 2005 there were other fishermen fishing in the bay and harbor areas of the Town of Islip. (*See* Tr. 171:14-24.) Thus, there was adequate evidence from which the jury could conclude that there were similarly situated fishermen to Sloup at the time of the alleged ban who were not subjected to such a ban.

In addition, plaintiffs must demonstrate that defendants acted intentionally and with no rational basis for their actions. *See, e.g.*, *Prestopnik*, 249 F. App'x at 213; *Siao-Pao v. Connolly*, No. 06 Civ. 10172, 2008 U.S. Dist. LEXIS 48697, at *27 (S.D.N.Y. June 25, 2008) ("This Court has interpreted the *Olech* standard to require that differential treatment be both intentional and irrational to satisfy the class of one standard."). "[T]he classic example of irrational government action in a class of one equal protection case . . . is an ordinance saying: 'No one whose last name begins with 'F' may use a portable sign in front of a 24-hour food shop, but everyone else may . . . . What makes the ordinance in the example irrational is not simply the act of singling out, but rather that the singling out is done in such an arbitrary way." *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 435 (W.D.N.Y. 2009) (quoting *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008)). There was sufficient evidence from which the jury could conclude that defendants did not have a rational basis for their ban on plaintiffs' fishing in the harbor areas and that, rather, the Town's action was arbitrary and irrational. As discussed extensively *supra*, there was ample evidence of the existence of a ban on fishing in the harbor areas against plaintiffs. Sloup further testified regarding interactions with defendants Loeffler and Pomroy that suggested that the ban against him was imposed out of personal animus rather than due to a legitimate reason. (*See* Tr. 721:10-14 (stating that Officer Pomroy told Sloup: "You have to take the pots out of Champlin's Creek. I said: Why? Do you feel there's a hazard to navigation? He goes: No. Messina says just because you won in court doesn't mean you can fish in the Town of Islip. Your pots are on Town property."); *see also* Tr. 712:1-2 (noting that when Sloup challenged the ticket, Loeffler stated, "that's

it. Now, get everything out. You're done in the Town of Islip. Everything out.").) This testimony was sufficient to support a finding that defendants acted intentionally in imposing a ban on plaintiffs and that there was no rational basis for their actions.

Defendants contend that the actions taken by defendants were discretionary state actions that are entitled to protection under *Engquist v. Oregon Department of Agriculture*. As noted in this Court's prior opinion, in *Engquist*, the Supreme Court held that class-of-one plaintiffs must show that the differential treatment received resulted from non-discretionary state action:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

553 U.S. 591, 603 (2008); *see also Siao-Pao*, 2008 U.S. Dist. LEXIS at *27 ("Additionally, the Supreme Court recently clarified the

*Olech* holding by limiting class of one claims in contexts characterized by individualized and subjective determinations . . . ."). In particular, defendants argue that Loeffler and Pomroy were taking discretionary state action when they regulated the location of Sloup's fishing and crabbing pots.

However, plaintiffs' claims are not based on the issuance of a ticket to Sloup, nor on the regulation of the location of individual crabbing and fishing pots belong to Sloup. If the location of individual pots or the issuance of the initial ticket for failure to remove his fishing equipment were solely at issue in this case, *Engquist* protection might apply. However, the entire theory upon which this case was based was that the defendants implemented a *ban* on plaintiffs that prevented them from placing fishing equipment in certain waters in the Town of Islip. The jury specifically and explicitly found that such a ban existed by answering "yes" to interrogatory question number one: "Did the plaintiffs prove, by a preponderance of the evidence, that the defendant imposed a ban on the plaintiff Frank Sloup prohibiting him from fishing in the harbor areas of the Town of Islip in 2004?" (Tr. 1569:24-1570:5.) The imposition of a ban, arbitrarily and against only one fisherman, cannot be said to be a discretionary action for which defendants are entitled to protection. Accordingly, *Engquist*'s exemption of discretionary state actions from equal protection class of one liability is inapplicable. Thus, plaintiffs presented sufficient evidence from which the jury could have reasonably concluded that a preponderance of the evidence indicated that defendants subjected plaintiffs to differential treatment that was arbitrary or irrational and that was not issued as part of a discretionary action that was part of defendants' job duties.

Defendants' motion for judgment as a matter of law on the class of one claim is accordingly denied.

c. Selective Enforcement Claim

A plaintiff bringing a selective enforcement claim must also demonstrate that he was treated differently from similarly situated individuals. *See Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) ("A selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated."). Although some district courts in the Second Circuit have stated that "the standard for 'similarly situated' when bringing a selective enforcement claim is the same as in a 'class of one' claim," *see, e.g.*, *Kamholtz v. Yates Cnty*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008); *Dones v. City of N.Y.*, No. 07 Civ. 3085, 2008 U.S. Dist. LEXIS 53681, at *28 (S.D.N.Y. July 9, 2008), the Court employs the slightly different formulations set forth by the Second Circuit for each claim. As this Court's Memorandum and Order dated August 21, 2008 noted, if anything, the two standards differ in that the similarly situated standard for class of one claims is more stringent. Accordingly, because the Court concludes that there was sufficient evidence from which the jury could find that plaintiffs were treated differently from others who were similarly situated for the purposes of plaintiffs' class of one claim, that element is also met for plaintiffs' selective enforcement claim.

The second element of a selective enforcement claim requires plaintiffs to demonstrate that "such selective treatment was based on impermissible considerations

14

such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Freedom Holdings Inc. v. Int'l Tobacco Partners, Ltd.*, 357 F.3d 205, 234 (2d Cir. 2004) (quoting *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999)). As discussed in this Court's August 21, 2008 Memorandum & Order, there is a distinction between a "motivation to punish [in order] to secure compliance with agency objectives," and "spite, or malice, or a desire to 'get' [someone] for reasons wholly unrelated to any legitimate state objective." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005) (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995)).

There was evidence that the ordinance under which Sloup was issued a ticket had not ever been used to enforce Town fishing regulations before. Sloup testified: "I never heard of this order. I have been fishing all these years. Supposedly this ordinance was written in 1978. And 25 years later, all of a sudden, they come after fishing all these years and no one said anything to me, no one warned me or gave me any kind of heads up that I'm doing something wrong, and I wanted to get a copy to read it personally." (Tr. 710:11-18.)

Here, the jury determined that defendants acted with malice when they imposed a fishing ban on plaintiffs in the waters of the Town of Islip. The mere imposition of such a ban—which was found by the jury to exist—is sufficient to establish malice when there was no basis for banning plaintiffs from all of the waters of the Town. As discussed extensively above, there was ample evidence from which the jury could have concluded that there was a ban against plaintiffs fishing in the harbor areas of the Town of Islip. (*See,*

*e.g.*, Tr. 871:4-7 ("Q: And you recall [Officer Pomroy] specifically telling you at that time that you had to remove all of your pots out of Champlin's Creek? A: Yes."); Tr. 950:19-21 ("[Officer Pomroy] told me I could not fish in the harbor areas at all, but I could fish out in the bay in the fish trap areas.").) Moreover, there was additional evidence, discussed above, from which the jury could have concluded that the ban was imposed in bad faith or based on malice. (*See, e.g.*, Tr. 712:1-2 (testimony by Sloup stating that, when they argued about the issuance of the ticket, Loeffler told Sloup, "that's it. Now, get everything out. You're done in the Town of Islip. Everything out.").) Sloup also testified that defendant Loeffler told him: "If it's the last thing I do, I'm going to get your buoys out of this bay." (Tr. 700:6-7.)

Officer Pomroy initially instructed Sloup to remove all of his pots from the water in June 2004. In addition to testimony regarding the directive to remove all pots from Champlin's Creek, plaintiffs presented into evidence Officer Pomroy's incident report regarding his interaction with Sloup in June 2004 regarding the pots.

Q. Would you look at defendant's exhibit E, please, which is in evidence. Would you read to the jury the factual part beginning with the word responded to above.

A. Responded to above incident location on complaint by Mr. McCall, of 171 Woodland Drive, East Islip, of crab traps and buoys posing a hazard to navigation. Upon observing 41 buoys in creek respondent Crabs Unlimited on Orowoc Creek, Islip, I issued summons A64A61790 to above for violating 37.56A of the Islip Town

Code. Advised above all traps and buoys must be removed.

Q. So you actually told Frank that he had to move all traps and buoys as is indicated in here, correct?

A. As the writing says.

(Tr. 1155:11-1156:1.) There was also testimony by Captain Timothy Huss, the chief environmental conservation officer with the rank of captain of the DEC (Tr. 127:12-128:6) that Sloup's pots in Champlin's Creek were not, in fact, hazards to navigation—or at least that it is not possible that all of the pots were hazards. (*See* Tr. 154:5-12, 154:21-24.) Furthermore, Sloup testified that shortly after he returned his pots to the water in October 2004, he was told to remove them again by Officer Pomroy, not because they were hazards to navigation, but because they were "on Town property." (Tr. 721:11-14.) This testimony, if deemed credible by the jury, was sufficient to establish that the defendants acted in bad faith or with malice by banning plaintiffs from fishing and crabbing in the Town of Islip harbor areas.

In sum, the Court concludes that there was sufficient evidence for a reasonable juror to conclude that plaintiffs proved, by a preponderance of the evidence, that they were treated differently from similarly situated individuals and that the differential treatment was intentional and based on malice or bad faith.

B. Motions for a New Trial Under Rule 59

1. Standard of Review

Under Rule 59(d), a court may order a new trial on its own motion. The rule provides that

The court may, on motion, grant a new trial on all or some of the issues and to any party as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .

Fed. R. Civ. P. 59(a)(1)(A). A Rule 59 motion for a new trial "ordinarily should not be granted, unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 82 (2d Cir. 2006) (quoting *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir. 1992) (internal citation omitted)).

The trial judge has "discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998). This discretion "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996). The district court has authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial in at least two distinct kinds of cases:

(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a

reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

*Kirsch*, 148 F.3d at 165 (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)).

Both the Town and the individual defendants argue that the jury reached a "seriously erroneous result" in awarding Sloup $1.8 million in compensatory damages. The defendants argue that this has resulted in a serious miscarriage of justice.

### 2. The Town's Rule 59 Motion

The Town moves for a new trial under Rule 59 based, in part, on the same arguments it raises in its motion for judgment as a matter of law. To the extent that the Town argues that a new trial is warranted based on plaintiffs' failure to prove the existence of a municipal policy or custom or the plaintiffs' failure to demonstrate policymaker liability, the Town's motion is denied for the same reasons that its Rule 50 motion fails.

The Town also argues that jury note number five indicates the jury's basis for awarding such large compensatory damages. That note read, "we need clarification. What is the Town of Islip's responsibility with regard to compensatory and punitive damages? Will the Town pay for damages regarding Pomroy and Loeffler?" (Tr. 1563:16-20.) At that point, the Court instructed the jury that an inquiry regarding who would ultimately pay the damages was inappropriate. (*See* Tr. 1563:21-1564:1 ("The answer to that is, it is irrelevant to your consideration. The issue of whether or not the Town of Islip is responsible for payment for any damages regarding Pomroy or Loeffler is irrelevant and not something that the jury can consider in connection with its deliberations.").) Although the Town makes much of the fact that "[t]he jury never inquired about the Town's responsibility absent the conduct of Loeffler and Pomroy," this does not conclusively demonstrate that the jury found the Town liable solely based on the actions of the individual defendants. The jury verdict specifically found that the "plaintiffs prove[d] by a preponderance of the evidence that the violation of plaintiffs' constitutional right(s) was pursuant to a long-standing custom or practice of the Town of Islip and that the policymakers approved or were deliberately indifferent to the custom or practice." (*See* Verdict Sheet at 3.) The jury further found that "plaintiffs prove[d] by a preponderance of the evidence that defendant Loeffler was a policymaker for the Town of Islip and that the violation of plaintiffs' constitutional right(s) was caused by the actions of defendant Loeffler acting in his policymaking capacity for the Town of Islip." (*Id.* at 4.)

Nonetheless, as discussed *infra*, the Court concludes that the jury verdict of $1.8 million in compensatory damages "shocks the judicial conscience."

### 3. Individual Defendants' Rule 59 Motions

The individual defendants move for a new trial under Rule 59(a) on substantially the same grounds upon which they move for judgment as a matter of law. The individual defendants point to several pieces of testimony that were favorable to them: specifically, they point to the testimony of Captain Huss that the DEC does not regulate the placement of eel pots and crab traps, testimony by several witnesses who agreed

that fishing buoys and crab traps in the harbor areas could be hazardous to boaters, and testimony by several witnesses that there was no ban against plaintiffs in the harbor areas. (Defs.' Mot. at 13-15.) However, defendants' argument is misplaced. As discussed extensively above, there was sufficient evidence to support the jury's findings that (a) defendants imposed a ban on plaintiff Frank Sloup prohibiting him from fishing in the harbor areas of the Town of Islip in 2004; (b) that plaintiffs' equal protection rights were violated under a "class of one" theory; (c) that plaintiffs' equal protection rights were violated by the selective enforcement of Town laws against plaintiffs; and (d) that plaintiffs' substantive due process rights were violated by defendants. Although the Court recognizes that there was testimony favorable to defendants, "[a]s a matter of law, the credibility of witnesses is exclusively for the determination by the jury." *Cameron v. City of N.Y.*, 598 F.3d 50, 61 (2d Cir. 2010) (citing *United States v. Forrester*, 60 F.3d 52, 63 (2d Cir. 1995)); *see also Elyse v. Bridgeside Inc.*, 367 F. App'x 266, 268 (2d Cir. 2010) ("The district court is authorized to grant a new trial based on the weight of the evidence only if it determines that the jury's verdict was 'seriously erroneous,' or 'a miscarriage of justice.' In making its determination, however, the court must refrain from invading the province of the jury to evaluate the credibility of the witnesses." (internal citation omitted)). Thus, it was well within the province of the jury to decide which testimony to rely upon in reaching its ultimate determination of liability.

## C. Motion to Set Aside the Verdict

Both the Town and the individual defendants have moved, under Rule 59 of the Federal Rules of Civil Procedure, to set aside the $1.8 million in compensatory damages awarded by the jury as excessive. The individual defendants also have moved to set aside the the award of $150,000 in punitive damages against each defendant as excessive.

In his summation, plaintiffs' counsel asked the jury to award three categories of damages. First, plaintiffs' counsel sought "a couple of hundred thousand" dollars based upon lost income during and after the fishing ban which, according to the plaintiffs' evidence, existed from approximately June 2004 until November 2004. Second, plaintiffs' counsel sought the equity lost in the property at 25 Degnon Avenue (bought by the plaintiff to establish his new business) when that property was the subject of a foreclosure sale in 2007. In particular, counsel argued that, by banning him from certain waters for several months in 2004 and depriving him of income, defendants had caused the foreclosure on that property that began in 2005 and was completed in 2007. Counsel estimated to the jury in his summation, without specific reference to the record, that the equity in that property was at least $550,000. Finally, plaintiffs' counsel sought an unspecified amount of non-economic damages – for substantial loss of enjoyment of life, inconvenience, and general suffering – because of the fishing ban. In particular, counsel sought compensation for Frank Sloup having to move to Maryland in 2007 and being apart from his wife during that period as they sought new employment after his foreclosure and bankruptcy.

During the trial, plaintiff Sloup was asked on direct examination to summarize the compensation he was seeking in the lawsuit. In response, Sloup requested categories of damages even broader than those being sought by plaintiffs' counsel: "I'm seeking

compensation for loss of my business and home, loss of my customers, loss of business that took me 20 years to build to establish the customer base, loss of having to be away from my wife for six months because we couldn't afford to live together." (Tr. 775:20-24.)

In the post-trial opposition to defendant's motion, plaintiffs' counsel attempts to argue that the economic losses suffered by plaintiffs totaled a minimum of $1.2 million dollars, and a maximum of $1.8 million, based upon the following breakdown:

> As to economic loss, the Plaintiffs suffered losses in income spanning multiple years as a direct result of the Defendants' actions. As a direct result of his loss of income, Mr. Sloup eventually lost his commercial property, located at 25 Degnon Blvd., with a market value of approximately $1.3 and $1.9 million dollars, subject to a mortgage of $650,000. In 2004, Plaintiffs' gross income was reduced $111,232 as compared to 2003. In 2005, Plaintiffs' gross income was reduced $159,826, as compared to 2003. In 2007, Plaintiffs' gross income was reduced $300,057 as compared to 2006, as a direct result of losing his commercial property located at 25 Degnon Blvd., the location out of which he conducted business. Additionally, Plaintiffs' commercial equipment were rendered valueless as a result of the foreclosure. The damages detailed above, at a minimum, approximate $1.2 million, and a maximum, not even considering equipment and other losses, approximate damages of $1.8 million.

(Pl.'s Opp. at 15-16.)

As discussed in detail below, the Court concludes that, in certain instances, the categories of compensatory damages sought by plaintiffs at trial (and which are used in the post-trial submissions to argue that the $1.8 million award was not excessive) are not recoverable as a matter of law and, in other instances, the particular amounts sought were unsupported by the record. First, with respect to lost income, plaintiff as a matter of law is not entitled to lost *gross* income; rather, he is only entitled to lost *net* income, or profits. Nevertheless, both before the jury and in the post-trial submissions, plaintiffs argue for loss of gross income. Moreover, plaintiff seeks years of lost income into 2007, even though it is undisputed the fishing ban ended in 2004 and plaintiff had one of his best years in the fishing business in 2006. There is an insufficient evidentiary basis in the record for a rational jury to find any loss of income in subsequent years after 2004 was proximately caused by the fishing ban in 2004. Thus, the amount of lost income sought during the trial was grossly in excess of any rational number that could be awarded by the jury and cannot justify the $1.8 million verdict. Second, there is a significant question, given the lack of expert testimony and the evidence in the record as a whole, as to whether a rational jury could conclude that the foreclosure sale of 25 Degnon Avenue that took place in 2007 was proximately caused by the fishing ban that existed for several months in 2004. However, the Court need not decide that issue for purposes of this motion because, even assuming *arguendo* that legal causation was proven, the jury had no basis in the record to determine the amount that plaintiff lost on the property given that there was no evidence regarding the results of the sale of the property in foreclosure in 2007 or plaintiff's actual loss from such sale. Thus, the jury would have had to speculate as to the value of

the property and the amount of plaintiff's actual loss with respect to the property following his bankruptcy and the foreclosure sale.  Third, although plaintiff could recover for non-economic damages in terms of loss enjoyment of life from not being able to fish during the fishing ban in 2004, plaintiff cannot recover for non-economic losses in terms of having to move to Maryland in 2007 and being  separated from his wife after the foreclosure on his property.  No rational jury could conclude that those damages in 2007 were proximately caused by the fishing ban in 2004.  In short, the jury was left with a demand for damages that was grossly in excess of what the law and the evidence would rationally support.  The result was a verdict in an amount that shocks the conscience of the Court and is clearly a gross miscarriage of justice.[3]  Moreover, this grossly excessive verdict cannot be corrected with remittitur under the circumstances of the instant case because of the lack of a special verdict on damages and the Court's conclusion, based upon the grossly excessive size of the award and the erroneous arguments on damages that were made to the jury, that error infected the jury's entire determination of compensatory damages.  Thus, there must be a new trial on compensatory damages.  Finally, although there was sufficient evidence for the issue of punitive damages to go to the jury, the new trial should include a new trial on punitive damages because, *inter*

---

[3]  The Court notes that, even plaintiffs' above-referenced calculation in the post-trial submission to justify the verdict – which erroneously uses gross income instead of net income and contains other amounts that cannot be legally and/or factually supported – still only reaches $1.2 million in compensatory damages, well below the $1.8 million in compensatory damages awarded by the jury.

*alia*, the issue of punitive damages in this particular case—both as to whether there should be an award of punitive damages and as to the amount—is so interwoven with the issue of compensatory damages that it was likely tainted by the grossly erroneous calculation of compensatory damages.

### (1) Applicable Standard

It is well settled that, pursuant to Rule 59 of the Federal Rules of Civil Procedure, a trial judge has the discretion to grant a new trial if the verdict is against the weight of the evidence, and "[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)" *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996); *accord Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 244 (2d Cir. 2004); *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004).  As the Second Circuit has instructed, "[w]here there is no particular discernable error, we have generally held that a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988) (internal quotations omitted)).  However, if the trial judge identifies a specific error, "the court may set aside the resulting award even if its amount does not 'shock the conscience.'" *Id.*  In reviewing a claim that a jury's damages award was excessive, the court must "accord substantial deference to the jury's determination of factual issues." *Martell v. Boardwalk Enters.*, 748 F.2d 740, 750 (2d Cir. 1984).  Moreover, "the trial judge is not called upon to say whether the amount is higher than he [or she] personally would

have awarded." *Dagnello v. Long Island R.R.*, 289 F.2d 797, 806 (2d Cir. 1961). Nevertheless, the Second Circuit has emphasized that "[w]hile a jury has broad discretion in measuring damages, it 'may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.'" *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) (quoting *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.3d 565, 568 (2d Cir. 1988) (internal quotation marks and citation omitted)). In other words, "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." *Dagnello*, 289 F.2d at 806.

### (2) Analysis of Compensatory Damages

As set forth in detail below, the Court concludes that the jury's compensatory damages award of $1.8 million in this case was excessive as a matter of law and warrants a new trial on the issue of damages. First, there was discernable error during the trial with respect to the issue of damages based upon the fact that plaintiffs' counsel urged the jury to award (1) certain categories of damages for which legal causation was lacking, and (2) amounts of damages in certain categories that were unsupported by the record and would require sheer speculation and guesswork by the jury. Second, even apart from these discernable errors, the Court finds that the award is so high that it shocks the judicial conscience and constitutes a denial of justice. Thus, the award of compensatory damages must be set aside.

### (a) Lost Profits

Whereas pain and suffering cannot be quantified, economic loss must be established with reasonable certainty. *See, e.g.*, *Tassone v. Mid-Valley Oil Co.*, 773 N.Y.S.2d 744, 746 (App. Div. 2004); *Faas v. New York*, 672 N.Y.S.2d 145, 147 (App. Div. 1998). "Under New York law, it is 'well established' that '[t]he rule of certainty as applied to the recovery of damages does not require mathematical accuracy or absolute certainty or exactness, but only that the loss or damage be capable of ascertainment with reasonable certainty.'" *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 444 (S.D.N.Y. 2000) (quoting *Reichman v. Warehouse One Inc.*, 569 N.Y.S.2d 452 (App. Div. 1991)). In essence, economic damages need not be exact, but they cannot be speculative. *Id.* (citing *Stringile v. Rothman*, 530 N.Y.S.2d 838 (App. Div. 1988)).

There is no question that Sloup would be entitled to recover lost income to his business that resulted from the ban on fishing and crabbing in the harbor areas. However, it is axiomatic that plaintiff is entitled to loss of net income, not gross income. Nevertheless, in his summation, plaintiff's counsel asserted that the jury should award "a couple of hundred thousand in lost income." Specifically, he argued:

> We also have at least a couple hundred thousand in lost income. And I ask you to look at the charts. The seven of you are smarter than I am, and I'm not that great at economics either, but you will see a couple of hundred thousand dollars in losses as a result of what they did to him.

(Tr. 1425:7-12.) Although not explicitly alluded to in the summation, this was based upon counsel's view that Sloup was entitled to multiple years of losses in gross income from

2004 to 2007. This is consistent with the post-trial submission which suggests the same: "In 2004, Plaintiffs' gross income was reduced $111,232 as compared to 2003. In 2005, Plaintiffs' gross income was reduced $159,826, as compared to 2003. In 2007, Plaintiffs' gross income was reduced $300,057 as compared to 2006, as a direct result of losing his commercial property located at 25 Degnon Blvd., the location out of which he conducted business." (Pl. Opp. at 15.) Similarly, Sloup testified to losses of gross income in response to questions during the trial. In particular, by Sloup's own admission, his gross losses were "about $115,000." (Tr. 729:19.) "Did you determine at the end of 2004 that you had a loss in gross sales from the previous year? A. Yes. Q. What was the approximate amount of that loss? A. About $115,000." (Tr. 729:15-18.) This was a loss in gross sales that does not take into account plaintiffs' expenses. (*See* Tr. 962:6-15.)

Thus, although plaintiffs suggest that the jury could have rationally awarded several hundreds of thousand of dollars in damages in lost profits, that assertion is based on the erroneous premise that (a) one looks to lost gross profits rather than net profits, and (b) plaintiff would be entitled to loss in profits not only for the months in 2004 during which the ban is in place but also for lost profits for years 2005 and 2007, when compared to profits in 2003 before the ban. Both of those positions asserted by plaintiffs are incorrect as a matter of law. As noted above, the measure of damages is clearly net income (or profits), rather than gross income. *See, e.g.*, *Martin Motor Sales, Inc. v. Saab-Scania of Am., Inc.*, 452 F. Supp. 1047, 1053 (S.D.N.Y. 1978) ("The general rule is that the measure of 'lost profits' is the net profit which is lost." (collecting cases)). Plaintiffs' gross income

versus net income differential for each year was as follows:

| Year | Gross | Net |
|------|-------|-----|
| 2002 | $312,000 | $97,781 |
| 2003 | $326,000 | $64,572 |
| 2004 | $215,000 | $33,000 |
| 2005 | $166,000 | $12,000 |
| 2006 | $330,000 | $94,000 |

Based upon the evidence at trial, even in most profitable years, plaintiffs' net income was still less than one-third of their gross. Thus, construing all the facts in a light most favorable to plaintiffs, even assuming that gross sales lost from the year 2004 were $115,000, as plaintiff testified, plaintiffs' net lost income would be roughly $36,050. Plaintiffs put forward no other evidence regarding lost profits. Any other compensatory award for plaintiffs' business losses would depend "entirely on speculation of a particularly dubious kind." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333 (2d Cir. 1993). Neither this Court nor the jury may assume, without proffered evidence, that plaintiffs' business would have been *more* lucrative in 2004 than it was in prior or subsequent years. In *Trademark Research Corp.*, the Second Circuit upheld the dismissal of part of a plaintiff's lost profits claim because it was not supported by evidence in the record. *Id.* at 329. The Circuit noted that the plaintiff, "assumed an abrupt expansion of the market for trademark search services, assumed that TRC would reverse the long decline in its market share, assumed that TRC's historically aggressive competitors would take no measures to counter TRC's ascendancy, and predicted which choices customers would make among a variety of new and old search technologies—all of these assumptions reduced to speciously exact dollar amounts

and spun out to the year 1998." *Id.* at 333. Here too, to assume that plaintiffs would have earned greater profits in 2004 than in any prior or subsequent year would be to make assumptions that plaintiffs' business would have grown significantly in that year. There was no evidence presented at trial that would justify reaching such a conclusion.

Similarly, to the extent plaintiff suggests that the jury could have rationally awarded plaintiff any lost profits in 2005 through 2007, that argument is similarly flawed. The fishing ban ended in 2004, and plaintiff began fishing again. There was no evidence from which the jury could have rationally concluded that any profits that were lost in 2005 through 2007 were proximately caused by a fishing ban that expired in or about November 2004. Although plaintiff made a conclusory reference to not being able to buy new traps in 2005 because of a shortage of money, that vague statement, in the absence of expert testimony or documentation, would be insufficient for the jury to rationally conclude that his net profits in 2005 were negatively impacted by the fishing ban that ended in 2004 (or what the amounts would be). Similarly, any residual impact clearly ended by 2006 when plaintiff made net profits of $94,000, which was his best year since he made $97,781 in 2002. Nevertheless, in an effort to justify the $1.8 million compensatory award, plaintiffs inexplicably suggest that the jury could have awarded over $300,000 in *gross* income in 2007.

In sum, although plaintiff's counsel argued that the jury could rationally award lost gross income for the years 2004, 2005, and 2007, the Court concludes that the jury could only rationally award net income (or profits) for 2004 which, by any measure, would result in a lost profits amount of less

than $50,000.

(b) Property at 25 Degnon Avenue

In his summation, plaintiff's counsel specifically argued that Frank Sloup should be entitled to at least $550,000 in equity for the building that was lost in foreclosure:

> What I'm asking you to do is send a message to Mr. Loeffler and to the Town of Islip. But the only message you can really send, besides ruling in Frank's favor with respect to the issues the judge will present to you, the questions that he will ask you, is to give him what you consider to be fair and just compensation. We're not asking that you make him a billionaire. We are asking you to consider that that building which he refinanced for $650,000 in 2002 was appraised for a million dollars in connection with that closing and that Mr. Mattimore testified about a 2007 offer for a building of $1.3 million. Even if you assume interest and penalties because of the foreclosure that he owes the bank $750,000, you have got a $550,000 in equity in that building that he has lost, we contend because of what Mr. Loeffler and the Town of Islip did to him. $550,000 in equity.

(Tr. 1424:15-1425:6.)

As a threshold issue, there is a significant issue as to whether a rational jury, given plaintiff Frank Sloup's substantial financial problems prior to the ban, could conclude that the fishing ban for several months in 2004 (and the loss of less than $50,000 in net income) proximately caused the foreclosure

on the property that began in 2005 and took place in 2007.

For example, Sloup testified, among other things, to the following: (1) when Sloup initially purchased the property for $550,000, he thought renovations to the property would cost $300,000, but such renovations ended up costing approximately $800,000; (2) after re-financing in 2002, plaintiff fell behind in his mortgage in 2003; (3) at the time of the ban in 2004, he was already behind on his mortgage payments; (4) the bank threatened to foreclose on the property; and (5) in the beginning of 2005, the bank started foreclosure on the property. (Tr. 741-48; 834-36; 897-98.) In fact, plaintiffs' counsel acknowledged in his summation, "There is no question he [Frank Sloup] took on too much debt. And what happened to him financially is not solely the responsibility of the Town of Islip or Mr. Loeffler. I never said that. They kicked this guy when he was down. This was the last straw. That's what this is about." (Tr. 1479:3-8.) Although counsel suggests that the ban was the proximate cause because it was the "last straw," there was no expert testimony, or detailed evidentiary basis, to explain why that was so. Moreover, even if the foreclosure was initiated in 2004 because of the lost net income of less than $50,000 than resulted from the ban, there was no testimony explaining why from 2005 to 2007 (during which there was no ban) plaintiff was unable to rectify the foreclosure situation before the actual sale of the property in 2007. *See, e.g.*, *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 345-46 (S.D.N.Y. 2002) (granting motion in limine to preclude evidence of damages at trial related to bankruptcy because, given the absence of expert testimony that plaintiff would have remained solvent absent the breach, damages were "highly speculative and insufficiently reliable to allow a jury to consider it").

In short, there is a significant issue as it relates to proximate cause regarding the foreclosure of the property at 25 Degnon Avenue. *See, e.g.*, *Point Prods. A.G.*, 215 F. Supp. 2d at 344 ("[I]n order to show that [defendant's] breach caused [plaintiff's] bankruptcy, plaintiff must establish a direct causal relationship. In order to hold [defendant] liable for the damages that occurred post-bankruptcy, [plaintiff] would have to show either that [defendant's] breach alone would have been sufficient to force the company to declare bankruptcy or that [plaintiff] would not have had to declare bankruptcy but for [defendant's] breach. If [plaintiff's] bankruptcy was inevitable regardless of [defendant's] breach, then [plaintiff] cannot be held responsible for that injury. The burden on [plaintiff] is to prove that [defendant's] actions forced [plaintiff] to file for bankruptcy protection.") (citation omitted); *see also Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554, 561 (Bankr. N.D. Ill. 2008) ("Plaintiff claims that the arrest and prosecution caused his company, NSA, to lose a five-year contract for security services with the CTA. . . . This claim is totally speculative. Plaintiff has put forth no evidence to demonstrate the arrest and prosecution was the legal cause of his inability to secure this contract, nor has he shown that this was a foreseeable consequence to his arrest and prosecution."); *In re Estrada*, 349 B.R. 859, 866 (N.D. Ala. 2006) ("The Plaintiff also testified that his mortgage balance increased as a result of the delayed closing caused by the Defendant. . . . However, as discussed above, we do not know if the purchase[r] withdrew his offer under the first contract and the closing was delayed because of the Defendant's conduct or if it was because of other reasons not attributable

to the Defendant. . . . Accordingly, the Court will not award damages for the delay in closing between the first contract and the second contract. To do so would be too speculative based on the evidence presented.").

However, the Court need not decide this causation issue because, even assuming *arguendo* that causation was proven, there was an insufficient evidentiary basis from which the jury could determine the plaintiff's actual loss with respect to the property after his bankruptcy and the foreclosure on the property. First, there was insufficient evidence from which the jury could actually determine the value of the property at the time of the foreclosure. Plaintiffs offered no testimony regarding the value of the property at the time of foreclosure, other than two offers to purchase the property (prior to the foreclosure) for $1.2 and $1.4 million in 2006, but those offers did not come to fruition. Those offers (which were not consummated in a sale) are insufficient evidence from which a rational jury could determine the value of the property. Moreover, even if the value of the property could be determined, there was no evidence in the record from which the jury could determine what the actual loss to plaintiff was after the bankruptcy and foreclosure sale. In other words, there was a substantial mortgage remaining on the property, but the jury did not have that amount before it. In the post-trial submissions, there is documentation that, at the time of Sloup's bankruptcy filing, the amount of the mortgage was $631,803.20 (Ex. D to Individual Defs.' Post-Trial Mot.) Moreover, the post-trial submissions note that, when the property was sold at auction, the bank purchased it back for the price of the mortgage. However, neither the amount of the mortgage, nor the sale price at the time of foreclosure, was presented to the jury at trial. In short, there was no evidentiary basis from which the jury could rationally determine the value of the property, or the actual loss of the plaintiffs from the foreclosure sale of the property in 2007. *See generally Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988) (given ongoing bankruptcy proceedings, "at this time, it is impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered by the corporation. Should they be recovered, [plaintiff] would benefit along with BAC's other creditors and its injury would decrease. As a result, the damages in this area are speculative and unprovable; any claim for relief based on the lost debt injury must therefore be dismissed without prejudice." (quotations and citations omitted)); *Tatum v. Jackson*, No. 06-cv-4290 (PGG) (GWG), 2009 WL 3633975, at *12 (S.D.N.Y. Nov. 3, 2009) ("With respect to medical expenses, it would have been unduly speculative for the jury to award [plaintiff] anything more than nominal expenses associated with transportation to medical appointments. . . . The only evidence [plaintiff] offered with respect to his actual medical expenses, however, was his testimony that his medical bills were 'somewhere in the hundred thousand dollars area' and were paid for by Medicaid. [Plaintiff's] testimony that he believed he 'would have to reimburse the state' for the Medicaid payments if he recovered money in a lawsuit was speculation and the jury could not reasonably have relied on it to find that [plaintiff] had actually suffered a compensable financial loss in the amount of $100,000 due to medical expenses.").

Moreover, there is no possible way that

the jury could have reached $1.8 million in compensatory damages without awarding substantial compensatory damages in connection with the sale of this property. Thus, there is a likelihood, given this absence of proof and the large amount of the compensatory award, that the jury may have awarded plaintiffs more than $1 million in connection with an alleged loss on the sale of that property which, given that the mortgage was for over $600,000, would result in an unjustified windfall to plaintiffs. However, at a minimum, this category of damages cannot support the $1.8 million award because an evidentiary basis did not exist from which the jury could rationally determine the value of the property and amount of the loss.[4]

<hr>

[4] Although never argued to the jury, plaintiffs suggest in the post-trial submissions that the jury also could have properly considered, in determining the amount of compensatory damages, the $800,000 expended by Sloup in renovations and equipment related to 25 Degnon Avenue. However, even if the jury did consider and include that category of damages on their own, there was an insufficient evidentiary basis for the jury to rationally consider and calculate those damages. In particular, the only evidence regarding the nature of those renovations was a cursory summary provided during Sloup's testimony – with such costs including eel tanks, an outside freezer, installation of a deck, new windows, etc. (Tr. 941-44.) Thus, it is unclear in the record as to the full extent (and individual costs) of these renovations. More importantly, although plaintiffs' counsel argues in a conclusory fashion in the post-trial submission that the equipment was rendered "valueless," it is entirely unclear from the record before the jury what happened to the equipment in terms of whether it was sold and, if so, what the loss amount was to Sloup. Therefore, there was no basis in the record from which the jury could have rationally determined the amount of any such losses related to the renovations and equipment; rather, the jury

### (c) Non-Economic Damages

In his summation, plaintiff's counsel specifically argued to the jury that Frank Sloup should be compensated for the emotional distress in 2007 (three years after the fishing ban in question), which counsel contended flowed from the eventual foreclosure on the property in 2007:

> [Frank Sloup] moves to Maryland. He's separated from Tracy. He does some landscaping and some fishing in Maryland. She waitresses in Florida. And according to this they make virtually no money. Frank described the horrible conditions under which he lived in Maryland. And I'm not going to repeat them and describe what it was like being separated from her. But I submit to you that they should be compensated for the intentional acts of Mr. Loeffler and the Town of Islip in forcing this situation, in forcing this foreclosure, the eventual, although it took two years, foreclosure of the property, getting locked out of their premises and having to try to do something completely different when he is past 60 years of age.

(Tr. 1422:2-15.) This category of damages was subsequently repeated later in the summation: "[Y]ou're entitled to compensate Mr. Sloup for what they did to him causing him to lose his business, move to Maryland, have to live under those horrible conditions, and just for the fact that he is out on the water at his age, after so many years, fishing for a

<hr>

would have had to engage in speculation and guesswork to include this category of damages. Accordingly, it cannot support the $1.8 million award.

living, starting at 5 o'clock in the morning." (Tr. 1425:13-18.)

A plaintiff may be entitled to damages for loss of enjoyment of life and other intangible injuries. Under § 1983, compensable injuries may include "not only monetary losses such as out-of-pocket expenses, but also injuries such as personal humiliation and mental anguish." *Dejesus v. Vill. of Pelham Manor*, 282 F. Supp. 2d 162, 177 (S.D.N.Y. 2003) (citing *Walz v. Town of Smithtown*, 46 F.3d 162, 169-70 (2d Cir. 1995); *Henry v. Gross*, 803 F.2d 757, 768 (2d Cir. 1986)). Non-economic damages, such as shock, anxiety, fear, and humiliation have been determined to be sufficient to establish compensatory damages in civil rights cases. *See id.* Notwithstanding the availability of such damages, the Second Circuit has held that emotional distress damages can not be established by mere subjective statements by the plaintiff, without corroboration, when the plaintiff does not indicate any physical manifestations of distress. *See Annis v. Cnty. of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998). In *Dejesus*, the court expounded upon the interpretation of *Annis* within the Second Circuit:

> District courts in this Circuit interpreting *Annis* have generally understood the Second Circuit's holding as not requiring a specific kind of support to justify emotional distress damages; but rather, have read it narrowly in the context of the Second Circuit's other precedents to hold that the holding in *Annis* is based on the particularly minimal evidence provided by the plaintiff in that case. *See Mahoney v. Canada Dry Bottling Co. of N.Y./Coors Distrib. Co. of N.Y.*, No. 94 Civ. 2924, 1998 WL 231082,

at *5 (E.D.N.Y. May 7, 1998) ("The Court is not convinced that *Annis* should be read so broadly as to preclude any award of compensatory damages for mental anguish absent corroborating testimony."); *Uddin v. N.Y. City/Admin. for Children's Servs.*, No. 99 Civ. 5843, 2001 WL 1512588, at *6 (S.D.N.Y. Nov. 28, 2001) ("[T]he *Annis* Court itself indicated that its holding was based on the nature of plaintiff's testimony, rather than the absence of corroboration, explaining that 'her testimony fails to establish that she suffers from any concrete emotional problems.'"). Moreover, district courts have held that as long as testimony points to concrete emotional problems, such testimony may suffice to justify emotional distress damages. *See Uddin*, 2001 WL 1512588, at *6 (plaintiff's testimony relating concrete emotional problems such as depression and malaise sufficient to justify award for compensable damages); *Mahoney*, 1998 WL 231082, at *5 (testimony regarding anxiety and sleeplessness for a period of three months, with some corroboration by other witnesses, sufficient to justify award of compensatory damages).

282 F. Supp. 2d at 177-78. "Despite . . . narrow interpretations of *Annis*, it is still the case that in order to justify recovery for emotional distress, [p]laintiffs must present sufficient evidence that they experienced 'concrete emotional problems' and mere subjective statements by a plaintiff concerning feelings of anguish or humiliation, without any physical effects of such distress, or corroborating evidence or other supporting

evidence, are insufficient." *Id.* at 178 (citing *Annis*, 136 F.3d at 249); *see also Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1254 (4th Cir. 1996) ("In this appeal, we express the same trepidation as our sister circuits regarding conclusory testimony with respect to the sufficiency of the evidence supporting an award of compensatory damage based on emotional distress for a constitutional violation.").

This Court instructed the jury regarding this during the charge:

> With respect to proximately caused injuries, compensatory damages can include any economic injury sustained by plaintiffs, as well as any suffering, inconvenience, loss of enjoyment of life, and other non-monetary losses that plaintiffs prove that were experienced as a consequence of the actions of a defendant.
>
> There is no requirement that evidence of the monetary value of such intangible things such as injury, pain, or suffering be introduced into evidence. There is no exact standard for figuring the compensation to be awarded for these types of damages, and no expert testimony need be introduced. Any award you make should be fair in light of the evidence presented at trial.

(Tr. 1522:16-1523:4.)

As noted above, plaintiffs' counsel argued to the jury that plaintiffs were entitled to damages for loss of enjoyment in 2007, when plaintiff was out of business and did not have a premises on which to conduct his business. (*See* Tr. 1421:20-22:15.) During that period,

Sloup moved to Maryland and was separated from his wife. He worked as a landscaper and did "some fishing in Maryland," while his wife "waitresse[d] in Florida." (Tr. 1422:3-4.) Specifically, plaintiffs' counsel argued that the jury was "entitled to compensate Mr. Sloup for what they did to him in causing him to lose his business, move to Maryland, have to live under those horrible conditions, and just for the fact that he is out on the water at his age, after so many years, fishing for a living, starting at 5 o'clock in the morning." (Tr. 1425:13-18.) However, these damages in 2007 are too attenuated to have been proximately caused by the ban in 2004.

Since civil actions under § 1983 "are analogous to state common law tort actions, serving primarily the tort objective of compensation," *Townes v. City of N.Y.*, 176 F.3d 138, 146 (2d Cir. 1999) (citation omitted), the type of damages available for a violation of § 1983 is "'determined according to principles derived from the common law of torts.'" *Id.* at 147-48 (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)). Thus, "[t]o recover compensatory damages under Section 1983, a plaintiff must prove that his injuries were proximately caused by the constitutional violation." *Tatum v. Jackson*, 668 F. Supp. 2d 584, 598 (S.D.N.Y. 2009) (quoting *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994) (internal citation omitted)). A plaintiff must "allege a tangible connection between the acts of [the] defendant[s] and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). The Court concludes that plaintiffs have not demonstrated a tangible connection between the constitutional violations by defendants in 2004 and Sloup's living situation in 2007. As a threshold matter, the Court notes that in 2006, plaintiffs had their most profitable year, earning over $330,000 in gross income.

(*See* Tr. 779:5-25; *see also* Defs.' Ex. C, Tax Summary Chart.) Plaintiffs' counsel noted this during his summation: "In '06 he is back in business. He grosses $330,000 and his net is higher than ever or just about as high as it has ever been." (Tr. 1421:6-8.) *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 93 n.14 (S.D.N.Y. 2004) ("DLJ observes that these changes, far from injuring ATI, helped it, for 'an elementary mathematical calculation demonstrates that the difference between $185 million at 11.5% and $165 million at 12.5% resulted in a net annual savings to ATI of $650,000. Moreover, . . . [DLJ] raised $190 million in total for ATI (not just $165 million), of which $25 million was not subject to debt service requirements.' These observations cast further doubt on ATI's claim that DLJ's last-minute changes to the bond offering proximately caused its bankruptcy, or indeed, injured it at all.").

Plaintiffs did not present evidence from which a rational jury could conclude that the ban on his fishing and crabbing in the harbor areas in 2004 proximately caused these personal hardships following his bankruptcy and foreclosure. "Damages must be more than a mere speculative loss, and must be shown to have been proximately caused." *Sands v. Abelli*, 290 F. Supp. 677, 681 (S.D.N.Y. 1968). Thus, plaintiff was not entitled to damages related to his bankruptcy or loss of enjoyment for the period in 2007, and no amount should be factored into the compensatory damages award for those items.

Although Sloup could recover for non-economic damages (such as emotional distress or loss of enjoyment of life) that occurred during the several month fishing ban in 2004, there was virtually no testimony or other evidence during the trial that would support such an award. First, there was no testimony that Sloup could not fish at all during the ban. To the contrary, there was testimony at trial that Sloup continued to fish in other areas despite the ban. (*See, e.g.*, Tr. 727:3-11 ("Q. What did you do to earn a living in the fall of 2004 after Mr. Remmer had the meeting with the representatives of the Town and said you can only fish in the southernmost portion of the Connetquot River, how did you make a living? A. I was fishing out in the bay doing the best I could under the circumstances in the fall. Q. Was the bay productive in the fall of '04? A. Yes."); *see also* Tr. 1408:15-17 ("He's obviously out of the harbor areas in June and through July. He is fishing in the bay during the summer.").) Thus, plaintiffs did not attempt to argue that Sloup suffered any intangible injury or loss of enjoyment during that period of the fishing ban in 2004. In fact, plaintiff explicitly stated during trial that the only non-economic damages he was seeking related to the period of time in 2007 when he lived and worked in Maryland, and was forced to be separated from his wife during that period:

> Q. Now, can you summarize what compensation, not the numbers because you've explained the tax returns and the decrease in your business, what the compensation is it that you're seeking here?
>
> A. I'm seeking compensation for loss of my business and home, loss of my customers, loss of business that took me 20 years to build to establish the customer base, loss of having to be away from my wife for six months because we couldn't afford to live together.

(Tr. 775:16-24.) Similarly, plaintiffs'

counsel's closing statement did not argue that plaintiff should be awarded damages for loss of enjoyment from fishing during the period of the ban. In short, the jury could not rationally award any significant level of damages for non-economic damages during the fishing ban and, as a matter of law, could not award such damages for events in 2007 which were not proximately caused by the constitutional violation in 2004. *See, e .g.*, *Worsham v. City of Pasadena*, 881 F.2d 1336 (5th Cir. 1989) (affirming trial court's decision to grant new trial in § 1983 lawsuit because of excessive damages and noting the following: "The only evidence of any actual damages upon which an award could have been based was Worsham's own highly speculative and unsupported testimony regarding his emotional distress and ruined reputation. After reviewing the evidence that went to the jury, [the district judge] concluded that it simply could not support a $400,000 award of actual damages.").

\* \* \*

In sum, the Court concludes that the compensatory damages awarded by the jury—$1.8 million—was grossly excessive, shocks the judicial conscience, and was a clear miscarriage of justice. Plaintiffs encouraged the jury to award damages for losses in gross income for multiple years, even though only net income for the period of the ban in 2004 was warranted under the law and the evidence. Plaintiffs further urged the jury to award compensatory damages for losses on the sale of the property at 25 Degnon Avenue even though sufficient evidence regarding the value of the property and the actual loss by the plaintiffs in the foreclosure was lacking in the record. Plaintiffs also argued to the jury that plaintiff should recover non-economic damages, not for hardships during the ban, but for hardships that occurred almost three years after the ban (following bankruptcy), even though such damages could not rationally have been proximately caused by the fishing ban. The cumulative result of these erroneous arguments was an irrational and grossly excessive award of compensatory damages. Even if the jury did not rely upon these arguments and there were no specific errors, the verdict is still grossly excessive and shocks the judicial conscience because, for all of the reasons discussed *supra*, the compensatory award cannot be justified by any rational calculation of the damages that could possibly be supported by the trial record.

The Court will now turn to an analysis as to whether the excessive award can be addressed by remittitur or whether a new trial on damages is warranted.

(3) Remittitur Issue

If the trial judge determines that the damage award is excessive as a matter of law under the above-referenced standard, the judge must next decide whether to order a new trial on damages or enter a conditional order of remittitur, which compels a plaintiff to decide whether to accept the court's proposed reduction of the excessive verdict or to opt for a new trial. *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1992). As to determining when remittitur is appropriate, the Second Circuit has explained:

[W]e have found remittitur appropriate in at least two distinct cases: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken . . . and

(2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus can be ascribed to a particular, quantifiable error."

*Trademark Research Corp.*, 995 F.2d at 337 (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)); *accord Kirsch*, 148 F.3d at 165. It is important to emphasize that "[c]rucial to the practice of remittitur in either kind of case is the requirement that the court confine its role to the removal of the excess portion of the verdict so that the 'damage calculation leaves in the judgement a portion of what the jury awarded.'" *Shu-Tao Lin*, 742 F.2d at 49 (quoting *Akermanis v. Sea-Land Serv., Inc.*, 688 F.2d 898, 902 (2d Cir. 1982)).

Remittitur, however, is not appropriate in certain circumstances, and, instead, the trial judge should simply order a new trial on damages. In particular, there are circumstances where "the size of a jury's verdict may be so excessive as to be 'inherently indicative of passion or prejudice' and to require a new trial." *Ramirez v. N.Y. City Off-Track Betting*, 112 F.3d 38, 40-41 (2d Cir. 1997) (quoting *Auster Oil & Gas, Inc. v. Stream,* 835 F.2d 597, 603 (5th Cir. 1988)). As the Second Circuit has noted, "[t]he cases in which the jury's award is seen to reflect prejudice, however, are generally limited to those in which the remittitur granted is totally out of proportion to the damages allowed by the district court." *Ramirez*, 112 F.3d at 41 (citing *Auster Oil & Gas, Inc.*, 835 F.2d at 603 (remittitur ordered in the amount of $4.35 million after jury awarded $5 million); *Wells v. Dall. Indep. Sch. Dist.*, 793 F.2d 679, 683-84 (5th Cir. 1986) (remittitur ordered in the amount of $1.65 million after jury awarded

$1.9 million)). Moreover, there are other circumstances where a new trial, rather than the remittitur, is the only option available to the trial judge. Specifically, remittitur is not warranted in a case where prejudicial error of some type infected the jury's entire consideration of the damages issue. The Second Circuit has articulated the rationale as to why remittitur is not an option in such circumstances:

These [remittitur] formulations are designed for circumstances in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award. They are not designed for a case such as the present one, in which prejudicial error has infected the jury's entire consideration of plaintiff's pecuniary loss. In such circumstances, it is impossible to preserve a portion of the jury's verdict, . . . by starting with the jury's verdict and cutting it down [as is done with remittitur]. Instead, one must proceed to calculate the damages from zero and build up. While this distinction may seem purely semantic, it is not, since building a damage award for pecuniary loss from zero up disregards the jury's verdict entirely and deprives the defendants of their right to trial by jury. We must, therefore, remand for a new trial.

*Shu-Tao Lin*, 742 F.2d at 50 (citations omitted).

With respect to whether remittitur is possible under the circumstances of this particular case, the Court concludes that it is not. As a threshold matter, this award is so far in excess of a rational award that it that

warrants a new trial on damages. In any event, the above-referenced errors in urging the jury to award certain categories or amounts of damages that were unsupportable by the law and/or the record undoubtedly infected the jury's entire determination of plaintiffs' loss. Moreover, since there was no special verdict form as to damages, it is impossible to discern whether the jury awarded any money in certain categories of damages and, if so, what the amounts were. Under these circumstances, it is impossible to preserve a portion of the jury's verdict by cutting it down by way of remittitur; rather, it would require starting from zero and trying to build up. Such an approach to remittitur is impermissible and, thus, a new trial on compensatory damages is required. *See, e.g., Oakley v. Consol. Rail Corp.*, No. 88-CV-364, 1992 WL 198087, at \*14 (N.D.N.Y. Aug. 11, 1992) ("[T]he court is convinced that the jury reached a seriously erroneous result in calculating damages for the various items listed on the jury verdict form. Because assessment of specific amounts of damages are factual rather than legal in nature, and because the court finds no feasible method through remittitur to remedy the defects in the specific damage amounts awarded by the jury, the court grants defendant's motion to set aside the damages portion of the jury verdict and hereby directs that a new trial take place on the issue of damages."); *see also Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 494 F. Supp. 505, 509 (S.D.N.Y. 1980) ("In light of the gross excessiveness and patent irrationality of the jury's award, there is no rational formula by which a remittitur could be calculated. Since the jury's verdict is so excessive as to suggest the possibility that it was the result of passion or prejudice, the court must order a new trial.").

Accordingly, defendants are entitled to a new trial to determine compensatory damages.

### (4) Punitive Damages

The individual defendants argue that punitive damages were not warranted because there was no evidence of conscious wrongdoing by either of the individual defendants, and, thus, the jury should not have been instructed on punitive damages. In the alternative, defendants argue that, even if punitive damages were warranted, the amount awarded by the jury was grossly excessive. For the reasons set forth below, the Court concludes that there was sufficient evidence of malice to have the punitive damages issue submitted to the jury. However, given that the decision on whether to award punitive damages in this case and the amount of such damages were so interwoven with the issue of compensatory damages, the Court finds that a new trial on whether punitive damages should be awarded and the amount of any such damages is warranted (along with the compensatory damages) because, *inter alia,* the jury's conclusion as to the amount of punitive damages may have been influenced by their erroneous conclusion that defendants' constitutional violations had caused massive compensatory harm to the plaintiffs in the amount of $1.8 million dollars.

### (a) Submission of Punitive Damages Issue to the Jury

Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). To be entitled to an award of punitive damages, a claimant must show a "positive element of conscious wrongdoing." *New*

*Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999) (internal quotation marks omitted)). That is, a "jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56.

As a threshold matter, the individual defendants also argue that the evidence was insufficient to justify the punitive damages charge issued in the jury charge. To warrant an instruction, "[a]ll that a party needs to show is that there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." *Cameron v. City of N.Y.*, 598 F.3d 50, 69 (2d Cir. 2010) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994)). A punitive damages instruction is appropriate when the plaintiffs have produced evidence that "the defendant's conduct is . . . motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others," or, in other words, when the plaintiffs have produced evidence of "a positive element of conscious wrongdoing" or "malice." *Id.* (quoting *New Windsor Volunteer Ambulance Corps., Inc.*, 442 F.3d at 121-22 (internal quotation marks omitted)). The evidence need only be sufficient "to permit the factfinder to infer that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference . . . ." *Meyers*, 442 F.3d at 122 (emphasis added). As discussed earlier, Sloup testified that defendant Loeffler told him: "If it's the last thing I do, I'm going to get your buoys out of this bay." (Tr. 700:6-7.)

Sloup presented additional evidence that Loeffler imposed a ban on him not for a legitimate purpose, but rather, as a result of anger or frustration toward Sloup: "We went back and forth about the situation and I told him if I move those pots, I'm going to lose my business. And it got quite heated. I said, you know, 20 years, 25 years, I'm getting robbed all the time. My pots are there seven days a week. You haven't caught one thief in 20 years. And he gets mad. Are you accusing me of not doing my job? . . . I said, no, but you haven't caught anyone in 20 years. He goes, that's it. Now, get everything out. You're done in the Town of Islip. Everything out." (Tr. 711:16-712:2.) Similarly, with respect to Pomroy, there was also evidence from which to conclude that defendant Pomroy acted with evil motive or intent, or with reckless or callous indifference to the federally protected rights of plaintiffs. It was Officer Pomroy who initially instructed Sloup to remove all of his pots from the water in June 2004. (*See* Tr. 1155:11-1156:1.) Moreover, there was testimony from Sloup that shortly after he returned his pots to the water in October 2004, he was told to remove them again by Officer Pomroy, not because they were hazards to navigation, but because they were "on Town property." (Tr. 721:11-14.) Thus, there was sufficient evidence of malice to submit the punitive damages issue to the jury. However, because the other factors regarding whether punitive damages should be awarded, as well as the amount of punitive damages, are so interwoven with grossly excessive compensatory award, a new trial on the punitive damages issue is warranted.

(b) Award of Punitive Damages

The Due Process Clause of the Fourteenth Amendment prohibits "grossly excessive or

arbitrary punishments on a tortfeasor." *State Farm Mut. Aut. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *In re Simon II Litig.*, 407 F.3d 125, 135 (2d Cir. 2006). A punitive damages award is excessive under the Constitution if it "is so high as to shock the judicial conscience and constitute a denial of justice." *DiSorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) (internal citation and quotation marks omitted). The Supreme Court requires courts reviewing the reasonableness of punitive damages to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575).

The Court need not analyze the amount of award under this multi-factor test because there is a more fundamental problem in this particular case with respect to punitive damages—namely, the fact that, in this case, the compensatory damages award is so interwoven with the award of punitive damages and the likelihood that the grossly excessive compensatory damages award may have impacted or tainted the jury's determination of the punitive damages award. In other words, a new trial on punitive damages is necessary because the jury likely based the award of punitive damages, in some part, on a desire to punish the defendants for the extraordinary harm that they believed was proximately caused by defendants. However, their calculation of the actual harm was grossly excessive and unsupported by the evidence. Thus, the jury's punitive damages award was likely tainted by its erroneous

calculation of the compensatory damages. Moreover, although not dispositive on this motion, the Court's conclusion regarding a taint in the punitive damages award is further supported by the jury note during deliberations inquiring about the issue of indemnification. Despite the Court's instruction that they could not consider (and should not speculate about) the issue of indemnification, the note, at a minimum, indicates that the jury was discussing the issue of indemnification as it related to the issue of punitive damages and raises further questions about how that punitive award was determined. These issues cannot be rectified by a remittitur under the circumstances of this case. Thus, a new trial must take place on whether punitive damages are warranted and, if so, the amount of such damages.[5]

This Court's conclusion on that issue under the circumstances of this case is consistent with decisions by other courts

---

[5] However, the Court believes that the scope of the new trial can be limited to damages, and that the liability verdict can stand, because there is no indication that (1) the liability issues were inextricably intertwined with the damages question, (2) the verdict was a result of a compromise of the liability and damage questions, or (3) the partial retrial on damages will result in the denial of justice to the defendants. *See Brooks v. Brattleboro Mem. Hosp.*, 958 F.2d 525, 531 (2d Cir. 1992); *see also Atlas Food Sys. & Serv. v. Crane Nat'l Vendors*, 99 F.3d 587 (4th Cir. 1996) ("Considerations of economy, fairness, and repose may provide justification for preserving a jury's liability determination that has been fairly and fully made and ordering only a new trial on damages where there is no substantial indication that the liability and damage issues are inextricably interwoven, or that the first jury verdict was the result of a compromise of the liability and damage questions." (quotations and citations omitted)).

under analogous circumstances. *See, e.g., Rodgers v. Fisher Body Div. Gen. Motors Corp.*, 739 F.2d 1102, 1109 (6th Cir. 1984) ("It is likely that the errors which tainted the compensatory award also affected the jury in its determination of punitive damages. While punitive damages may stand independently of compensatory, here the two are sufficiently interwoven that the interests of justice require that both issues be re-tried."); *see also Ramsey v. Am. Air Filter*, 772 F.2d 1303, 1314 (7th Cir. 1985) ("That both the trial court and this court already have construed as excessive two components of the jury's awards strengthens our conviction that the jury also improperly awarded punitive damages."). *See generally Zender v. Vlasic Foods, Inc.*, No. 94-56499, 1996 WL 406145, at *5 (9th Cir. July 19, 1996) (unpublished decision) (noting that "[b]oth federal and California law . . . generally require that the same jury determine both liability for, and the amount of, punitive damages because those questions are so interwoven" (citations omitted)).

Accordingly, in its discretion, the Court concludes, under the particular circumstances of this case, that there needs to be a new trial on both the issue of compensatory and punitive damages.

## III. CONCLUSION

For the foregoing reasons, defendants' motions to set aside the verdict, for judgment as a matter of law, and for a new trial are granted in part and denied in part. Specifically, defendants' motion for a new trial as to the compensatory damages awarded and as to punitive damages is granted. Defendants' motions for other relief are denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 30, 2010
Central Islip, New York

* * *

Plaintiff is represented by A. Craig Purcell, Esq. And Rebecca Ebbecke of Glynn Mercep and Purcell, LLP, North Country Road, P.O. Box 712, Stony Brook, NY, 11790-0712. The individual defendants are represented by Jessica D. Klotz, Esq. of Lewis, Johs, Avallone, Aviles & Kaufman, LLP, 425 Broadhollow Road, Melville, NY, 11747. The Town of Islip is represented by Erin A. Sidaras, Esq., of the Town Attorney's Office, 655 Main Street, Islip, NY, 11751.